*EXHIBIT "1"*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

PRIVILEGE WEALTH ONE LIMITED                    Chapter 15
PARTNERSHIP

    Debtor in a Foreign Proceeding.                    Case No.:

_____/

**DECLARATION OF THE FOREIGN REPRESENTATIVE IN SUPPORT OF**
**CHAPTER 15 PETITION FOR RECOGNITION OF A FOREIGN PROCEEDING**

    I, David Ingram, hereby declare as follows:

    1.    I am over the age of 18 and, if called upon, could completely testify as to all matters set forth in this statement based upon my own personal knowledge, except for those portions specified as being otherwise.

    2.    I am a Licensed Insolvency Practitioner, as defined in Section 388 of the England and Wales Insolvency Act 1986 and as defined in Sections 474 to 479 of the Gibraltar Insolvency Act 2011 ("Gibraltar Insolvency Act"). Since 2008, I have been a Partner in the firm of Grant Thornton UK LLP[1], which is an accountancy firm and I have extensive experience in asset tracing and recovery actions in foreign jurisdictions and the investigation of significant shortfalls in insolvency and fraud related cases.

---

[1] Grant Thornton UK LLP is constituted as a limited liability partnership in accordance with the Limited Liability Partnerships Act 2000 (with registered number OC307742 and with its registered office at 30 Finsbury Square, London, EC2P 2YU). Where reference is made to a 'partner' of Grant Thornton UK LLP, the term 'partner' indicates a member of Grant Thornton UK LLP or a senior employee of Grant Thornton UK LLP. It shall not be construed as indicating that the members of Grant Thornton UK LLP are carrying on business in partnership for the purposes of the Partnership Act 1890.

3.     I am one of the appointed Joint Liquidators together with Frederick White, a licensed Insolvency Practitioner and Managing Director of Grant Thornton, Gibraltar, 6A Queensway, Gibraltar ("Joint Liquidators") of the Gibraltar incorporated entity named Privilege Wealth One Limited Partnership (the "Debtor"), pursuant to the Order for Appointment of Liquidator ("Appointment Order") entered by the Supreme Court of Gibraltar ("Gibraltar Court") on June 6, 2018, in an insolvency proceeding pending in the Gibraltar Court under the Gibraltar Insolvency Act ("Gibraltar Proceeding"). A true and correct copy of the Appointment Order is attached to this Declaration as **Exhibit A**.   I have acted in the capacity as Joint Liquidator in the Gibraltar Proceeding continuously since the date of the Appointment Order.

4.     I am advised that within the meaning of Chapter 15 of the U.S. Bankruptcy Code: (i) I am the "foreign representative" the Debtor; (ii) the Debtor's center of its main interests has, at all times relevant, been in Gibraltar; and (iii) the Gibraltar Proceeding is a "Foreign Main Proceeding."

## Appointment of the Joint Liquidators

5.     On or about March 15, 2018, Richard Leclerc ("Leclerc"), a creditor of the Debtor, served and filed a Statutory Demand letter under Section 141 of the Insolvency Act ("Statutory Demand") requesting payment of money owed by the Debtor and Privilege Wealth Management Limited ("PWML") pursuant to a loan note agreement. On even date, Leclerc filed a similar written statutory demand on PWML. True and correct copies of the Statutory Demands Under Section 141 of the Insolvency Act served on the Debtor and PWML are attached as **Composite Exhibit B**.

6.     Pursuant to the Statutory Demand upon the Debtor, the Debtor had 21 days to and through April 5, 2018, to satisfy or request that the Supreme Court of Gibraltar set aside the Statutory Demand pursuant to section 142 of the Gibraltar Insolvency Act.

7.      Failure to satisfy or set aside the Statutory Demand raised the presumption that the Debtor is insolvent under Gibraltar law.

8.      The Debtor failed to satisfy or set aside the Statutory Demand by the return date.

9.      As a result, on or about May 2, 2018, Leclerc filed an application in the Supreme Court of Gibraltar, pursuant to Section 149(1)(a) of the Insolvency Act 2011, to request the appointment of joint liquidators over the Debtor and PWML on the grounds that the Debtor and PWML are insolvent. A true and correct copy of the Application for the Appointment of a Liquidator is attached hereto as **Exhibit C**. No response or objection was filed by the Debtor, PWML, or any other interested party in relation to the Application for the Appointment of a Liquidator.

10.     Three additional investors in the Debtor and PWML appeared through counsel at the June 6, 2018, hearing on Leclerc's application to appoint joint liquidators to advise the Supreme Court of Gibraltar of their support of Leclerc's application.  Those investors are Joao Campos ("Campos"), Beatrice von Richthofen ("von Richthofen"), and Inversiones y Asesorias Azevedo e Campos Ltda. ("IAAC").

11.     Together with Leclerc, Campos, von Richthofen and IAAC hold debts unsatisfied by the Debtor and PWML in the principal amounts of US$600,000 (Leclerc and Campos in USD loan notes) and £800,000 ( von Richthofen and IAAC in EUR loan notes), excluding any unpaid interest, fees, costs, etc.

12.     On June 6, 2018, the Gibraltar Court ordered the compulsory liquidation of the Debtor and PWML, and appointed the Joint Liquidators as the joint judicial liquidators pursuant to the Appointment Order. *See* Exhibit A.

## Overview of steps taken by the Joint Liquidators

13.    To date, I have diligently taken steps to gather information on the affairs of the Debtor and PWML; notify all known creditors and interested persons of the Joint Liquidators' appointment; interview persons with knowledge of the financial state and dealings of the Debtor and PWML; and work with counsel to seek to identify potential assets and claims of the Debtor, PWML, or related entities.

14.    Importantly, with the information available to date, the Joint Liquidators cannot ascertain the precise details of the funds received from creditors for the intended purpose of investment ("the Investment") in the Debtor and PWML or how the proceeds of the Investment were invested or otherwise utilized by the Debtor and PWML. The instant application for recognition in the United States is of critical importance to addressing these issues—in particular in determining the size of the Investment in USD and whether there are any claims or assets in the United States.  Moreover, recognition under Chapter 15 is essential to the Joint Liquidators' worldwide pursuit of assets with which to recover the funds received from creditors in the Debtor and PWML.

15.    Under Gibraltar insolvency law, there is no distinction applied between assets of the insolvent entity that are located within Gibraltar and such assets that are located outside Gibraltar. Thus, the Joint Liquidators are empowered to seek recovery of all assets and rights, wherever located, in settlement of an insolvent's liabilities and is duty bound to pursue assets and claims of the Debtor in the United States.

## Factual Background

16.    The Debtor was constituted and registered with The Registrar of Limited Partnerships in Gibraltar as a private limited partnership on April 24, 2013. The Debtor's

Registration Number is 093 as reflected in the Debtor's Certificate of Registration of a Limited Partnership. True and correct copies of the Application for Registration of a Limited Partnership and Certificate of Registration of a Limited Partnership are attached hereto as **Composite Exhibit D**.

17.    The Debtor's General Partner is PWML, a private limited company incorporated on April 19, 2013, under the company number 109665 as reflected in the PWML Memorandum of Association.

18.    The Debtor's most current registered address reflected in the public records is 186 Main Street, Gibraltar.  A true and correct copy of the public record reflecting the Debtor's most current principal place of business is attached as **Exhibit E**.  Additionally, the business records of the Debtor including the minutes of loan note holders dated on March 23, 2017, and Introducers Newsletters dated August 8, 2017, and September 30, 2017, respectively, reflect the Debtor's address at 186 Main Street, Gibraltar.

19.    In accordance with the Debtor's Introduction Letter and other loan instruments, the Debtor is liable for certain obligations, liabilities and debts together with PWML as referenced therein.  Copies of the Introduction Letter and certain form loan instruments issued by the Debtor jointly with PWML including the following: (1) "Series A" GBP denominations; (2) "Series B" USD denominations; and (3) "Series C" EUR denominations ("the Loan Instruments") are attached as **Composite Exhibit F.**

20.    According to the Introduction Letter, the Debtor would directly concentrate in investing into the U.S. pay-day loan and asset-backed lending sectors. The Loan Instruments also provide that the proceeds of all subscriptions for the loan notes issued to investors ("Loan Notes")

shall be used to lend funds to corporate entities trading in the payday loan industry of the United States of America.

21.     Similarly, according to the Minutes of Debtor's Loan Note Holders dated March 23, 2017, the proceeds the Loan Notes were to be used to lend funds to corporate entities operating in, and providing loans to, the consumer loan market and to purchase interests in non-performing debtors books for collection and rehabilitation of loans in the United States of America. A true and correct copy of the Minutes of Debtor's Loan Note Holders dated March 23, 2017, is attached hereto as **Exhibit G.**

22.     On or about July 2015, Privilege Wealth PLC ("PWPLC"), an affiliate of the Debtor, was registered in the United Kingdom. A true and correct copy of the Certificate of Incorporation of a Public Limited Company for PWPLC dated July 22, 2015, is attached as **Exhibit H**.

23.     On January 23, 2018, PWPLC was placed into Administration pursuant to the England and Wales Insolvency Act of 1986. John Kelmanson ("Kelmanson") and Stephen Katz ("Katz") were appointed as the Joint Administrators of PWPLC ("the Administrators"). On March 17, 2018, the Administrators filed a Notice of Administrators' Proposal in the UK Companies House summarizing the financial difficulties of PWPLC that led to its Administration. A true and correct copy of the UK Companies House report filed by the Administrators is attached hereto as **Exhibit I.**

24.     According to Appendix D of PWPLC's Notice of Administrators' Proposal, the Debtor is the largest investor of PWPLC with a claim in the amount of £28,440,125.36. As further detailed in Sections 1.1 to 1.11, the Debtor is a principal investor and had invested funds secured from its loan note holders, bondholders and investors in PWPLC ("the Investment Proceeds").

PWPLC's principal purpose was to raise funds for its overseas subsidiaries and the business model of the group was pay day loans with Oliphant Group/Oliphant Financial as a trading partner namely Oliphant Financial LLC, Oliphant Financial Group LLC, and Oliphant Funding LLC, entities incorporated or operating in Florida *See* Exhibit I, Section 1.10 and 2.

25.     On August 2, 2018, Kelmanson and Katz sought recognition of the Administration of PWPLC under Chapter 15 of the Bankruptcy Code in the District of New Jersey Bankruptcy Court. Upon information and belief, the request for recognition is presently pending.

26.     It is critical to the Joint Liquidators' investigation into the financial status and dealings of the Debtor and PWML to investigate the movement of the Investment Proceeds of the Debtor and PWML to or through US entities, as well as investigate potential claims and assets of the Debtor and PWML in the United States.

<u>**Current Position of Privilege Wealth One Limited Partnership**</u>

27.     Upon information currently available and belief, the Debtor and PWML have in excess of 80 claims from individuals and entities in various jurisdictions, including Brazil, China, Hong Kong, Mexico and the US.

28.     The liquidation of the Debtor in Gibraltar remains open and is an ongoing collective proceeding capable of making distributions to the recognized creditor body.

29.     The Joint Liquidators have reason to believe that there are potentially a number of assets worldwide directly or indirectly owned by the Debtor and PWML that may be traced including potential assets and claims located in Florida. As such, the Joint Liquidators are now focused on conducting necessary discovery and identifying said assets.

30.     The Joint Liquidators have retained Sequor Law, P.A. in Miami, Florida in connection with this matter.  In addition, Sequor Law holds in its trust account US$2,475.00

deposited by the Joint Liquidators on behalf of and for the benefit of the Debtor, to which funds Sequor Law has no rights of setoff, charging lien, or similar right.

## Why Recognition is Sought in the United States

31.    As the Joint Liquidator of the Debtor, I need to investigate the Debtor's business, affairs, and dealings, both in Gibraltar and worldwide and to reconstruct its affairs, and the detriment caused to creditors, as far back as possible.

32.    As part of this process, I need to investigate the nature and extent of any activities undertaken in the United States, and specifically in Florida, that could be related to the Debtor, its affiliates or to its assets.  Additionally, I need to investigate the possibility that assets in the United States may have been acquired using the Debtor's assets.

33.    My investigations (which are ongoing) have unearthed several connections with the United States as detailed above.

34.    Given these multiple connections to the United States, and in the event that the instant application is granted, I would hope to undertake further investigations and recover value to the extent possible, including by taking proceedings and asserting such proprietary claims as may be available to me in the United States.  I may also bring such claims against individuals or entities identified with a view to enforcing against assets in the United States, which may be the subject of tracing or other claims.

35.    Subject to the results of the investigations I plan to undertake in the United States, it will be my intention in due course to commence proceedings in the United States against third parties (whether associated individuals or affiliated corporate entities).

### Administrators in Foreign Proceedings of the Debtor

36.     As the term is defined in 11 U.S.C. 101(23) the Debtor is the subject of "foreign proceedings" pending before the Supreme Court of Gibraltar, which issued the order placing the Debtor into compulsory liquidation and appointed Mr. Frederick David John White and myself as the joint judicial liquidators. Our address in that capacity is:

> Attn: David Ingram
> Frederick David John White
> Grant Thornton UK LLP
> 30 Finsbury Square
> London, EC2P 2YU

37.     For purposes of this proceeding, I request that any correspondence be sent, in addition to the addresses provided above, to:

> Attn: Edward H. Davis, Jr.
> Leyza F. Blanco
> Sequor Law, P.A.
> 1001 Brickell Bay Drive, 9th Floor
> Miami, Florida 33131

### Parties to any U.S. Litigation in which Debtor is a Party

38.     I am not aware of any litigation pending in the United States in which the Debtor is a party.

### Statement Identifying Foreign Proceedings With Respect to the Debtor

39.     Other than the Statutory Demand and the foreign main proceeding from which the Appointment Order emanated referenced hereinabove, the Joint Liquidators are not aware of any other foreign proceedings with respect to the Debtor.

### Entities Against Whom Provisional Relief is Being Sought

40.     I may be seeking interim relief at this time against any entities under 11 U.S.C. §1519.

| | |
|---|---|
| Privilege Direct Corp. | LegalInc   Corporate   Services,   Inc., Registered Agent<br>5237 Summerlin Commons<br>Suite 400<br>Fort Myers, FL 33907<br><br>6-9 The Square<br>Stockley Park Business Park<br>Uxbridge, XX  UB11-1FW UK |
| Fintech Software Development Group Inc. | Mark Thomas Munnelly, Registered Agent<br>333 Las Olas River House<br>Unit 1910<br>Fort Lauderdale FL 33301 |
| Oliphant Financial, LLC | Corporation Service Company<br>Registered Agent<br>1201 Hays Street<br>Tallahassee, FL 32301<br><br>1800 2nd ST<br>Suite 603<br>Sarasota, FL 34236-5946<br><br>2601 Cattlemen Road<br>Suite 300<br>Sarasota, FL 34232 |
| Oliphant Financial Group, LLC | Business Filings Incorporated<br>Registered Agent<br>1200 Pine Island Road<br>Plantation, FL 33324<br><br>Corporation Service Company<br>Registered Agent<br>251 Little Falls Drive<br>Wilmington, DE 19808<br><br>9009 Town Center Parkway<br>Lakewood Ranch, FL 34202<br><br>2601 Cattlemen Road<br>Suite 300<br>Sarasota, FL 34232<br><br>With a copy to known counsel:<br>Scott D. McKay |

| | 1904 Manatee Avenue West<br>Suite 300<br>Bradenton, FL 34205 |
|---|---|
| Oliphant Financial Corporation | Corporation Service Company<br>Registered Agent<br>1201 Hays Street<br>Tallahassee, FL 32301<br><br>2601 Cattlemen Road<br>Suite 300<br>Sarasota, FL 34232<br><br>With a copy to known counsel:<br>Scott D. McKay<br>1904 Manatee Avenue West<br>Suite 300<br>Bradenton, FL 34205 |
| Oliphant Funding, LLC | Corporation Service Company<br>Registered Agent<br>1201 Hays Street<br>Tallahassee, FL 32301<br><br>9009 Town Center Parkway<br>Lakewood Ranch, FL 34202 |
| Helix Investment Management, LP | 89E Parc D'Activites<br>L-8308<br>Capellen, Luxembourg<br><br>Ernest H. Kohlmyer, III, Esq.<br>Registered Agent<br>Shepard, Smith, Kohlmyer & Hand, P.A.<br>2300 Maitland Center Parkway<br>Suite 100<br>Maitland, FL 32751<br><br>with a copy to known counsel:<br>Ernest H. Kohlmyer, III, Esq.<br>Mary Grace Dyleski<br>Rachel M. Ortiz<br>Shepard, Smith, Kohlmyer & Hand, P.A.<br>2300 Maitland Center Parkway<br>Suite 100<br>Maitland, FL 32751 |

| Privilege Wealth PLC | Stephen Katz, Joint Administrator<br>David Rubin & Partners<br>26-28 Bedford Row,<br>London WC 1R HE, England<br><br>John Kelmanson, Joint Administrator<br>KCBS LLP<br>4 Stirling Court, Stirling Way<br>Borehamwood, WD6 BT England<br><br>with a copy to known counsel:<br>Ilana Volkov<br>Cole Schotz P.C.<br>Court Plaza North, 25 Main Street<br>Hackensack, NJ 07601 |

I, David Ingram, declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that I am one of the Joint court-appointed Liquidators for Privilege Wealth One Limited Partnership and Privilege Wealth Management Limited and that, in such capacity, I have the authority to make this Statement; that I have read the foregoing Statement; and that the facts and matters alleged and contained herein are true and correct to the best of my knowledge and belief, based upon my own personal knowledge of the facts involved and upon my review of the available documents pertaining to Privilege Wealth One Limited Partnership.

Dated this ____ day of August, 2018

DAVID INGRAM
for and on behalf of Privilege Wealth One
Limited Partnership – as Joint Liquidator in
Gibraltar Proceeding

*EXHIBIT "A"*



The Insolvency Act 2011                                        Form L.11
The Insolvency Rules 2014

## Order for Appointment of Liquidator

Section 160

I hereby certify that this is a true copy of the original

Date: 26/6/18    REGISTRAR

### In the Supreme Court of Gibraltar

Case Number: **2018-COMP-023**
Name of Partnership: **Privilege Wealth One Limited Partnership**
Partnership number: 093

**Before the Honourable Mr Justice Butler sitting on the 6th day of June 2018**

**UPON THE APPLICATION OF** Richard Leclerc of Camino La Bandurria 3484, Lo Barnechea, Santiago, Chile presented to the Court in respect of the above Partnership on 6th June 2018

**AND UPON READING** the evidence filed in support of the application

**AND UPON HEARING** Mr Sebastian Triay, solicitor of Triay & Triay, solicitors for the Applicant and (1) Joao Campos; (2) Beatrice Von Richthofen; (3) Inversiones e Asesoria Azevedo e Campos Limitada.

**IT IS ORDERED** that Mr Frederick David John White of Grant Thornton Limited, 6A Queensway, Gibraltar having filed a written statement of consent and eligibility and David Ingram of Grant Thornton UK LLP of 30 Finsbury Square, London, EC2P 2YU, England having filed a consent to act, be appointed as joint liquidators of Privilege Wealth One Limited Partnership under section 160 of the Insolvency Act 2011.

And the Court being satisfied on the evidence before it that
(i) the EC insolvency Regulation does / does not apply; and
(ii) that these proceedings are *main/secondary/territorial proceedings as defined in article 3 of the regulation

**AND IT IS ORDERED** that the costs of the application be payable out of the assets of the Partnership

SUPREME COURT

★ 2 0 JUN 2018 ★

GIBRALTAR

**AND IT IS FURTHER ORDERED THAT:**

The reasonable remuneration of the Liquidators from time to time shall be payable from the assets of the Company.

REGISTRAR

***EXHIBIT "B"***

The Insolvency Act 2011

The Insolvency Rules 2014

## STATUTORY DEMAND UNDER SECTION 141 OF THE
## INSOLVENCY ACT (COMPANY)

Section 141
Rule 75

---

**Warning**

This is an important document. This demand, must be dealt with within 21 days after its service on the Limited Liability Partnership or a liquidator could be appointed for the Limited Liability Partnership and the Limited Liability Partnership placed into liquidation under the Insolvency Act 2011 ("the Act")

Please read the demand and notes carefully

---

**Demand:**

To:      Privilege Wealth One Limited Partnership (the "**Limited Liability Partnership**")

      Address:      186 Main Street, Gibraltar

1.  This demand is served on you by the Creditor (the "**Creditor**"):

      Name:      Richard Leclerc

      Address:      Camino La Bandurria 3484, Lo Barnechea, Santiago, Chile

2.  The Creditor claims that the Limited Liability Partnership owes the Creditor the sum of **US$755,546.50**[1], full particulars of which are set out in the Schedule.

3.  The Creditor demands that the Limited Liability Partnership pay the debt in full, or to secure or compound for the debt to the reasonable satisfaction of the creditor, within 21 days of the date of service of this demand on the Limited Liability Partnership.

4.  This demand is a statutory demand issued under the Insolvency Act 2011 (the "**Act**") and if this demand is not complied with, the creditor may make application to the Court for the appointment of a liquidator of the Limited Liability Partnership.

5.  Section 142 of the Act provides that a Limited Liability Partnership served with a statutory demand may apply to the Court for an order setting it aside. An application to set the demand aside must be made within 21 days of the date of service of this demand on you. The Court does not have the power to extend this period.

6.  An application to set this demand aside must be supported by an affidavit complying with rule 78(1) of the Insolvency Rules 2014.

7.  The address for service on the Creditor of any application to set this demand aside is:

      Address:      Triay & Triay, 28 Irish Town, Gibraltar

---

[1] The equivalent amount claimed in GBP is £544,350.73; as per the exchange rate adopted by the Creditor - 1 USD = 0.720473 GBP (source: www.xe.com as at 10:42 on 13th March 2017)

**8.** The following is the name, address and contact details of one or more individuals with whom you, the Limited Liability Partnership, may communicate with a view to securing or compounding for the debt to the satisfaction of the Creditor:

Name: Charles Simpson

Address: Triay & Triay, 28 Irish Town, Gibraltar

Contact details: ++350 200 72020

Signed:

Name of person signing: **SEBASTIAN TRIAY/ TRIAY & TRIAY**

Address of person signing: **28 Irish Town, Gibraltar**

Telephone number for communications concerning this demand: **++350 200 72020**

*Position with, or relationship to, creditor: **Solicitors for the Creditor**

If signed by solicitor or agent of creditor, name of firm: **Messrs Triay & Triay (a firm)**

I am authorised to make this demand on the creditor's behalf

## Schedule

Note:

1.  These particulars must include (a) when the debt was incurred, (b) the consideration for the debt (or if there is no consideration the way in which it arose) and (c) the amount due as at the date of this demand.

2.  If the amount claimed includes a charge by way of interest not previously notified to the Limited Liability Partnership as included in its liability, or any other charge accruing from time to time, the amount or rate of the charge must be separately identified and the grounds on which payment is claimed stated. Where this paragraph applies, the amount claimed must be limited to the amount that has accrued at the date of this demand.

### Particulars of Debt

1.  **On 19th March 2015, the Creditor paid US$500,000 by way of investment and subscription for Series B (USD) Loan Notes issued by Privilege One Limited Partnership and its general partner Privilege Wealth Management Limited ("the Issuers").**

2.  **The payment of US$500,000 was made to the account designated by the Issuers namely the account of FSE Law, Account Number 29534030 at LGT Bank in Vadus, Liechtenstein and the Loan Notes were duly issued by the Issuers to Mr Leclerc subject to the terms and conditions of a Deed dated 18th April 2015 and an agreed rate of 15% interest to be applied to the Capital Value of the Loan Notes (US$500,000) on an annual basis.**

3.  **By letter dated 20th May 2016 (which is attached for ease of reference) Privilege Wealth One Limited Partnership provided confirmation of the investment made together with the interest amounts to be compounded annually on 30th March each year at the rate of 15% as follows:**

| Date | Amount b/fwd (US$) | Annual Interest @15% (US$) | Amount c/fwd (US$) |
|---|---|---|---|
| 30-Mar-16 | $500,000 | $75,000 | $575,000 |
| 30-Mar-17 | $575,000 | $86,250 | $661,250 |
| 30-Mar-18 | $661,250 | $99,188 | $760,438 |
| 30-Mar-19 | $760,438 | $114,066 | $874,503 |
| 30-Mar-20 | $874,503 | $131,175 | $1,005,679 |

4.  **The Creditor has on various occasions sought redemption of the Loan Notes inclusive of their capital value (US$500,000) and accrued interest. However, the Issuers have failed to redeem the Loan Notes and are in default of payment to the Creditor of the redemption value of the same including the capital value and interest.**

5.  **As at the date of this demand namely 13th March 2018, the Issuers are liable to pay the Creditor US$661,250 (the amount carried forward to 30 March 2017) plus interest amounting to US$94,296.50 for the period 31st March 2017 to 13th March 2018. Until payment is made a daily interest rate of US$271.75 applies until the 30th March 2018. As from 31st March 2018 the daily interest rate is US$312.51 per day. Therefore, the amount due at the date of this demand (13/03/18) is US$755,546.50.**

Form G.2

The Insolvency Act 2011

The Insolvency Rules 2014

## STATUTORY DEMAND UNDER SECTION 141 OF THE
## INSOLVENCY ACT

Section 141
Rule 75

<table>
<tr><td><b>Warning</b></td></tr>
<tr><td>This is an important document.  This demand, must be dealt with within 21 days after its service on the company or a liquidator could be appointed for the company and the company placed into liquidation under the Insolvency Act 2011 ("the Act")<br><br>Please read the demand and notes carefully</td></tr>
</table>

**Demand:**

To:    Name:         Privilege Wealth Management Limited (the "**Company**")

       Address:      186 Main Street, Gibraltar

1.  This demand is served on you by the Creditor (the "**Creditor**"):

       Name:         Richard Leclerc

       Address:      Camino La Bandurria 3484, Lo Barnechea, Santiago, Chile

2.  The Creditor claims that the Company owes the Creditor the sum of **US$755,546.50[1]**, full particulars of which are set out in the Schedule.

3.  The Creditor demands that the Company pay the debt in full, or to secure or compound for the debt to the reasonable satisfaction of the creditor, within 21 days of the date of service of this demand on the Company.

4.  This demand is a statutory demand issued under the Insolvency Act 2011 (the "**Act**") and if this demand is not complied with, the creditor may make application to the Court for the appointment of a liquidator of the Company.

5.  Section 142 of the Act provides that a company served with a statutory demand may apply to the Court for an order setting it aside.  An application to set the demand aside must be made within 21 days of the date of service of this demand on you.  The Court does not have the power to extend this period.

6.  An application to set this demand aside must be supported by an affidavit complying with rule 78(1) of the Insolvency Rules 2014.

7.  The address for service on the Creditor of any application to set this demand aside is:

       Address:      Triay & Triay, 28 Irish Town, Gibraltar

---

[1] The equivalent amount claimed in GBP is £544,350.73; as per the exchange rate adopted by the Creditor - 1 USD = 0.720473 GBP (source: www.xe.com as at 10:42 on 13th March 2017)

-1-

Form G.2

8. The following is the name, address and contact details of one or more individuals with whom you, the Company, may communicate with a view to securing or compounding for the debt to the satisfaction of the Creditor:

Name:                  Charles Simpson

Address:            Triay & Triay, 28 Irish Town, Gibraltar

Contact details:      ++350 200 72020

Signed:

Name of person signing:  **SEBASTIAN TRIAY/ TRIAY & TRIAY**

Address of person signing:  **28 Irish Town, Gibraltar**

Telephone number for communications concerning this demand:  **++350 200 72020**

*Position with, or relationship to, creditor:  **Solicitors for the Creditor**

If signed by solicitor or agent of creditor, name of firm:  **Messrs Triay & Triay (a firm)**

I am authorised to make this demand on the creditor's behalf

-2-

**Schedule**

Note:

1. These particulars must include (a) when the debt was incurred, (b) the consideration for the debt (or if there is no consideration the way in which it arose) and (c) the amount due as at the date of this demand.

2. If the amount claimed includes a charge by way of interest not previously notified to the Company as included in its liability, or any other charge accruing from time to time, the amount or rate of the charge must be separately identified and the grounds on which payment is claimed stated. Where this paragraph applies, the amount claimed must be limited to the amount that has accrued at the date of this demand.

<u>**Particulars of Debt**</u>

1. **On 19th March 2015, the Creditor paid US$500,000 by way of investment and subscription for Series B (USD) Loan Notes issued by Privilege One Limited Partnership and its general partner Privilege Wealth Management Limited ("the Issuers").**

2. **The payment of US$500,000 was made to the account designated by the Issuers namely the account of FSE Law, Account Number 29534030 at LGT Bank in Vadus, Liechtenstein and the Loan Notes were duly issued by the Issuers to Mr Leclerc subject to the terms and conditions of a Deed dated 18th April 2015 and an agreed rate of 15% interest to be applied to the Capital Value of the Loan Notes (US$500,000) on an annual basis.**

3. **By letter dated 20th May 2016 (which is attached for ease of reference) Privilege Wealth One Limited Partnership provided confirmation of the investment made together with the interest amounts to be compounded annually on 30th March each year at the rate of 15% as follows:**

| Date | Amount b/fwd (US$) | Annual Interest @15% (US$) | Amount c/fwd (US$) |
|---|---|---|---|
| 30-Mar-16 | $500,000 | $75,000 | $575,000 |
| 30-Mar-17 | $575,000 | $86,250 | $661,250 |
| 30-Mar-18 | $661,250 | $99,188 | $760,438 |
| 30-Mar-19 | $760,438 | $114,066 | $874,503 |
| 30-Mar-20 | $874,503 | $131,175 | $1,005,679 |

4. **The Creditor has on various occasions sought redemption of the Loan Notes inclusive of their capital value (US$500,000) and accrued interest. However, the Issuers have failed to redeem the Loan Notes and are in default of payment to the Creditor of the redemption value of the same including the capital value and interest.**

5. **As at the date of this demand namely 13th March 2018, the Issuers are liable to pay the Creditor US$661,250 (the amount carried forward to 30 March 2017) plus interest amounting to US$94,296.50 for the period 31st March 2017 to 13th March 2018. Until payment is made a daily interest rate of US$271.75 applies until the 30th March 2018. As from 31st March 2018 the daily interest rate is US$312.51 per day. Therefore, the amount due at the date of this demand (13/03/18) is US$755,546.50.**



Richard Leclerc
Camino La Bandurria 3484,
Lo Barnechea,
Santiago
Chile

20 May 2016

Dear Richard,

Privilege Wealth's investment structure with you was a tailor made compounded investment structure. However, as this was tailor made our computer system was not able to structure this, therefore we are not able to provide new loan notes on an annual basis and are writing to you to provide further confirmation of your investment and the associated insurance coverage.

Please accept this letter as written confirmation that your current investment with us will be compounded annually at the anniversary of each investments effective date, as shown in the tables below.

At each anniversary the 95% capital cover provided by the associated insurance policy will apply to the newly capitalised amount of each investment.

| Effective Date | Amount b/fwd ($) | Annual Interest ($) | Amount c/fwd ($) |
|---|---|---|---|
| 30 March 2015 | 500,000 | 75,000 | 575,000 |
| 30 March 2016 | 575,000 | 86,250 | 661,250 |
| 30 March 2017 | 661,250 | 99,188 | 760,438 |
| 30 March 2018 | 760,438 | 114,066 | 874,503 |
| 30 March 2019 | 874,503 | 131,176 | 1,005,679 |

If you require any further information then please do not hesitate to contact us.

Yours sincerely,

Mark Munnelly
Signed on behalf Of Privilege Wealth One LP

www.PrivilegeWealthLP.com  |  Info@PrivilegeWealthLP.com
The General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO. 109665-18 and by
the power vested in the Limited Partnership Agreement acting for and on behalf of;
The Limited Partnership: Privilege Wealth One Limited Partnership. Partnership Reg. No: 093
and the General Partner's wholly owned subsidiary:
The Operating Company: Privilege Wealth Management Limited (United States of America): File No. 2291941/EIN 33-1230322
Directors: Mark Munnelly ACA (British) / Andrew J Gaudet (Canadian)
186 Main Street, Gibraltar
+44 (0) 203 582 3810



Richard Leclerc
Camino La Bandurria 3484,
Lo Barnechea,
Santiago
Chile

20 May 2016

Dear Richard,

Privilege Wealth's investment structure with you was a tailor made compounded investment structure. However, as this was tailor made our computer system was not able to structure this, therefore we are not able to provide new loan notes on an annual basis and are writing to you to provide further confirmation of your investment and the associated insurance coverage.

Please accept this letter as written confirmation that your current investment with us will be compounded annually at the anniversary of each investments effective date, as shown in the tables below.

At each anniversary the 95% capital cover provided by the associated insurance policy will apply to the newly capitalised amount of each investment.

| Effective Date | Amount b/fwd ($) | Annual Interest ($) | Amount c/fwd ($) |
|---|---|---|---|
| 30 March 2015 | 500,000 | 75,000 | 575,000 |
| 30 March 2016 | 575,000 | 86,250 | 661,250 |
| 30 March 2017 | 661,250 | 99,188 | 760,438 |
| 30 March 2018 | 760,438 | 114,066 | 874,503 |
| 30 March 2019 | 874,503 | 131,176 | 1,005,679 |

If you require any further information then please do not hesitate to contact us.

Yours sincerely,

Mark Munnelly
Signed on behalf Of Privilege Wealth One LP

The General Partner: Privilege Wealth Management Limited (Gibraltar). Company Reg. No: 109665/REID No. GICO.109665-18 and by
the power vested in the Limited Partnership Agreement acting for and on behalf of;
The Limited Partnership: Privilege Wealth One Limited Partnership. Partnership Reg. No: 093
and the General Partner's wholly owned subsidiary;
The Operating Company: Privilege Wealth Management Limited (United States of America): File No. 2291341/EIN 33-1230322
Directors: Mark Munnelly ACA (British) / Andrew J Gaudet (Canadian)
186 Main Street, Gibraltar
+44 (0) 203 582 3810

*EXHIBIT "C"*

Form L.4

The Insolvency Act 2011

The Insolvency Rules 2014

## APPLICATION FOR THE APPOINTMENT OF A LIQUIDATOR

Section 149

Rule 81

### IN THE SUPREME COURT OF GIBRALTAR

| | | | |
|---|---|---|---|
| **For Court use only** | Case Number: 2018 / Comp / 022 | | |
| **Name of Company:** | Privilege Wealth Management Limited; | | |
| **Company Number:** | 109665 | **Date of Incorporation:** | 19 April 2013 |

| | | |
|---|---|---|
| **Full Name of Applicant**: | Richard Leclerc (the "**Applicant**") | |
| **Status of Applicant:** | [ ] Company | [ ] Administrator of Company |
| *(select one box only)* | [X] Creditor | [ ] Administrative Receiver of Company |
| | [ ] Directors | [ ] Supervisor of Arrangement |
| | [ ] a director | [ ] A Liquidator (EC Insolvency Regulation) |
| | [ ] the Minister | [ ] Temporary administrator (EC Insolvency Regulation) |
| | [ ] the Commission | |

-1-

Form L.4

| | |
|---|---|
| **Address of registered office of Company:** | 186 Main Street<br><br>PO BOX 453<br><br>Gibraltar<br><br>GX11 1AA |
| **Nominal Capital:** | (a) 2,000 ORDINARY shares of GBP1.00 each; |
| **Paid up capital:** | (a) 1,000 divided into: 1,000 ORDINARY shares of GBP1.00 each; and |
| **Principal business of company:** | Investment Company |
| **Select as appropriate:** | The EC Insolvency Regulation applies, and these proceedings are: |

[X] main proceedings

*(select one box only)*

[ ] secondary proceedings

[ ] territorial proceedings

[ ] The EC Insolvency Regulation does not apply

| | |
|---|---|
| **Set out Grounds for Appointment of Liquidator:** | The application for the appointment of a liquidator is made pursuant to Section 149(1)(a) of the Insolvency Act 2011 on the ground that the Company is insolvent. |

| **Where eligible solvency practitioner proposed as liquidator:** | Name of proposed liquidator: | (1)Frederick David John White |
|---|---|---|
| | | (2)David Ingram |
| | Address of proposed liquidator: | (1)Grant Thornton Limited |
| | | 6A Queensway, Gibraltar |
| | | (2) Grant Thornton UK LLP |

Form L.4

30 Finsbury Square,

London

EC2P 2YU, England

IP Licence number        n/a
of proposed
liquidator:

To the best of the Applicant's knowledge and belief, the
proposed liquidator is eligible to act as an insolvency
practitioner in relation to the Company.

**If Applicant
relies on
failure of
Company to
comply with a
statutory
demand,
insert date of
demand:**

13th March 2018/ Served on 15th March 2018

**Applicant's
address for
services:**

Triay & Triay

28 Irish Town

Gibraltar

GX11 1AA

The following documents are attached:

[x]     affidavit in support

[x]     affidavit of service of Statutory Demand

[x]     where a liquidator is proposed a written statement
        of consent and eligibility

The Applicant applies for:

1.    the appointment of a liquidator under the provisions of the Insolvency Act 2011; **OR**

2.    the Court to make such other order as it considers appropriate.

**Insert the Company (unless the application is made by the company) and any other person to be served:**

It is intended to serve this application on:

1.    **Privilege Wealth One Limited Partnership**

186 Main Street

PO BOX 453

Gibraltar

GX11 1AA

2.    **Privilege Wealth Management Limited**

186 Main Street

PO BOX 453

Gibraltar

GX11 1AA

**Signed:**

..........................................

**Applicant/Applicant's Solicitor**

**Name of person signing:**

Triay & Triay
28 Irish Town
Gibraltar
GX11 1AA
(Ref. CS/ST/JO 17-14776)

**Position held by person signing:**

Solicitors for the Applicant

-4-

Form L.4

**Date:**                    02 May 2018

Form L.4

The Insolvency Act 2011

The Insolvency Rules 2014

## APPLICATION FOR THE APPOINTMENT OF A LIQUIDATOR

Section 229

Rule 81

### IN THE SUPREME COURT OF GIBRALTAR

| **For Court use only** | Case Number: 2018/comp/023 |
| --- | --- |
| **Name of Partnership:** | Privilege Wealth One Limited Partnership (the "**Partnership**") |

| **Partnership Number:** | 093 | **Date of Commencement:** | 24 April 2013 |
| --- | --- | --- | --- |

| **Full Name of Applicant:** | Richard Leclerc (the "**Applicant**") | |
| --- | --- | --- |
| **Status of Applicant:** | [ ] Company | [ ] Administrator of Company |
| | [X] Creditor | [ ] Administrative Receiver of Company |
| *(select one box only)* | [ ] Directors | [ ] Supervisor of Arrangement |
| | [ ] a director | [ ] A Liquidator (EC Insolvency Regulation) |
| | [ ] the Minister | [ ] Temporary administrator (EC Insolvency Regulation) |
| | [ ] the Commission | |

-1-

Form L-4

| | |
|---|---|
| **Address of registered office of Partnership:** | 186 Main Street<br>PO BOX 453<br>Gibraltar<br>GX11 1AA |
| **Nominal Capital:** | (a) N/A |
| **Paid up capital:** | (a) N/A |
| **Principal business of company:** | Investment in companies (as described in Form No LP1 - Application for Registration of a Limited Partnership) |

**Select as appropriate:**

*(select one box only)*

The EC Insolvency Regulation applies, and these proceedings are:

[X] main proceedings

[ ] secondary proceedings

[ ] territorial proceedings

[ ] The EC Insolvency Regulation does not apply

**Set out Grounds for Appointment of Liquidator:** The application for the appointment of the liquidators is made pursuant to section 229(1)(a) of the Insolvency Act 2011(as applied by section 10 of the Insolvent Partnerships Regulations 2014) on the ground the partnership is insolvent.

**Where eligible solvency practitioner proposed as liquidator:**

Name of proposed liquidator: (1) Frederick David John White

(2) David Ingram

Address of proposed liquidator: (1) Grant Thornton (Gibraltar) Limited

6A Queensway, Gibraltar

(2) Grant Thornton UK LLP

30 Finsbury Square,

London

EC2P 2YU, England

IP Licence number        n/a
of proposed
liquidator:

To the best of the Applicant's knowledge and belief, the
proposed liquidators are each eligible to act as an
insolvency practitioner in relation to the Partnership.

**If Applicant
relies on
failure of
Partnership to
comply with a
statutory
demand,
insert date of
demand:**

13th March 2018; served on 15th March 2018

**Applicant's
address for
services:**

Triay & Triay

28 Irish Town

Gibraltar

GX11 1AA

The following documents are attached:

[x]      affidavit in support

[x]      affidavit of service of Statutory Demand

[x]      where a liquidator is proposed a written statement
         of consent and eligibility

-3-

Form L.4

The Applicant applies for:

1. the appointment of Mr White and Mr Ingram as joint liquidators of the insolvent partnership as an unregistered company under the provisions of the Insolvency Act 2011;

2. For such other or further relief as the Court considers appropriate.

**Insert the Partnership (unless the application is made by the company) and any other person to be served:**

It is intended to serve this application on:

1. **Privilege Wealth One Limited Partnership**

   186 Main Street

   PO BOX 453

   Gibraltar

   GX11 1AA

2. **Privilege Wealth Management Limited**

   186 Main Street

   PO BOX 453

   Gibraltar

   GX11 1AA

**Signed:**

**Applicant/Applicant's Solicitor**

**Name of person signing:**

Triay & Triay
28 Irish Town
Gibraltar
GX11 1AA
(Ref. CS/ST/JO 17-14776)

-4-

**Position held by
person signing:**

Solicitors for the Applicant

**Date:**

2nd May 2018

Form L.4

## Endorsement

This application having been presented to the court

on ___2|5|13___ will be heard at the Supreme Court of Gibraltar

on:

Date ___12300 6 June 2013___

Time ___12 30pm___ hours

(or as soon thereafter as the petition can be heard)

The solicitor to the applicant is:-

Name_____

Address_____

_____

_____

Telephone
no_____

Reference_____

Form L.4

## Endorsement

This application having been presented to the court

on ___2|5|8___ will be heard at the Supreme Court of Gibraltar

on:

Date ___6 June 2018___

Time ___12.30PM___ hours

(or as soon thereafter as the petition can be heard)

The solicitor to the applicant is:-

Name_____

Address_____

_____

_____

Telephone
no_____

Reference_____

*EXHIBIT "D"*

1857

# Limited Partnerships Rules

### SCHEDULE

2 4 APR 2013

### FORM NO. L.P. 1 - Application for Registration of a Limited Partnership.

TO:     The Registrar of Limited Partnerships
1st Floor, The Arcade,
30-38 Main Street,
PO Box 848
Gibraltar

We the undersigned, being the partners of the firm hereby apply for Registration of a Limited Partnership, and for that purpose supply the following particulars, pursuant to Section 7 of the Limited Partnerships Act:-

1. The Firm Name. PRIVILEGE HEALTH ONE LIMITED PARTNERSHIP

2. The general nature of the business. INVESTMENT IN COMPANIES

3. The principal place of business. 31A PARLIAMENT LANE GIBRALTAR

4. The term (if any) for which the partnership is entered into ........................... years.

5. If no definite term, the conditions of existence of the partnership. UNTIL SUCH

TIME AS THE GENERAL PARTNER AND ALL

LIMITED PARTNERS AGREE TO THE TERMINATION

OF THE LIMITED PARTNERSHIP

6. Date of Commencement. 24 APRIL 2013

7. The Partnership is Limited.

8. Presented or forwarded for filing by:-

Name    CHRISTIAN TRUST COMPANY LIMITED
Address  31A PARLIAMENT LANE    GIBRALTAR

**9. Full Name  & Address of the Partners:- .**

(a) General Partners PRIVILEGE WEALTH MANAGEMENT LIMITED

31A PARLIAMENT LANE

P₂ BOX 413

GIBRALTAR

(b) Limited Partners SMOOTH OPERATIONS LIMITED

31A PARLIAMENT LANE

P₂ BOX 453

GIBRALTAR

**10. \*Amount contributed by each limited partner, and whether paid in cash, or how otherwise**

GBP 100 CASH

**Signatures of all the Partners.**

**CT Directors Limited**
DIRECTOR
PRIVILEGE WEALTH
MANAGEMENT LTD

**CT Directors Limited**
DIRECTOR
SMOOTH OPERATIONS LTD

Dated this 24 day of APRIL 2015

---

\*A separate statement (Form L.P.3) of the amounts contributed must accompany this application, for the purpose of payment of fee, pursuant to Section 10 of the Act.

# LIMITED PARTNERSHIP RULES.
## SCHEDULE

### FORM NO. L.P. 3 -  Statement of the Capital contributed by Limited Partners made under Section 10.

**TO:**   The Registrar of Limited Partnerships
1st Floor, The Arcade,
30-38 Main Street,
PO Box 848
Gibraltar

\* PRIVILEGE WEALTH ONE LIMITED PARTNERSHIP

**\* Here insert name of firm or limited partnership**

The amounts contributed in cash or otherwise by the Limited Partners

of the Firm:- \*.PRIVILEGE WEALTH ONE LIMITED PARTNERSHIP
are as follows:-

| Name & Address of Limited Partners | Amount contributed in cash or otherwise (if otherwise than in cash, that fact with particulars must be stated) |
|---|---|
| SMOOTH OPERATIONS LIMITED 31A PARLIAMENT LANE Po BOX 453 GIBRALTAR | GB/ 100 |

Signature of a general partner  P.Y. Bullock    DIRECTOR
CT DIRECTORS LIMITED
CORPORATE DIRECTOR
Dated this 24 day of APRIL    2013    PRIVILEGE WEALTH MANAGEMENT

Presented or forwarded for Registration by:-    LIMITED

Name COLINTHIAN TRUST COMPANY LIMITED
Address 31A PARLIAMENT LANE, GIBRALTAR

This statement must accompany the application For, L.P.1 for registration of a limited partnership.

  

CERTIFIED TRUE COPY

1 5 NOV 2017

BY THE REGISTRAR

# Certificate of Registration
## of a Limited Partnership

Registration number:     093

IT IS HEREBY CERTIFIED that the firm

### PRIVILEGE WEALTH ONE LIMITED PARTNERSHIP

having lodged a statement of particulars pursuant to section 7 of the
Limited Partnerships Act, is this day registered as a Limited Partnership.

Given at Gibraltar, this 30th day of April Two Thousand and Thirteen.

For and on behalf of the
Registrar of Partnerships

*EXHIBIT "E"*

Certificate Number:    **93**

*THE LIMITED PARTNERSHIPS ACT*

**Notice of Situation of Principal Place of Business or Any Change Therein**
Pursuant to Section 8

*8 1 OCT 2013*

Name of Limited Partnership       **Privilege Wealth One Limited Partnership**

Notice of the situation of the Principal Place of Business of **Privilege Wealth One Limited Partnership** or any change therein.

**Privilege Wealth One Limited Partnership** hereby gives you notice in accordance with Section 8 of the Limited Partnerships Act that the Principal Place of Business of the Limited Partnership is situated at:

> **186 Main Street**
> **PO Box 453**
> **Gibraltar**

*(Signature)*    P. J. Bullock.

*(State whether Director or Secretary)*     Paula J. Bullock
For and on behalf of
CT Directors Limited
Director of Privilege Wealth Management Limited
General Partner

Dated the    30th day of August, 2013

Presented by         Corinthian Trust Company Limited
186 Main Street, PO Box 453, Gibraltar

DOCUMENT RESUBMITTED

1 8 OCT 2013

LP000001

*EXHIBIT "F"*



# INTRODUCTION LETTER

### The Privilege Wealth One Limited Partnership

Thank you for your interest in Privilege Wealth, and we sincerely appreciate your time in reading this introduction.  Should you require any clarification upon any of the issues raised please do not hesitate to e-mail the General Partner of The Partnership at: General.Partner@PrivilegeWealthLP.com

### Corporate fact sheet

| | |
|---|---|
| **The Partnership:** | Privilege Wealth One Limited Partnership |
| | Certificate of Registration Number: 096 |
| | 186  Main Street, Gibraltar |
| | |
| **The General Partner:** | Privilege Wealth Management Limited. |
| | Company Registration Number: 109665 |
| | REID No. GICO 109665-18 |
| | 186 Main Street, Gibraltar |

### General facts about Limited Partnerships in Gibraltar:

- A Gibraltar Limited Partnership has perpetual succession and separate legal personality; therefore "body corporate" status.

- A Limited Partnership is formed by the constitution and registration of the Partnership by a number of partners.  There are two distinctly different types of partners: Limited Partners and General Partners.

- A General Partner is liable for all obligations, liabilities and debts of the Partnership

- A Limited Partner does not take part in the management, administration or control of the Partnership, but can share in the profits.

- A Limited Partner is not responsible for the obligations, liabilities and debts of the Partnership over and above the Limited Partner's share capital.

- Normally each Partnership contains one or two General Partners but a higher number of Limited Partners.

- Partnerships are registered with the Registrar of Partnerships in Gibraltar.

- Gibraltar has a territorial tax system and has no VAT or Capital Gains Tax.

- Limited Partnerships in Gibraltar are confirmed by HMRC as tax-transparent i.e.; The Partnership is not taxed on its profits as each individual Limited Partner pays their taxes in terms of their own jurisdiction and circumstances.

- Gibraltar is a dependent territory of the United Kingdom and part of the EU.

### Features and benefits of becoming a Limited Partner of a Gibraltarian Partnership:

- No hidden fund management, analyst, initial debt charges etc.  The Limited Partner receives the payments as detailed in the Loan Note and/or Fixed Term Dividend Agreement without deductions of any type.

- 100% of the Capital Value of each £10,000 Loan Note (*with a 5% deductible*) is insured against "default" and "wrongful act" risk. (*Please see Insurance Policy Document for more details*).

- The opportunity is in the form either of Loan Note or a Fixed Term Dividend Agreement (*or a hybrid of the two*) between the Limited Partner and the General Partner (*acting for and on behalf of the Partnership*) and is a closed-end 12-month contract consisting of 4 quarterly payments and the return of capital at end of term.

1

7950000572701651409385713



- A General Partner working only for the Limited Partners of the Partnership, therefore giving instant access to facts, figures and performance data.

- An extremely confidential legal and business structure.

- Incorporation services in a variety of international off-shore jurisdictions if required.

- Nominee shareholders, directors and trustees available from the Partnership's service providers if required.

- The ability to transact in USD, EUR as well as GBP.

**Business Model and Sector.**

The majority of transactions are in financial instruments that provide funding to business models that can show a minimum of 5 years sustained returns, with a diverse and broad base end-consumer; diversity offsets risk and The Partnership therefore engages in opportunities whereupon the end-user numbers are in their hundreds of thousands.  At present Privilege Wealth is concentrating on the United States Pay-Day loan and Asset-Backed lending sector.  The companies that Privilege Wealth targets all trade almost exclusively with U.S. residents who have a 2 year unbroken employment history, a thresholds credit score, and both residential and employment references.

**Risk Mitigation.**

Before funding a Corporate Borrower The Partnership takes cession of all debtor's books, assets and shareholding of the company concerned.  Share transfer certificates and Director's resignation forms are pre-signed in favour of The Partnership; financial tracking software is installed to give The Partnership a live data feed on the debtor's books, financial trends and lending statistics of the Corporate Borrower concerned.

The risk and surety calculations performed on each Corporate Borrower clearly shows an asset to liability threshold of in excess of 400% (four hundred percent), to clarify; The Partnership lends on average no more than 25% (*twenty-five percent*) of the value of any asset or debtor's book (*LTV*) that is ceded as security.

**Insurance Profile**

The General Partner secures insurance cover for and on behalf of Limited Partners, The Partnership, and trading subsidiaries of the General Partner itself. The insurance takes two basic forms:

- **BBB/IMI type cover: (***Bankers' Blanket Bond/Investment Managers' Indemnity***)**
- **SB/PB type cover: (***Surety Bond/Performance Bond***)**

100% of the Capital Value of each Loan Note (with a 5% deductible) is insured against "Default" and "Wrongful Act" by the General Partner and includes the following types of cover.

**BBB/IMI**

**Indemnity against:**
Director's or Employee's Dishonesty
Loss sustained due to illegal entry into the Partnership's premises
Loss sustained due to the theft of, or illegal use of documents in transit
Any loss sustained due to forged or fraudulent documentation
Loss due to counterfeit securities or currency
Loss sustained due to the theft at office, or malfunction of Contents thereof
Loss due to extortion
Loss of subscription rights
Loss of any funds, data, or securities placed in a safe deposit box
Loss of intellectual property causing a loss to a Limited Partner
Computer systems failure causing a loss to a Limited Partner
Any financial loss due to electronic computer instructions or transmission failure
Any financial loss due to electronic data and media loss

2

7950000572701651409385713



Loss sustained due to forged tele-facsimile or electronic mail instruction
Loss sustained by any Limited Partner due to breach of fiduciary duties
Loss sustained by any Limited Partner due to defamation.

**SB/PB**

**Indemnity against:**
Default of the US Payday Loan company, the General Partner (and Partnership) in terms of the non-payment of 100% of the principal Capital Value of each Loan Note as loaned by any Loan Note Holder or Limited Partner to the General Partner (and Partnership) as agreed and signed in any Loan Note transaction between the General Partner and the respective Limited Partner.

---

**Transaction Process**

By visiting www.PrivilegeWealthLP.com you will immediately see on the homepage a qualifying questionnaire; please complete either the left block of six questions as to your qualification criteria. or tick the box on the right signifying you are a regulated Financial Services Advisor in your own jurisdiction. The Partnership calls this the "Stage 1" agreement, and it simply signifies we are talking to qualified persons in terms of various Financial Services promotion regulations in force.

Each jurisdiction obviously has their own reasoning and logic behind their own financial regulations, and therefore it can become quite difficult to know why what is permitted in one country, is simply not in another. The Partnership has taken considerable legal and financial advice on various jurisdictional regulatory authorities or directives, including but not limited to: The Financial Conduct Authority of the United Kingdom, The Financial Services and Markets Act 2000 of the United Kingdom, The Financial Services (Investment and Fiduciary Services) Act 1989 of Gibraltar, The Financial Services (Market in Financial Instruments) Act 2006, The Financial Services (Market in Financial Instruments) Regulations 2007 and the Markets in Financial Instruments Directive of the EU. (MiFID)

The Partnership is therefore extremely cognisant of the various infractions that can result from not following strict compliance procedures. In this regard The Partnership (*and the General Partner and Limited Partners therein*) do not promote to, or accept any introduced business from, any other source than a Qualified Person, a Limited Partner or an Authorised and Regulated Financial Services Firm or Person (*The definition of each term to be found at the end of this document*); and if any Introducer is found to be breaching this agreement then such Introducer's Association Agreement shall be immediately terminated.

The Partnership understand that not all of our investors are not technologically advanced or IT literate, in this regard we provide what we call a "Wet Ink" service whereupon The Partnership will appoint an account manager to any prospective investor; the account manager will contract and transact the entire process via e-mail or even post if required.

The process is similar whether using the online or the Wet-Ink option and follows this procedure:

- Sign Stage 1:
  - NCA/NDA and Disclaimer
  - High-Net-Worth / Experienced / Sophisticated Qualifying Statement

    Or

- Sign Stage 1R:
  - Regulated and Authorised Financial Services Entity.

    And

- Receive all contractual & Statutory documentation for perusal, including:
  - Brochure detailing current opportunity.
  - Due Diligence Pack
  - Copy Insurance Policy
  - Specimen Limited Partnership Agreement
  - Generic Term Sheet
  - Specimen Loan Note
  - Specimen Fixed term Dividend Agreement
  - Specimen Payment Schedule
  - Copy of Gibraltarian Limited Partnership Act (Website link)
  - Copy of the Markets in Financial Instruments Directive (*MiFID 2004/39/EC - MiFID II is likely 2014/2015*) (*website link*)

This phase of the relationship can be achieved within less than 10 minutes online via www.PrivilegeWealthLP.com or certainly within 24 hours using our Wet-Ink service.

3

79500005727016514093885713



- Any prospective Investor, Partner or Introducer would then take legal and financial counsel (*a Closing Condition of the Generic and Transactional Term Sheets are a statement made by the prospective Investor, Partner or Introducer is that they have taken such advice*).

- At which point the prospective Investor, Partner or Introducer would make a decision as to:

  o Becoming a Limited Partner, and/or (*any party may become a Limited Partner upon acceptance by The General Partner*)

    A natural person, body corporate, trust, private or public limited company, partnership, corporation or fund are permitted to become a Limited Partner by The Partnership. The entity involved does not need to Authorised or Regulated, although The Partnership will apply strict due diligence, compliance and capital adequacy checks before authorising the appointment of a new Limited Partner.

  o Becoming an Introducer, and/or (*only certain authorised parties are permitted to become an Introducer*)

    In terms of Financial Regulations surrounding Financial Promotions, The Partners of The Partnership do not approve or except any Introducer that is not a Authorised and Regulated by the Financial Services Regulatory Authority in their own jurisdiction.

  o Entering into a Loan Note and/or (*any Qualifying Person or firm may enter into a Loan Note*)

    A prospective investor who is looking to solely invest into a Loan Note and therefore become a Loan Note Holder, can, after reading all of the Due Diligence simply into a Loan Note at a set percentage per annum paid quarterly, with return of capital at the end of the 12-month period.

  o Entering into a Fixed Term Dividend Agreement (*any Limited Partner may enter into a Fixed Term Dividend Agreement*)

    Only Limited Partners may enter into Fixed Term Dividend Agreements as essentially they are a pre-agreed profit share agreement based on injections of Share Capital.

- The essential difference between Privilege Wealth Dividend Agreements and Loan Notes are:

  o The Capital Value of a Loan Note is insured.
  o The Loan Note is a Qualifying and Regulated Financial Instrument in terms of section 21 of the UK FMSA, and is also transferable on a retail basis within the MiFID area.
  o The Partnership and a Qualifying Person or Firm can enter into an arms length Loan Note transaction without the Loan Note Holder becoming a Limited Partner of the Partnership.

  o The Partnership only enters into Dividend Agreement with its Limited Partners.
  o The return achieved on a Dividend Agreement is substantially higher that of a Loan Note as there is no insurance premium of capitalisation to subtract from the returns.

- To summarize, your two options are:

  o To simply enter into a Loan Note Transaction on:

    ▪ A Fixed Annual Interest Rate,
    ▪ paid on Fixed Quarterly Payment Dates,
    ▪ with the return of capital in 12-months,
    ▪ with the benefit of Insurance Cover on the Capital Value of the Loan Note

  o Or, to become a Limited Partner, and have the option of:

    ▪ Entering into a Loan Note transaction exactly as shown above, plus
    ▪ having the option to enter into a Fixed term Dividend Agreement at a higher rate of return, and
    ▪ having the opportunity to introduce other potential investors upon which (as a Limited Partner of the Partnership) you will make additional profit/dividends.

- Having made you decision to proceed the process is an extremely easy one;

  o If you are fairly IT literate and want to transact online, then Stage 1 (The Qualifying Process) and Stage 2 (The Limited Partnership Agreement) can be digitally signed online. Your KYC/AML/Compliance documents can be uploaded online too.

    Once accepted by the Partnership, (never more than 48 hours), you can then declare an investment value online, and the automated process will automatically e-mail you a "Transactional Term Sheet" that is legally binding upon The Partnership for a 30 day period. As long as the funds are remitted to The Partnership within the 30 day window the terms and conditions of the Transactional Term Sheet will be honoured. *(a bank MT 103 is considered proof of remittance).* Upon receipt of funds The Partnership holds the funds in Escrow for 10 days whilst KYC/AML/Compliance/Source of Funds are checked and archived; at 09.00 am on the 11th day the Loan Note is issued to you.

4

7950000572701651409385713



- 91 days from the date of Issue of the Loan Note you will receive your 1st Quarterly Interest Payment
- 182 days from the date of Issue of the Loan Note you will receive your 2nd Quarterly Interest Payment
- 273 days from the date of Issue of the Loan Note you will receive your 3rd Quarterly Interest Payment
- 364 days from the date of Issue of the Loan Note you will receive your 1st Quarterly Interest Payment AND the return of your initial principal Capital.

o   The online route is extremely simple to follow and a video tutorial is available on The Partnership's website; however, we understand some of our clients want a more personal service, and with that in mind The Partnership offers its "Wet-Ink" service.

You simply e-mail us at: General.Partner@PrivilegeWealthLP.com attaching the following documents and making the following statements:

- Copy of your passport.
- Copy of your driving licence.
- 2 x Utility bills.
- Proof of Bank account or credit card (delete appropriately).
- How much you would like to invest, and
- by way of a Loan Note of a Fixed Term Dividend Agreement.

The Partnership will e-mail you by return with a Transactional Term Sheet showing all payment dates and amounts as shown above. Once again, you will have 30 days to remit funds.

**Becoming a Limited Partner**

The Partnership's business relationships fall into two broad categories;

- **Arm's Length Transactions.**
  People that want a very simple Financial Instrument with a fixed interest rate, return of their money in 12 months, and their Capital is insured.

  Or

- **Funding Partners in a Joint Enterprise.**
  Most people will start with an Arm's Length Transaction, say a Loan Note for £500,000.00 for example; but as their trust grows, or possibly due to the fact they wish to introduce more investors to The Partnership, or maybe they just want access to a higher rate of return, they will make the decision to become a Limited Partner. The Partnership considers applications from new Limited Partners from time to time, and the criteria is as follows:

  o   £1,000.00 Share capital contribution;
  o   We need to know if you wish to become a Limited Partner in your own name, or in your company's name, or if you would like The Partnership to incorporate a new limited company in Gibraltar, or any other jurisdiction you would require.
  o   There is an immediate requirement of £100,000.00 contribution to The Partnership, and this can be achieved via a Loan Note or a Fixed term Dividend Agreement.

  Various benefits exist for Limited Partners, including access to Dividend Agreements, structured institutional lending programs and in the near future The Partnership will give access to its considerable list of repossessed assets such as boats, planes, jewellery etc.

**The General Partner**

In the legal and financial regulations surrounding Limited Partnerships; "The Limited Partnership Act 1927-07" a Limited Partnership may consist of many Limited Partners, but the administration, accounting, and day-to-day control and management of The Partnership rest with a "General Partner".

- The Board of Directors of the General Partner consists of a Chartered Accountant, an International Fund specialist, and an Attorney.

**Mr. Andrew Gaudet:**
Andrew originated and developed the initial business and arranges the loans with the underlying payday loan company borrowers. Prior to establishing Privilege Wealth, Andrew successfully negotiated and provided loans to the same borrowers. Andrew established Privilege to build on and expand on the successful investing experience. He established Privilege in Europe (Gibraltar) because of its well-respected legal framework and to accommodate the strong European demand for the Loan Notes.

Andrew has more than 15 years experience in the financial services industry, having worked in in Europe, Asia, Latin America and the Caribbean. His experience has included working with high-net-worth clients, investors and companies. Mr. Gaudet currently serves as Managing Director of Privilege Wealth. Andrew has extensive experience in debt financing and is also a director of Anglo Finance Group Ltd. a Toronto and Cayman Islands based corporate finance firm specializing in debt and equity financing. His professional experience has included

5

7950000572701651409385713



## British Pound Sterling Denominated "Series A" Loan Note Instrument

The Loan Note is only issued to certified High Net Worth persons within the meaning of Article 48 of the Financial Services and Markets Act (Financial Promotions) Order 200S (FPO) or self certified sophisticated investors within the meaning of Article SOA FPO.

The contents of this Loan Note are exempt from the provisions of S21 of the FMSA 2000 on the grounds that it is only issued to high net worth persons being persons who have complied with the provisions of Part 1 of Schedule 5 of the FPO or self certified sophisticated investors being persons who have complied with Part ii of Schedule 5 of the FPO.

## A Qualifying and Regulated Financial Instrument in terms of section 21 of the UK FMSA, transferable on a retail basis within the MiFID area.

**_ . _ %     INTEREST PER ANNUM P A I D _ . _ %    QUARTERLY**

**Contents**

*Clause*

| | | |
|---|---|---|
| 1. | Interpretation | 3 |
| 2. | Capital Value | 5 |
| 3. | Ranking | 4 |
| 4. | Use of Proceeds | 4 |
| 5. | Loan Note Certificates | 4 |
| 6. | Conditions of issue | 4 |
| 7. | Loan Notes register | 4 |
| 8. | Loan Notes not quoted | 5 |
| 9. | Enforcement | 5 |
| 10. | Set-off | 5 |
| 11. | Merger / Takeover / Adjustment | 5 |
| 12. | Third party rights | 5 |
| 13. | Governing law and jurisdiction | 5 |
| 14. | Risks & Specific Investment Risks | 5 |

Schedules

| | | |
|---|---|---|
| Schedule 1 | Loan Note Certificate | 6 |
| Schedule 2 | Interest and Redemption | 7 |
| Schedule 3 | Transfer provisions and other matters | 8 |
| Schedule 4 | Meetings of the Loan Note Holders | 9 |

www.PrivilegeWealthLP.com   I  Info@PrivilegeWealthLP.com

The General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GIC0.109665-18
and by the power vested in the Limited Partnership Agreement acting for and on behalf of;
The Limited Partnership: Privilege Wealth One Limited Partnership: Partnership Reg. No: 093.
186 Main Street, Gibraltar
+44 (0) 203 582 3810

1

**THIS DEED** is dated this _____ day of _____ / 2017

**Privilege Wealth One LP** of 186 Main Street, Gibraltar, constituted and registered with The Registrar of Partnerships in Gibraltar with registration number 093 (the "**Partnership**").

The **General Partner**: Privilege Wealth Management Limited of 186 Main Street, Gibraltar, incorporated and registered with the Registrar of Companies in Gibraltar with Company Registration Number 109665 and REID Number GICO.109665-18 (the "**General Partner**").

<span style="font-variant: small-caps">BACKGROUND</span>

By exercising the powers conferred on it in terms of The Limited Partnership Agreement, ("Stage 2") the **General Partner** of the **Partnership** has, by a resolution passed on Friday 11th July 2013, approved the issue of up to £500,000,000 (Five Hundred Million British Pounds Sterling) in aggregate value of "**Series A**" secured **Loan Notes** denominated in British Pounds Sterling ("Pounds"), and have agreed to constitute these **Series A Loan Note(s)** in the following manner.

The **Loan Notes** are issued by the **General Partner** for and on behalf of the **Partnership** in the form and on the terms and conditions set out in this Deed including the Schedules hereto.

<span style="font-variant: small-caps">AGREED TERMS</span>

1    **Interpretation**

    **The definitions and rules of interpretation in this clause 1 apply in this instrument.**

    "**Business Day**": a day (other than a Saturday, Sunday or public holiday) on which banks in the City of London are open for normal banking business.
    "**Capital Value**": the **Capital Value** of each **Series A Loan Note** of £10,000.00 (ten thousand Pounds) representing the value upon which interest is to be paid in terms of this **Series A Loan Note** instrument.
    "**Certificate**": a certificate for **Loan Note(s)** in the form set out in Schedule 1
    "**Conditions**": the conditions attaching to the **Loan Note(s)**, as set out in The Schedules
    "**Date of Issue**": 9.00 am on 11th Day anniversary of the **General Partner** receiving cleared funds into the **Partnership's** bank account; and if such day in not a Business Day, then the next **Business Day.**
    "**Event of Default**": any of the events set out in paragraph 9 of Schedule 2.
    "**General Partner**": The **General Partner** is Privilege Wealth Management Limited, 186 Main Street, Gibraltar and is registered under company number 109665.
    "**Interest Rate**": means the annual percentage interest at which the **Loan Note(s)** attracts quarterly interest payments calculated upon the **Capital Value.**
    "**Loan Note Holder Majority**": the holders of 75% (seventy-five percent) of the value held in nominal amount of the **Loan Notes** outstanding.
    "**KYC & AML Suspension Period**": the 10 (ten) day period allotted to the **General Partner**, to check and authenticate "Source of Funds", and to perform "Know Your Client" and "Anti Money-Laundering" compliance. No interest accrues during the **KYC & AML Suspension Period,** and **Loan Note** are therefore deemed to have been Issued at 9.00 am on the 11th Day following the date of this deed.
    "**Loan Note Holders**": the persons for the time being entered in the register as holders or joint holders of the **Loan Notes.**
    "**Loan Note(s)**": £10,000 (ten thousand Pounds) secured **Series A Loan Notes** constituted by this instrument or as the case may be, the **Capital Value** from time to time issued and paid up and outstanding.
    "**Insurance Policy Document**": the description of the insurance policy entered into by the **General Partner** on behalf of the **Partnership** in order to mitigate risk and protect both the **Limited Partner's** and **Partnership's** funds.
    "**Limited Partnership Agreement**": the Limited Partnership Agreement made and entered into between the **General Partner** and all Limited Partners of the **Partnership** by which the partners shall be bound and that sets out the powers and responsibilities of the **General Partner.**
    "**Quarter Dates**": the Quarterly dates after the **KYC & AML Suspension Period** upon which interest is paid in terms of this **Loan Note(s)**; being, day 91, day 182, day 273, and day 364 after the **Date of Issue**, or the next business day if that day is not a business day.
    "**Limited Partner**": A Limited Partner of the **Partnership.**
    "**Redemption Date**": has the meaning given in paragraph 8 of Schedule 2.
    "**Redemption Notice**": has the meaning as given in paragraph 10 of Schedule 2.

1.1    Any phrase introduced by the terms **including**, **include** or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.
1.2    The schedules to this instrument form part of (and are incorporated into) this instrument.
1.3    A **Person** includes a corporate or unincorporated body.
1.4    Words in the singular include the plural and vice versa.
1.5    A reference to a clause or a schedule is (unless expressly stated otherwise) a reference to a clause of, or schedule to, this instrument.
1.6    Clause and schedule headings do not affect the interpretation of this instrument.
1.7    A reference to one gender includes a reference to the other gender.

**2    Capital Value**

The Capital Value of each **Series A Loan Note** is £10,000 (ten thousand Pounds) and the maximum aggregate Capital Value amount of the **Series A Loan Notes** is £500,000,000. (five hundred million Pounds)  The minimum subscription will be £100,000 (one hundred thousand Pounds).

The maximum aggregate Capital Value amount in total of all **Series A, Series B and Series C Loan Notes** shall not exceed £2,000,000,000.00 (two billion Pounds) or the Euro or Dollar equivalent.

**3    Ranking**

**Loan Note(s)** are held in the three different trading currencies:

> Series A **Loan Notes** = Pounds (GBP)
> Series B **Loan Notes** = United States Dollar (USD)
> Series C **Loan Notes** = Euro (EUR)

Each Series **Loan Notes** shall rank pari passu, equally and rateably, with each other and pro rata to Capital Value without discrimination or preference as to other **Loan Note(s)** issued or to be issued by the Partnership.  For purposes of voting at meetings of **Loan Note Holders** and to equalize the voting rights thereof a currency weighting is applied between the different **Series** as further described in Schedule 4 paragraph 5.

**4    Use of Proceeds**

The proceeds of all subscriptions for the **Loan Notes** shall be used to lend funds to corporate entities trading in the Payday loan industry in the United States of America, and to cover the allied administration, management and insurance costs thereof.

**4.1**   The **Capital Value** of each **Series A Loan Note** is: £10,000.00 (ten thousand Pounds), and each and every **Loan Note** is risk insured to the full **Capital Value** of £10,000 (ten thousand Pounds) with a deductible of 5% (five percent), therefore covering 95% (ninety-five per cent) of all capital advances by the **Limited Partner** to the **Partnership**.

**4.2**   The insurance cover is in the form of Insurance Managers Insurance with Capital Protection providing indemnity against:

Loss incurred by a **Wrongful Act** (namely any misstatement, misleading statement, act, error, omission, neglect, breach of trust, breach of fiduciary duty or breach of regulations committed or attempted or allegedly committed or attempted by any Insured, and/or any other person for whom an Insured Entity or Fund is legally liable, while performing or failing to perform Investment Advisory Services)

Direct financial loss incurred as a result of any **Act of Infidelity** (namely any dishonest, fraudulent or malicious act committed by an Employee alone or in collusion with others with the intent of making improper financial gain for the Employee who committed such act)

Direct financial loss incurred as a result of any **Third Party Crime**

Loss of Business Income directly arising from a **Cyber Event**

Crisis Management Costs and Customer Notification Expenses following a **Security Breach**, Privacy Breach, or breach of Privacy Regulations

**Cyber Extortion** Monies paid following a Cyber Extortion Threat

Any claim from a **Loan Note Holder** arising from any **Event of Default** by the **Partnership** in repaying the full **Capital Value** of the **Loan Note(s)** upon maturity due to default by the US Payday loan companies in repaying its loan obligations to the **Partnership**.

**4.3**   In the **Event of Default** by the **Partnership** in its repayment of the **Capital Value** of the **Loan Note** to the **Loan Note Holder** upon maturity; all proceeds recovered by the **General Partner** from the loans made to corporate entities trading in the Payday loan industry in the United States of America, and all proceeds received from the Insurance Managers Insurance with Capital Shortfall Protection shall be applied solely and exclusively in the reduction of all and any outstanding proportion(s) of the **Capital Value** of the **Loan Note(s)** that were due and payable upon maturity. Such funds shall be paid directly by the **General Partner** to the **Loan Note Holder**.

**4.4**   The **General Partner** and the **Partnership** shall maintain the insurances as provided for by the Insurance Managers Insurance with Capital Protection policy as described above for the full term of the **Loan Note(s)** and for so long as the **Loan Note(s)** remains outstanding and has not been redeemed. It is agreed that this is the sole insurance cover taken out by the **Partnership** (and the **General Partner**) pertaining to this **Loan Note(s)**. The **Loan Note Holder** may have sight of the insurance policy document upon request to the **General Partner**.

**4.5**   The **Loan Note Holder** specifically accepts that all insurance cover and all and any contractual relationships with insurers and re-insurers arranged by the **Partnership** is conducted in British Pounds (GBP) and as such a positive or negative discrepancy might exist between the **Capital Value** insured and the amount paid out in terms of a Series B or Series C **Loan Note** insurance claim.

**5    Loan Note Certificates**

**5.1**   Each **Loan Note Holder,** or the joint holders of **Loan Notes,** shall be entitled to receive as part of the instrument (without charge) a Certificate executed by the **General Partner** for the amount of **Loan Notes** held by him (or them) provided that joint holders of **Loan Notes** will only be entitled to receive one Certificate in respect of their joint holding and delivery of a Certificate to the first-named joint holder set out in the register shall be sufficient delivery to all.

**5.2**   Every Certificate shall have copies of the **Loan Note(s)** endorsed on or attached to it.

**5.3**   \\There a **Loan Note Holder** transfers only part of the **Loan Notes** comprised in a Certificate, the old Certificate shall be cancelled and a new Certificate for the balance of such **Loan Notes** shall be issued without charge.

## 6   Conditions of issue

The **Loan Notes** shall be issued subject to, and with the benefit of, the Conditions fonning part of and as contained in the **Loan Note Certificate.** The Conditions shall be binding upon the **Partnership,** the **Loan Note Holders** and all persons claiming through or under them.

## 7   Loan Notes register

**7.1**   The **General Partner** shall keep, or cause to be kept, a register of the **Loan Notes** at its registered office showing:

**7.1.1**   the names and addresses of the **Loan Note Holders** for the time being of the **Loan Notes;**

**7.1.2**   the amount of the **Loan Notes** held by every **Loan Note Holder** and the principal monies paid up on them;

**7.1.3**   the date on which the name of that **Loan Note Holder** is entered in respect of the **Loan Notes** standing in his name;

**7.1.4**   the serial number of each **Certificate** issued and the date of its issue; and

**7.1.5**   the date on which a person ceased to hold the **Loan Notes.**

**7.2**   Any change of name or address of any **Note Holder** shall ilmnediately be notified to the **General Partner** and, on receipt, the register shall be altered accordingly. The **Loan Note Holders** (or any of them) and any person authorised i11 writing by any of them may, at all reasonable times during office hours, i11spect the register and to take copies of it or extracts from it. The **General Partner** may however close the register for such periods and at such times as the **General Partner** deems fit, provided that the register is not closed for more than 30 (thil-ty) Busi11ess Days in any one year.

## 8   Loan Notes not quoted

No application has been made to any listi11g authority, stock exchange or other market for the **Loan Notes** to be listed or otherwise traded however, the **General Partner** reserves the right to actively explore the possibility to seek and list the **Loan Notes** on a public market suitable for such listi11g.

## 9   Enforcement

The **Partnership** covenants with each of the **Loan Note Holders** to perform and observe the obligations in this instrument to the i11tent that this instrument shall endure for the benefit of all persons for the time being registered as holders of any **Loan Notes,** each of whom may sue for the performance and observance of the provisions of this instrument so far as his holding is concen1ed.

## 10   Set-off

Each **Loan Note Holder** shall be recognised by the **Partnership** as entitled to the **Loan Note(s)** registered in his name free from any equity, defence, set-off or cross-claim on the part of the **Partnership** against the original, or any ·intermediate, **Loan Note Holder.**

## 11   Merger/ Takeover/ Adjustment

**11.1**   The **Limited Partnership Agreement** provides that the **General Partner** cannot sell, assign, transfer, exchange, pledge, encumber or otherwise dispose of all or any part of its rights or obligations as a **General Partner** or voluntarily withdraw or resign as the **General Partner** without the sanction of a majority of the **Limited Partners.**

**11.2**   On the basis that the **General Partner** is subject to a winding up order, or an adJninistrator is appoi11ted and another **General Partner** cannot be fow1d, the **Partnership** will cease trading and a professional finn appoi11ted for this purpose will manage the remaining term of the **Loan Note.**

**11.3**   If the **Partnership** is dissolved for any reason an independent firm of auditors will be appoi11ted to contilme the administration of the **Loan Note(s)** until redemption.

## 12   Third party rights

This instrument is enforceable under the Contracts (Rights of Third Parties) Act 1999 by the **Partnership** and any **Loan Note Holder,** but not by any other person.

## 13   Governing law and jurisdiction

**13.1**   This instrument and the **LoanNote(s)** shall be governed by, and construed in accordance with, the laws of England.

**13.2**   The courts of England shall have exclusive jurisdiction to settle any dispute or claim that arises out of, or in connection with, this instrument. Accordingly, any proceeds relating to, or in connection with this instrument or the **Loan Note(s)** may be bought only i11 such courts.

---

**This section draws attention to the risks associated with the Loan Note Investment strategy.**

---

## 14   The Risks & Specific Investment Risks

While recovery of all loans made by the **Partnership** to the Payday loan companies are protected by the Insurance Policy, it is possible that any insurance claim may be partly or fully rejected on the grounds that the terms and conditions of the policy were not fully met.

In the event that a **Loan Note Holder** is not repaid the **Capital Value** of the **Loan Note** in full upon maturity, and which results in the **Partnership** claiming under the terms of the Insurance Policy to repay the **Capital Value** (or part thereof) to the **Loan Note Holder**, and if in the circumstances the Payday loan company remains unable or unwilling to repay the **Partnership**, this is likely to have a negative impact upon the cash flow and trading activities of the **General Partner**.

Date:          /          /2017                    Place:

_____

Signed, digitally stamped and executed as a Deed for and on behalf of Privilege Wealth Management Limited by Mr. Mark Munnelly ACA an authorized Director thereof:

Mr. Mark Munnelly ACA:

Witness Name:                              Witness Signature

Digital Stamp:

**Schedule 1 - Loan Note Certificate**

**Schedule 2 - Interest and Redemption**

1. Interest shall accrue on any outstanding **Loan Notes** at the rate of interest as shown in the **Loan Note Certificate** per Schedule 1 (**Interest Rate**) payable quarterly in arrears.

2. Any interest due under clause 1 abovementioned shall be payable upon the respective **Quarter Dates** in each year in which the **Loan Notes** are held.  The **General Partner** reserves the right to make the first coupon payment on the second payable **Quarter Date.**

3. Interest, if payable, shall accrue daily at the **Interest Rate** and shall be calculated on the basis of a 365-day year and the actual number of days elapsed from the date of issue of the **Loan Note(s)** to the **Redemption Date** (as defined below).

4. If the **Partnership** fails to pay the **Capital Value** on the **Redemption Date**, interest shall continue to accrue on the unpaid amount at the **Interest Rate.**

5. As and when the **Loan Notes** (or any part of them) are to be redeemed in accordance with paragraph 8 of this Schedule 2, the **Partnership** shall pay the **Loan Note Holders** the **Capital Value** of the **Loan Note(s)**, which are to be redeemed.

6. The **Partnership** shall pay all and any funds due to the **Loan Note Holder**, whether Quarterly interest payments or the refund of the **Capital Value** on the **Redemption Date** to the same bank account as the funds were received from by the **Partnership.**

7. Whenever any payment of Capital Value (or otherwise) becomes due on a day, which is not a Business Day, payment shall be made on the next following Business Day.

8. The **Loan Note(s)** will be redeemed at the **Capital Value** by the **Partnership** on the redemption date (as shown on the Transactional Term Sheet attached to this Loan Note).

9. The date and time of Issue of this **Loan Note** is 9.00 am on the morning of the 11th day after the date that cleared funds are shown as received and cleared by the **Partnership's** bankers;

10. The **Loan Notes** then in issue shall be immediately redeemed at their **Capital Value**, together with interest on the **Loan Note(s)** outstanding at the **Interest Rate**, if an **Event of Default** occurs, namely:
    a) an administration order is made in relation to the **Partnership** or
    b) an order is made, or an effective resolution is passed, for the winding-up, liquidation, administration or dissolution of the **Partnership** (except for the purpose of reorganisation or amalgamation of the **Partnership** or any of its subsidiaries); or
    c) a receiver is appointed in respect of the **Partnership** or in respect of the whole or the major part of the assets or undertaking of the **Partnership** or if distress, execution or other legal process is levied or enforced or sued out on or against the whole or the major part of the assets of the **Partnership** and is not discharged, paid out, withdrawn or removed within 21 (twenty-one) Business Days; (but an Event of Default shall not occur by reason of an encumbrance being placed on the assets of the **Partnership** or a part of the assets of the **Partnership** for purposes of a securitisation transaction for purposes of issuing additional **Loan Notes** for the **Partnership** provided such additional loan notes rank *parri passu* with the **Loan Notes**); or
    d) **The Partnership** stops (or threatens to stop) payment of its debts generally or ceases (or threatens to cease) to carry on its business or a substantial part of its business;

11. The **Partnership** shall give written notice to the **Loan Note Holders** immediately upon the **Partnership** becoming aware of the occurrence of an event specified in paragraph 10 of this Schedule 2, giving reasonable details of that event.

12. If, on redemption of a **Loan Note**, a **Loan Note Holder** fails to deliver the **Certificate** for it, or an indemnity in accordance with these Conditions or to accept payment of moneys due to him, **The Partnership** shall pay the moneys due to him into a bank account which payment shall discharge the **Partnership** from all further obligations in respect of the **Loan Note.**

13. The **Partnership** shall cancel any **Loan Notes** repaid, redeemed or transferred and shall not reissue them.

**Schedule 3 - Transfer Provisions and Other Matters**

1. The **Partnership** shall recognise the registered holder of any **Loan Note(s)** as the absolute owner of them and shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to take notice or see to the execution of any trust (whether express, implied or constructive) to which any **Loan Note** may be subject. The **Partnership** shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to enter any notice of any trust (whether express, implied or constructive) on the register in respect of any of the **Loan Notes.**

2. The **Loan Notes** are transferable in accordance with this Schedule 3 in integral multiples of £10,000 (ten thousand Pounds) by instrument in writing in the usual common form (or in such other form as the **General Partner** may approve) and such instrument need not be under seal.

3. Each instrument of transfer shall be signed by the transferor, and the transferor shall be deemed to remain the owner of the **Loan Notes** to be transferred until the name of the transferee is entered in the register in respect of such **Loan Notes.**

4. Each instrument of transfer shall be sent to, or left for registration at, the registered office of the **Partnership** for the time being, and shall be accompanied by the **Certificate(s)** for the **Loan Note(s)** to be transferred and any other evidence that the **Partnership** may require to prove the title of the transferor or his right to transfer the **Loan Note(s)** (and, if such instrument is executed by some other person on his behalf, the authority of that person to do so). All instruments of transfer that are registered may be retained by the **Partnership.**

5. No transfer of **Loan Notes** shall be registered in respect of which a **Redemption Notice** has been given.

6. Payment of the **Capital Value** and all accrued interest on the **Loan Note(s)** may be made by cheque or electronic fund transfer to the registered holder or, in the case of joint registered holders, to the one who is first-named on the register, or to such person or persons as the registered holder or all the joint registered holders may in writing direct. By default **The Partnership** will pay all payments of Capital and Interest due to a **Loan Note Holder** to the bank account from where the funds were first remitted.

7. If more than one person is entered in the register as joint holders of any **Loan Notes** then, without prejudice to paragraph 5 of this Schedule 3, the receipt of any one of such holders for any moneys payable on or in respect of the **Loan Notes** shall be as effective a discharge to **The Partnership** or other person making the payment as if the person signing such receipt were the sole registered holder of such **Loan Note(s).**

8. If any **Certificate** is worn out or defaced then, on production of it to the **General Partner**, they may cancel it and may issue a fresh **Certificate** in lieu. If any **Certificate** is lost or destroyed it may be replaced on such terms (if any) as to evidence and indemnity as the **General Partner** may reasonably require. An entry recording the issue of the new **Certificate** and indemnity (if any) shall be made in the register. No fee shall be charged for the registration of any transfer or for the registration of any probate, letters of administration, certificate of marriage or death, power of attorney or other documents relating to or effecting title to any **Loan Notes.**

9. Any notice or other document required to be given under this instrument shall be in writing and may be given to or served on any **Loan Note Holder** by sending it by first-class post in a prepaid envelope addressed to such **Loan Note Holder** at his registered address. In the case of joint **Loan Note Holders**, a notice given to, or document served on, the **Loan Note Holder** whose name stands first in the register in respect of such **Loan Note(s)** shall be sufficient notice to, or service on, all the joint **Loan Note Holders.** Any such notice sent or document served by first-class post shall be deemed to have been given or served 48 hours or 96 hours in the case of a notice or document sent to an address for a **Loan Note Holder** not in the United Kingdom after the time when it is posted and in proving such notice or service, it shall be sufficient to prove that the envelope containing the notice or document was properly addressed, stamped and posted.

10. Any notice or other document delivered or sent by post to, or left at, the registered address of any **Loan Note Holder** in pursuance of these provisions shall, notwithstanding that such **Loan Note Holder** is then dead or bankrupt or in liquidation, and whether or not the **Partnership** has notice of his death or bankruptcy or liquidation, be deemed to have been duly served or delivered in respect of any **Loan Note(s)** registered in the name of such **Loan Note Holder** as sole or first-named joint holder unless his name shall at the time of the service of the notice or document have been removed from the register as the holder of the **Loan Notes**, and such service shall for all purposes be deemed sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the **Loan Notes.**

11. A copy of this instrument shall be kept at the **Partnership's** registered office. A **Loan Note Holder** (and any person authorised by a **Loan Note Holder**) may inspect that copy of the instrument at all reasonable times during office hours.

**Schedule 4 - Meetings of the Loan Note Holders**

1.   For the purposes of Schedule 4 only, the definition of **Loan Note Holders** will constitute the combined nominal holders for all **Loan Notes.**

2.   The **General Partner** may at any time convene a meeting of **Loan Note Holders**. In addition, the **General Partner** shall at the written request of the holders of not less than one-tenth in nominal amount of the outstanding **Loan Notes** convene a meeting of the **Loan Note Holders.**  Any meeting shall be held at such place as the **General Partner** may designate.

3.   At least 14 days' notice (exclusive of the day on which the notice is served or deemed to be served and of the day for which notice is given) of every meeting shall be given to the **Loan Note Holders.**  The notice shall specify the place, day and time of the meeting and the general nature of the business to be transacted, but it shall not be necessary (except in the case of an Extraordinary Resolution) to specify in the notice the terms of any resolution to be proposed.  The accidental omission to give notice to, or the non-receipt of notice by, any of the **Loan Note Holders** shall not invalidate the proceedings at any meeting.  A meeting of the **Loan Note Holders** shall, despite being called at shorter notice than specified above, be deemed to have been duly called if it is agreed in writing by all of the **Loan Note Holders.**

4.   At any meeting the quorum shall be 2 (two) **Loan Note Holders** holding, or representing by proxy, at least 25% (twenty-five percent) in nominal amount of the value of the outstanding **Loan Notes.**  No business (other than choosing a Chairman) shall be transacted at any meeting unless the requisite quorum is present.

5.   Three Series of **Loan Notes** are issued;

        (a)     Series A issued in British Pounds

        (b)     Series B issued in United States Dollars

        (c)     Series C issued in Euro

        A currency weighting bias is utilised in order to establish equitable voting rights between the Series; each Series of **Loan Note** is apportioned a set amount of votes (the Voting Factor) for each **Loan Note** held; and any matter requiring a poll or a majority of votes shall be calculated in terms of the number of votes cast by **Loan Note Holders** in terms of the **Loan Notes** issued within a series multiplied by the Voting Factor.

        (d)     Series A voting factor = 1 Vote for each **Loan Note** held

        (e)     Series B voting factor = 0.65 of a Vote for each **Loan Note** held

        (f)     Series C voting factor = 0.80 of a Vote for each **Loan Note** held

        Thus a vote cast by a **Loan Note Holder** holding a Series A **Loan Note** shall cast 1 (one) vote, whilst a vote cast by a **Loan Note Holder** holding a Series B **Loan Note** shall cast 00.65 (point six-five) of a vote.

6.   If a quorum is not present, within half an hour from the time appointed for the meeting, the meeting shall be dissolved if it was convened on the requisition of **Loan Note Holders.**  In any other case, it shall stand adjourned to such day and time (at least 14 (fourteen) days later, but not more than 28 (twenty-eight) days later) and to such place as may be appointed by the Chairman. At such adjourned meeting, 2 (two) **Loan Note Holders** present in person (or by proxy) and entitled to vote shall constitute a quorum (whatever the nominal amount of the **Loan Notes** held by them).  At least 14 (fourteen) days' notice of any adjourned meeting of **Loan Note Holders** shall be given (in the same manner mutatis mutandis as for an original meeting). That notice shall state that 2 (two) **Loan Note Holders** present in person (or by proxy) at the adjourned meeting (whatever the nominal amount of **Loan Notes** held by them) shall form a quorum.

7.   A person (who may but need not be a **Loan Note Holder**) nominated by the **Partnership** shall be entitled to take the chair at every such meeting but, if no such person is nominated or if the person nominated is not be present at the meeting within five minutes after the time appointed for holding the meeting, the **Loan Note Holders** present shall choose one of their number to be Chairman.  Any Director or officer of, and the Secretary and solicitors of, the **Partnership** and the **General Partner** or any other person authorised in that behalf by the **Partnership** may attend at any such meeting.

8.   Each question submitted to a meeting of **Loan Note Holders** shall, unless a poll is demanded, be decided by a show of hands.

9.   At any meeting of **Loan Note Holders** unless a poll is demanded by the Chairman or by one or more **Loan Note Holders** present in person or by proxy and holding or representing in the aggregate not less than one-twentieth in nominal amount of the outstanding **Loan Notes** (before or on the declaration of the result of the show of hands), a declaration by the Chairman that a resolution has been carried by the requisite majority, lost or not carried by the requisite majority shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

10.  If a poll is duly demanded, it shall be taken in such manner and (subject as set out below) either at once or after an adjournment as the Chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.  The demand for a poll shall not prevent the meeting from continuing for the transaction of any business other than the question on which the poll has been demanded.  The demand for a poll may be withdrawn.

11.  If there is an equality of votes, whether on a show of hands or on a poll, the Chairman of the meeting shall be entitled to a casting vote in addition to the vote(s) (if any) to which he may be entitled as a **Loan Note Holder** or as a proxy.

12.  The Chairman may, with the consent of (and shall if so directed by) any meeting at which a quorum is present, adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting except business that might lawfully have been transacted at the meeting from which the adjournment took place.

13.  Any poll demanded at any meeting on the election of a Chairman, or on any question of adjournment, shall be taken at the meeting without adjournment.

14.  On a show of hands, each **Loan Note Holder** who is an individual and is present in person or (being a corporation) is present by its duly authorised representative or by one of its officers as its proxy, shall have one vote.  On a poll, each **Loan Note Holder** present in person or by proxy, shall have such number of votes for every, £10,000 (ten thousand Pounds) nominal value of **Loan Notes** held by him as set out in the currency weighting in clause 5 above, and a person entitled to more than one vote need not (if he votes) use all his votes or cast all the votes that he uses in the same way.

15.     In the case of joint registered **Loan Note Holders** any one of them shall be entitled to vote in respect of such **Loan Notes** either in person or by proxy and, in the latter case, as if the joint holder were solely entitled to such **Loan Notes.** If more than one joint holder is present at any meeting either personally or by proxy that one joint holder so present whose name as between himself and the other or others present stands first in the register as one of the joint holders shall alone be entitled to vote in person or by proxy.

**16.**    Each instrument appointing a proxy must be in writing and duly executed by the **Loan Note Holder** or his duly authorised attorney or, in the case of a corporation under its common seal or duly executed by a duly authorised attorney or officer. The Chairman may (but shall not be bound to) require evidence of the authority of any attorney or officer. A proxy need not be a **Loan Note Holder.**

17.     An instrument of proxy shall be in the usual or common form or in any other form that the Directors may accept. The proxy shall be deemed to include the right to demand or join in demanding a poll. A proxy shall, unless stated otherwise, be valid as well for any adjournment of the meeting as for the meeting to which it relates and need not be witnessed.

18.     The instrument appointing a proxy, and the power of attorney or other authority (if any) under which it is signed or a notary certified copy of such power of attorney or authority, shall be deposited at the place specified in (or in any document accompanying) the notice convening the meeting. If no such place is specified, the proxy shall be deposited at the registered office of the **Partnership** not less than 48 hours before the time appointed for holding the meeting or adjourned meeting or for taking of the poll at which the person named in that instrument proposes to vote. In default, the instrument of proxy shall not be treated as valid. A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the revocation of the proxy or of the authority under which the proxy is given, unless notification in writing of the revocation has been received at the registered office of the **Partnership** or at such other place (if any) specified for the deposit of instruments of proxy in the notice convening the meeting (or any document accompanying it) 48 (forty-eight) hours before the commencement of the meeting or adjourned meeting or the taking of the poll at which the vote is given.

19.     Without prejudice to any of the powers conferred on the **Partnership** under any of the provisions of the instrument, a meeting of the **Loan Note Holders** shall, in addition to any other powers, have the following powers exercisable by Extraordinary Resolution:

(a)     power to sanction any abrogation, modification or compromise of, or any arrangement in respect of, the **Loan Note Holders'** rights against **The Partnership**, provided the same has been previously approved in writing by the **Partnership**, whether those rights shall arise under the instrument, the **Loan Note(s)** or otherwise;

(b)     power to assent to any modification of the provisions contained in the instrument and the Conditions. Any such modification shall be proposed by the **Partnership** and to authorise the **Partnership** to execute any supplemental instrument embodying any such modification; and

(c)     power to:

(i)      having been previously approved by the **Partnership** modify the date fixed for final redemption of the **Loan Note(s);**

(ii)    reduce or cancel the principal amount payable on the **Loan Notes;**

(iii)    reduce the amount payable or modify the method of calculating the amount payable on the **Loan Note(s)**; or

(iv)    modify the dates for payment in respect of any interest, on the **Loan Notes.**

20.     An Extraordinary Resolution passed at a meeting of the **Loan Note Holders** shall be binding on all the **Loan Note Holders** whether or not they are present at the meeting. Each of the **Loan Note Holders** shall be bound to give effect to it accordingly. The passing of any such resolution shall be conclusive evidence that the circumstances justify passing it (so that the meeting may determine without appeal whether or not the circumstances justify passing it).

21.     **Extraordinary Resolution**, when used in the Conditions, means a resolution passed at a meeting of the **Loan Note Holders** duly convened and held in accordance with the Conditions.

22.     A resolution in writing signed by or on behalf of all the **Loan Note Holders** shall, for all purposes, be as valid and effectual as an Extraordinary Resolution passed at a meeting duly convened and held in accordance with the Conditions. Such resolution in writing may be contained in one document or in several documents in similar form, each signed by one or more **Loan Note Holders.**

23.     Minutes of all resolutions and proceedings at every meeting shall be made and duly entered in books to be from time to time provided for that purpose by the **Partnership**. Any minutes, if purporting to be signed by the Chairman of the meeting or by the Chairman of the next succeeding meeting of the **Loan Note Holders**, shall be conclusive evidence of the matters stated in them. Until the contrary is proved, every meeting for which minutes have been made and signed shall be deemed to have been duly held and convened, and all resolutions passed at the meeting to have been duly passed.



being the Senior Vice President-Capital Markets for Toronto and Bahamas based Seaquest Global Corp ("SGC"). His experience with SGC included the responsibility of relationships with banks, lawyers and financial partners as well as arranging syndicates for corporate finance projects. Mr. Gaudet was the Managing Director for Caribbean based Richmond Consultants, which was a corporate consulting firm that created custom structures for development and investment projects. His activities included serving as resident director for family and corporate trusts, investment banking for private offerings and initial public offerings (IPOs) and the formation of investment funds in the resource, real estate development and energy sectors.

**Mr Mark Munnelly ACA (MAAT and ICAEW)**

Mark has 10 years experience in audit and professional financial management of companies and provides the financial management and oversees the administration and reporting of the partnership

Mark has 10 years experience in both large corporate audit environments and smaller tax planning practices. Mark began with Macintyre Hudson Chartered Accountants in 2004 in the audit department. Mark subsequently moved to Baker Tilly's "large turnover" audit department and also worked within the Tax department. In 2007 Mark joined RSM Tenon, the 7th largest practice in the UK concentrating on audit and tax issues. In May 2010 - June 2013 Mark joined the HHC Partnership servicing primarily owner-managed businesses and personal tax clients. In June 2013 Mark left to concentrate his efforts on Munnelly & Dunleavy Accountants, a firm Mark co-founded in 2010 and has expanded its client base to 462 (as at today's date). Mark has had a long-standing relationship with the business and founder sponsors of Privilege Wealth and was brought in as partner of the business in 2013 to provide the financial management and administration oversight function for the business.

**Peter Stokes (BA LLB LLM) – Non – Executive Director.**

Peter qualified as a lawyer and practiced as a commercial attorney at Fairbridges in South Africa. In 2000 Peter joined The Carphone Warehouse Group PLC to assist in the successful listing of the Company, which is now in the FTSE 100. Subsequently he was responsible for managing their Venture Capital portfolio and fund-raising operations from UK institutional investors. In 2001, Peter was integrally involved in the management buy-out of the fund management company from Car Phone Warehouse to form Frontiers Capital as a founding Principal and Director. At Frontiers Capital, Peter initiated, structured, executed and managed venture capital investments. On the finalising of a merger of Frontiers with nCoTec in 2004 Peter left to focus on the Concord Group and in particular on investments in Southern Africa.

Peter was a founder investor of Concord Maritime Training, an oil and gas maritime training academy of which he currently serves as Chairman. Peter is a Director of Concord Equity, a corporate advisory firm and is also Affinity Insurance PCC Ltd. an insurance company that is regulated and authorized in Guernsey.

Recently, Concord Equity acted as senior Corporate Advisor to the General Partner of the Privilege Wealth Partnership, and due to the synergy generated and the excellent ongoing working relationship it became mutually beneficial for Peter to take a position as a Non-Executive Director to the board.

- Various specialist processes such as Compliance (*KYC/AML*), Secretarial Services, and Incorporations etc. are performed by Corinthian Trust Company Ltd. in Gibraltar. *(a regulated and authorised Financial Services Firm in Gibraltar)*
- Specialist Insurance advice is given by Affinity Insurance PCC Ltd. *(a regulated and authorised Financial services Firm in Guernsey)*
- Corporate advisors to the group are Concord Equity Ltd. of Guernsey.
- KPMG perform the audit function for The Partnership in Gibraltar.
- Morrison, Brown, Argiz & Farra - Baker Tilly International perform the audit function for the US operation.

All and any further enquiries please e-mail the General Partner at: General.Partner@PrivilegeWealthlp.com

This document sets out a general description of the Payday Loan industry in the United States and also includes general guidelines of the 12 month Loan Note/Fixed Term Dividend transaction between the General Partner and Limited Partners of Privilege Wealth One Limited Partnership; it is meant purely for qualifying prospective Limited Partners of Privilege Wealth and does not form part of, or represent, or imply any terms and conditions of any agreed contractual relationship. This document is subject to change at any time, without notice, and at the entire discretion of Privilege Wealth. All references to Insurance products are subject to policy terms and conditions at the time of issue. (The names and abbreviations of the policies are solely indicative of the type of cover provided and to which type of institutions the policies and risk cover are normally provided to, and do not in any way intend to suggest that Privilege Wealth is a Bank or Investment Manager.)

7950000572701651409385713



## U.S. Dollar Denominated "Series B" Loan Note Instrument

## A Qualifying and Regulated Financial Instrument in terms of section 21 of the UK FMSA, transferable on a retail basis within the MiFID area

_ . _ %     INTEREST PER ANNUM P A I D _ . _ %     QUARTERLY

**Contents**

*Clause*

| 1. | Interpretation | 3 |
|---|---|---|
| 2. | Capital Value | S |
| 3. | Ranking | 4 |
| 4. | Use of Proceeds | 4 |
| 5. | Loan Note Certificates | 4 |
| 6. | Conditions of issue | 4 |
| 7. | Loan Notes register | 4 |
| 8. | Loan Notes not quoted | s |
| 9. | Enforcement | S |
| 10. | Set-off | s |
| 11. | Merger / Takeover / Adjustlnent | S |
| 12. | Third party rights | S |
| 13. | Governing law and jurisdiction | S |
| 14. | Risks & Specific Investment Risks | 5 |

Schedules

| Schedule 1 | Loan Note Certificate | 6 |
|---|---|---|
| Schedule 2 | Interest and Redemption | 7 |
| Schedule 3 | Transfer provisions and other matters | 8 |
| Schedule 4 | Meetings of the Loan Note Holders | 9 |

www.PrivilegeWealthLP.com    I    Info@PrivilegeWealthLP.com
The General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GIC0.109665-18
and by the power vested in the Limited Partnership Agreement acting for and on behalf of;
The Limited Partnership: Privilege Wealth One Limited Partnership: Partnership Reg. No: 093.

186 Main Street, Gibraltar
+44 (0) 203 582 3810

1

**THIS DEED** is dated this _____ day of _____ / 2017

**Privilege Wealth One LP** of 186 Main Street, Gibraltar, constituted and registered with The Registrar of Partnerships in Gibraltar with registration number 093 (the "**Partnership**").

The **General Partner**: Privilege Wealth Management Limited of 186 Main Street, Gibraltar, incorporated and registered with the Registrar of Companies in Gibraltar with Company Registration Number 109665 and REID Number GICO.109665-18 (the "**General Partner**").

<small>BACKGROUND</small>

By exercising the powers conferred on it in terms of The Limited Partnership Agreement, ("Stage 2") the **General Partner** of the **Partnership** has, by a resolution passed on Friday 12th September 2017, approved the issue of up to $500,000,000 (Five Hundred Million Dollars) in aggregate value of "**Series B**" secured **Loan Notes** denominated in United States Dollars, and have agreed to constitute these **Series B Loan Note(s)** in the following manner.

The **Loan Notes** are issued by the **General Partner** for and on behalf of the **Partnership** in the form and on the terms and conditions set out in this Deed including the Schedules hereto.

<small>AGREED TERMS</small>

1    **Interpretation**

   **The definitions and rules of interpretation in this clause 1 apply in this instrument.**

   "**Business Day**": a day (other than a Saturday, Sunday or public holiday) on which banks in the City of London are open for normal banking business.
   "**Capital Value**": the **Capital Value** of each **Series B Loan Note** of $10,000.00 (ten thousand Dollars) representing the value upon which interest is to be paid in terms of this **Series B Loan Note** instrument
   "**Certificate**": a certificate for **Loan Note(s)** in the form set out in Schedule 1
   "**Conditions**": the conditions attaching to the **Loan Note(s)**, as set out in The Schedules
   "**Date of Issue**": 9.00 am on 11th Day anniversary of the **General Partner** receiving cleared funds into the **Partnership's** bank account; and if such day in not a Business Day, then the next **Business Day.**
   "**Event of Default**": any of the events set out in paragraph 9 of Schedule 2.
   "**General Partner**": The **General Partner** is Privilege Wealth Management Limited, 186 Main Street, Gibraltar and is registered under company number 109665.
   "**Interest Rate**": means the annual percentage interest at which the **Loan Note(s)** attracts quarterly interest payments calculated upon the **Capital Value.**
   "**Loan Note Holder Majority**": the holders of 75% (seventy-five percent) of the value held in nominal amount of the **Loan Notes** outstanding.
   "**KYC & AML Suspension Period**": the 10 (ten) day period allotted to the **General Partner**, to check and authenticate "Source of Funds", and to perform "Know Your Client" and "Anti Money-Laundering" compliance.  No interest accrues during the **KYC & AML Suspension Period,** and **Loan Note** are therefore deemed to have been Issued at 9.00 am on the 11th Day following the date of this deed.
   "**Loan Note Holders**": the persons for the time being entered in the register as holders or joint holders of the **Loan Notes.**
   "**Loan Note(s)**": $10,000 (ten thousand Dollars) secured **Series B Loan Notes** constituted by this instrument or as the case may be, the **Capital Value** from time to time issued and paid up and outstanding.
   "**Insurance Policy Document**": the description of the insurance policy entered into by the **General Partner** on behalf of the **Partnership** in order to mitigate risk and protect both the **Limited Partner's** and **Partnership's** funds.
   "**Limited Partnership Agreement**": the Limited Partnership Agreement made and entered into between the **General Partner** and all Limited Partners of the **Partnership** by which the partners shall be bound and that sets out the powers and responsibilities of the **General Partner.**
   "**Quarter Dates**": the Quarterly dates after the **KYC & AML Suspension Period** upon which interest is paid in terms of this **Loan Note(s)**; being, day 91, day 182, day 273, and day 364 after the **Date of Issue**, or the next business day if that day is not a business day.
   "**Limited Partner**": A Limited Partner of the **Partnership**.
   "**Redemption Date**": has the meaning given in paragraph 8 of Schedule 2.
   "**Redemption Notice**": has the meaning as given in paragraph 10 of Schedule 2.

1.1   Any phrase introduced by the terms **including**, **include** or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.
1.2   The schedules to this instrument form part of (and are incorporated into) this instrument.
1.3   A **Person** includes a corporate or unincorporated body.
1.4   Words in the singular include the plural and vice versa.
1.5   A reference to a clause or a schedule is (unless expressly stated otherwise) a reference to a clause of, or schedule to, this instrument.
1.6   Clause and schedule headings do not affect the interpretation of this instrument.
1.7   A reference to one gender includes a reference to the other gender.

**2    Capital Value**

The Capital Value of each **Series B Loan Note** is $10,000 (ten thousand Dollars) and the maximum aggregate Capital Value amount of the **Series B Loan Notes** is $500,000,000. (five hundred million Dollars)  The minimum subscription will be $100,000 (one hundred thousand Dollars).

The maximum aggregate Capital Value amount in total of all **Series A, Series B and Series C Loan Notes** shall not exceed £2,000,000,000.00 (two billion British Pounds) or the Euro or Dollar equivalent.

**3    Ranking**

**Loan Note(s)** are held in the three different trading currencies:

> Series A **Loan Notes** = British Pounds (GBP)
> Series B **Loan Notes** = United States Dollar (USD)
> Series C **Loan Notes** = Euro (EUR)

Each Series **Loan Notes** shall rank pari passu, equally and rateably, with each other and pro rata to Capital Value without discrimination or preference as to other **Loan Note(s)** issued or to be issued by the Partnership.  For purposes of voting at meetings of **Loan Note Holders** and to equalize the voting rights thereof a currency weighting is applied between the different **Series** as further described in Schedule 4 paragraph 5.

**4    Use of Proceeds**

The proceeds of all subscriptions for the **Loan Notes** shall be used to lend funds to corporate entities trading in the Payday loan industry in the United States of America, and to cover the allied administration, management and insurance costs thereof.

**4.1**    The **Capital Value** of each **Series B Loan Note** is: $10,000.00 (ten thousand Dollars), and each and every **Loan Note** is risk insured to the full **Capital Value** of $10,000 (ten thousand Dollars) with a deductible of 5% (five percent), therefore covering 95% (ninety-five per cent) of all capital advances by the **Limited Partner** to the **Partnership**.

**4.2**    The insurance cover is in the form of Insurance Managers Insurance with Capital Protection providing indemnity against:
> Loss incurred by a **Wrongful Act** (namely any misstatement, misleading statement, act, error, omission, neglect, breach of trust, breach of fiduciary duty or breach of regulations committed or attempted or allegedly committed or attempted by any Insured, and/or any other person for whom an Insured Entity or Fund is legally liable, while performing or failing to perform Investment Advisory Services)
> Direct financial loss incurred as a result of any **Act of Infidelity** (namely any dishonest, fraudulent or malicious act committed by an Employee alone or in collusion with others with the intent of making improper financial gain for the Employee who committed such act)
> Direct financial loss incurred as a result of any **Third Party Crime**
> Loss of Business Income directly arising from a **Cyber Event**
> Crisis Management Costs and Customer Notification Expenses following a **Security Breach**, Privacy Breach, or breach of Privacy Regulations
> **Cyber Extortion** Monies paid following a Cyber Extortion Threat
> Any claim from a **Loan Note Holder** arising from any **Event of Default** by the **Partnership** in repaying the full **Capital Value** of the **Loan Note(s)** upon maturity due to default by the US Payday loan companies in repaying its loan obligations to the **Partnership**.

**4.3**    In the **Event of Default** by the **Partnership** in its repayment of the **Capital Value** of the **Loan Note** to the **Loan Note Holder** upon maturity; all proceeds recovered by the **General Partner** from the loans made to corporate entities trading in the Payday loan industry in the United States of America, and all proceeds received from the Insurance Managers Insurance with Capital Shortfall Protection shall be applied solely and exclusively in the reduction of all and any outstanding proportion(s) of the **Capital Value** of the **Loan Note(s)** that were due and payable upon maturity. Such funds shall be paid directly by the **General Partner** to the **Loan Note Holder**.

**4.4**    The **General Partner** and the **Partnership** shall maintain the insurances as provided for by the Insurance Managers Insurance with Capital Protection policy as described above for the full term of the **Loan Note(s)** and for so long as the **Loan Note(s)** remains outstanding and has not been redeemed. It is agreed that this is the sole insurance cover taken out by the **Partnership** (and the **General Partner**) pertaining to this **Loan Note(s)**. The **Loan Note Holder** may have sight of the insurance policy document upon request to the **General Partner**.

**4.5**    The **Loan Note Holder** specifically accepts that all insurance cover and all and any contractual relationships with insurers and re-insurers arranged by the **Partnership** is conducted in British Pounds (GBP) and as such a positive or negative discrepancy might exist between the **Capital Value** insured and the amount paid out in terms of a Series B or Series C **Loan Note** insurance claim.

**5    Loan Note Certificates**

3

**5.1** Each **Loan Note Holder,** or the joint holders of **Loan Notes,** shall be entitled to receive as part of the instrument (without charge) a Certificate executed by the **General Partner** for the amount of **Loan Notes** held by him (or them) provided that joint holders of **Loan Notes** will only be entitled to receive one Certificate in respect of their joint holding and delivery of a Certificate to the first-named joint holder set out in the register shall be sufficient delivery to all.

**5.2** Every Certificate shall have copies of the **Loan Note(s)** endorsed on or attached to it.

**5.3** \\There a **Loan Note Holder** transfers only part of the **Loan Notes** comprised in a Certificate, the old Certificate shall be cancelled and a new Certificate for the balance of such **Loan Notes** shall be issued without charge.

**6   Conditions o fissue**

The **Loan Notes** shall be issued subject to, and with the benefit of, the Conditions fonning part of and as contained in the **Loan Note Certificate.** The Conditions shall be binding upon the **Partnership,** the **Loan Note Holders** and all persons claiming through or under them.

**7   Loan Notes register**

**7.1** The **General Partner** shall keep, or cause to be kept, a register of the **Loan Notes** at its registered office showing:

**7.1.1** the names and addresses of the **Loan Note Holders** for the time being of the **Loan Notes;**

**7.1.2** the amount of the **Loan Notes** held by every **Loan Note Holder** and the principal monies paid up on them;

**7.1.3** the date on which the name of that **Loan Note Holder** is entered in respect of the **Loan Notes** standing in his name;

**7.1.4** the serial number of each **Certificate** issued and the date of its issue; and

**7.1.5** the date on which a person ceased to hold the **Loan Notes.**

**7.2** Any change of name or address of any **Note Holder** shall ilmnediately be notified to the **General Partner** and, on receipt, the register shall be altered accordingly. The **Loan Note Holders** (or any of them) and any person authorised i11 writing by any of them may, at all reasonable times during office hours, i11spect the register and to take copies of it or extracts from it. The **General Partner** may however close the register for such periods and at such times as the **General Partner** deems fit, provided that the register is not closed for more than 30 (thil-ty) Busi11ess Days in any one year.

**8   Loan Notes not quoted**

No application has been made to any listi11g authority, stock exchange or other market for the **Loan Notes** to be listed or otherwise traded however, the **General Partner** reserves the right to actively explore the possibility to seek and list the **Loan Notes** on a public market suitable for such listi11g.

**9   Enforcement**

The **Partnership** covenants with each of the **Loan Note Holders** to perform and observe the obligations in this instrument to the i11tent that this instrument shall endure for the benefit of all persons for the time being registered as holders of any **Loan Notes,** each of whom may sue for the performance and observance of the provisions of this i11strument so far as his holdil1g is concen1ed.

**10   Set-off**

Each **Loan Note Holder** shall be recognised by the **Partnership** as entitled to the **Loan Note(s)** registered in his name free from any equity, defence, set-off or cross-claim on the part of the **Partnership** against the original, or any ·intermediate, **Loan Note Holder.**

**11   Merger/ Takeover/ Adjustment**

**11.1** The **Limited Partnership Agreement** provides that the **General Partner** cannot sell, assign, transfer, exchange, pledge, encumber or otherwise dispose of all or any part of its rights or obligations as a **General Partner** or voluntarily withdraw or resign as the **General Partner** without the sanction of a majority of the **Limited Partners.**

**11.2** On the basis that the **General Partner** is subject to a winding up order, or an ad]ninistrator is appoi11ted and another **General Partner** cannot be fow1d, the **Partnership** will cease trading and a professional firm appoi11ted for this purpose will manage the remaining term of the **Loan Note.**

**11.3** If the **Partnership** is dissolved for any reason an independent firm of auditors will be appoi11ted to contilme the administration of the **Loan Note(s)** until redemption.

**12   Third party rights**

This instrument is enforceable under the Contracts (Rights of Third Parties) Act 1999 by the **Partnership** and any **Loan Note Holder,** but not by any other person.

**13   Governing law and jurisdiction**

**13.1** This instrument and the **LoanNote(s)** shall be governed by, and construed in accordance with, the laws of England.

**13.2** The courts of England shall have exclusive jurisdiction to settle any dispute or claim that arises out of, or in connection with, this instrument. Accordingly, any proceeds relating to, or in connection with this instrument or the **Loan Note(s)** may be bought only i11 such courts.

| This section draws attention to the risks associated with the Loan Note Investment strategy. |
| --- |

**14 The Risks & Specific Investment Risks**

4

While recovery of all loans made by the **Partnership** to the Payday loan companies are protected by the Insurance Policy, it is possible that any insurance claim may be partly or fully rejected on the grounds that the terms and conditions of the policy were not fully met.

In the event that a **Loan Note Holder** is not repaid the **Capital Value** of the **Loan Note** in full upon maturity, and which results in the **Partnership** claiming under the terms of the Insurance Policy to repay the **Capital Value** (or part thereof) to the **Loan Note Holder**, and if in the circumstances the Payday loan company remains unable or unwilling to repay the **Partnership**, this is likely to have a negative impact upon the cash flow and trading activities of the **General Partner**.

Date:        /      /2017                Place:
_____

Signed, digitally stamped and executed as a Deed for and on behalf of Privilege Wealth Management Limited by Mr. Mark Munnelly ACA an authorized Director thereof:

Mr. Mark Munnelly ACA:

Witness Name:                        Witness Signature

Digital Stamp:

5

**Schedule 1- Loan Note Certificate**

6

**Schedule 2 - Interest and Redemption**

1. Interest shall accrue on any outstanding **Loan Notes** at the rate of interest as shown in the **Loan Note Certificate** per Schedule 1 (**Interest Rate**) payable quarterly in arrears.

2. Any interest due under clause 1 abovementioned shall be payable upon the respective **Quarter Dates** in each year in which the **Loan Notes** are held.  The **General Partner** reserves the right to make the first coupon payment on the second payable **Quarter Date.**

3. Interest, if payable, shall accrue daily at the **Interest Rate** and shall be calculated on the basis of a 365-day year and the actual number of days elapsed from the date of issue of the **Loan Note(s)** to the **Redemption Date** (as defined below).

4. If the **Partnership** fails to pay the **Capital Value** on the **Redemption Date**, interest shall continue to accrue on the unpaid amount at the **Interest Rate.**

5. As and when the **Loan Notes** (or any part of them) are to be redeemed in accordance with paragraph 8 of this Schedule 2, the **Partnership** shall pay the **Loan Note Holders** the **Capital Value** of the **Loan Note(s)**, which are to be redeemed.

6. The **Partnership** shall pay all and any funds due to the **Loan Note Holder**, whether Quarterly interest payments or the refund of the **Capital Value** on the **Redemption Date** to the same bank account as the funds were received from by the **Partnership.**

7. Whenever any payment of Capital Value (or otherwise) becomes due on a day, which is not a Business Day, payment shall be made on the next following Business Day.

8. The **Loan Note(s)** will be redeemed at the **Capital Value** by the **Partnership** on the redemption date (as shown on the Transactional Term Sheet attached to this Loan Note).

9. The date and time of Issue of this **Loan Note** is 9.00 am on the morning of the 11th day after the date that cleared funds are shown as received and cleared by the **Partnership's** bankers;

10. The **Loan Notes** then in issue shall be immediately redeemed at their **Capital Value**, together with interest on the **Loan Note(s)** outstanding at the **Interest Rate**, if an **Event of Default** occurs, namely:
    a) an administration order is made in relation to the **Partnership** or
    b) an order is made, or an effective resolution is passed, for the winding-up, liquidation, administration or dissolution of the **Partnership** (except for the purpose of reorganisation or amalgamation of the **Partnership** or any of its subsidiaries); or
    c) a receiver is appointed in respect of the **Partnership** or in respect of the whole or the major part of the assets or undertaking of the **Partnership** or if distress, execution or other legal process is levied or enforced or sued out on or against the whole or the major part of the assets of the **Partnership** and is not discharged, paid out, withdrawn or removed within 21 (twenty-one) Business Days; (but an Event of Default shall not occur by reason of an encumbrance being placed on the assets of the **Partnership** or a part of the assets of the **Partnership** for purposes of a securitisation transaction for purposes of issuing additional **Loan Notes** for the **Partnership** provided such additional loan notes rank *parri passu* with the **Loan Notes**); or
    d) **The Partnership** stops (or threatens to stop) payment of its debts generally or ceases (or threatens to cease) to carry on its business or a substantial part of its business;

11. The **Partnership** shall give written notice to the **Loan Note Holders** immediately upon the **Partnership** becoming aware of the occurrence of an event specified in paragraph 10 of this Schedule 2, giving reasonable details of that event.

12. If, on redemption of a **Loan Note**, a **Loan Note Holder** fails to deliver the **Certificate** for it, or an indemnity in accordance with these Conditions or to accept payment of moneys due to him, **The Partnership** shall pay the moneys due to him into a bank account which payment shall discharge the **Partnership** from all further obligations in respect of the **Loan Note.**

13. The **Partnership** shall cancel any **Loan Notes** repaid, redeemed or transferred and shall not reissue them.

### Schedule 3 - Transfer Provisions and Other Matters

1. The **Partnership** shall recognise the registered holder of any **Loan Note(s)** as the absolute owner of them and shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to take notice or see to the execution of any trust (whether express, implied or constructive) to which any **Loan Note** may be subject. The **Partnership** shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to enter any notice of any trust (whether express, implied or constructive) on the register in respect of any of the **Loan Notes.**

2. The **Loan Notes** are transferable in accordance with this Schedule 3 in integral multiples of $10,000 by instrument in writing in the usual common form (or in such other form as the **General Partner** may approve) and such instrument need not be under seal.

3. Each instrument of transfer shall be signed by the transferor, and the transferor shall be deemed to remain the owner of the **Loan Notes** to be transferred until the name of the transferee is entered in the register in respect of such **Loan Notes.**

4. Each instrument of transfer shall be sent to, or left for registration at, the registered office of the **Partnership** for the time being, and shall be accompanied by the **Certificate(s)** for the **Loan Note(s)** to be transferred and any other evidence that the **Partnership** may require to prove the title of the transferor or his right to transfer the **Loan Note(s)** (and, if such instrument is executed by some other person on his behalf, the authority of that person to do so). All instruments of transfer that are registered may be retained by the **Partnership.**

5. No transfer of **Loan Notes** shall be registered in respect of which a **Redemption Notice** has been given.

6. Payment of the **Capital Value** and all accrued interest on the **Loan Note(s)** may be made by cheque or electronic fund transfer to the registered holder or, in the case of joint registered holders, to the one who is first-named on the register, or to such person or persons as the registered holder or all the joint registered holders may in writing direct. By default **The Partnership** will pay all payments of Capital and Interest due to a **Loan Note Holder** to the bank account from where the funds were first remitted.

7. If more than one person is entered in the register as joint holders of any **Loan Notes** then, without prejudice to paragraph 5 of this Schedule 3, the receipt of any one of such holders for any moneys payable on or in respect of the **Loan Notes** shall be as effective a discharge to **The Partnership** or other person making the payment as if the person signing such receipt were the sole registered holder of such **Loan Note(s).**

8. If any **Certificate** is worn out or defaced then, on production of it to the **General Partner**, they may cancel it and may issue a fresh **Certificate** in lieu. If any **Certificate** is lost or destroyed it may be replaced on such terms (if any) as to evidence and indemnity as the **General Partner** may reasonably require. An entry recording the issue of the new **Certificate** and indemnity (if any) shall be made in the register. No fee shall be charged for the registration of any transfer or for the registration of any probate, letters of administration, certificate of marriage or death, power of attorney or other documents relating to or effecting title to any **Loan Notes.**

9. Any notice or other document required to be given under this instrument shall be in writing and may be given to or served on any **Loan Note Holder** by sending it by first-class post in a prepaid envelope addressed to such **Loan Note Holder** at his registered address. In the case of joint **Loan Note Holders**, a notice given to, or document served on, the **Loan Note Holder** whose name stands first in the register in respect of such **Loan Note(s)** shall be sufficient notice to, or service on, all the joint **Loan Note Holders**. Any such notice sent or document served by first-class post shall be deemed to have been given or served 48 hours or 96 hours in the case of a notice or document sent to an address for a **Loan Note Holder** not in the United Kingdom after the time when it is posted and in proving such notice or service, it shall be sufficient to prove that the envelope containing the notice or document was properly addressed, stamped and posted.

10. Any notice or other document delivered or sent by post to, or left at, the registered address of any **Loan Note Holder** in pursuance of these provisions shall, notwithstanding that such **Loan Note Holder** is then dead or bankrupt or in liquidation, and whether or not the **Partnership** has notice of his death or bankruptcy or liquidation, be deemed to have been duly served or delivered in respect of any **Loan Note(s)** registered in the name of such **Loan Note Holder** as sole or first-named joint holder unless his name shall at the time of the service of the notice or document have been removed from the register as the holder of the **Loan Notes**, and such service shall for all purposes be deemed sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the **Loan Notes.**

11. A copy of this instrument shall be kept at the **Partnership's** registered office. A **Loan Note Holder** (and any person authorised by a **Loan Note Holder**) may inspect that copy of the instrument at all reasonable times during office hours.

8

**Schedule 4 - Meetings of the Loan Note Holders**

1. For the purposes of Schedule 4 only, the definition of **Loan Note Holders** will constitute the combined nominal holders for all **Loan Notes.**

2. The **General Partner** may at any time convene a meeting of **Loan Note Holders**. In addition, the **General Partner** shall at the written request of the holders of not less than one-tenth in nominal amount of the outstanding **Loan Notes** convene a meeting of the **Loan Note Holders.** Any meeting shall be held at such place as the **General Partner** may designate.

3. At least 14 days' notice (exclusive of the day on which the notice is served or deemed to be served and of the day for which notice is given) of every meeting shall be given to the **Loan Note Holders.** The notice shall specify the place, day and time of the meeting and the general nature of the business to be transacted, but it shall not be necessary (except in the case of an Extraordinary Resolution) to specify in the notice the terms of any resolution to be proposed. The accidental omission to give notice to, or the non-receipt of notice by, any of the **Loan Note Holders** shall not invalidate the proceedings at any meeting. A meeting of the **Loan Note Holders** shall, despite being called at shorter notice than specified above, be deemed to have been duly called if it is agreed in writing by all of the **Loan Note Holders.**

4. At any meeting the quorum shall be 2 (two) **Loan Note Holders** holding, or representing by proxy, at least 25% (twenty-five percent) in nominal amount of the value of the outstanding **Loan Notes.** No business (other than choosing a Chairman) shall be transacted at any meeting unless the requisite quorum is present.

5. Three Series of **Loan Notes** are issued;

    (a)   Series A issued in British Pounds

    (b)   Series B issued in United States Dollars

    (c)   Series C issued in Euro

    A currency weighting bias is utilised in order to establish equitable voting rights between the Series; each Series of **Loan Note** is apportioned a set amount of votes (the Voting Factor) for each **Loan Note** held; and any matter requiring a poll or a majority of votes shall be calculated in terms of the number of votes cast by **Loan Note Holders** in terms of the **Loan Notes** issued within a series multiplied by the Voting Factor.

    (d)   Series A voting factor = 1 Vote for each **Loan Note** held

    (e)   Series B voting factor = 0.65 of a Vote for each **Loan Note** held

    (f)   Series C voting factor = 0.80 of a Vote for each **Loan Note** held

    Thus a vote cast by a **Loan Note Holder** holding a Series A **Loan Note** shall cast 1 (one) vote, whilst a vote cast by a **Loan Note Holder** holding a Series B **Loan Note** shall cast 00.65 (point six-five) of a vote.

6. If a quorum is not present, within half an hour from the time appointed for the meeting, the meeting shall be dissolved if it was convened on the requisition of **Loan Note Holders.** In any other case, it shall stand adjourned to such day and time (at least 14 (fourteen) days later, but not more than 28 (twenty-eight) days later) and to such place as may be appointed by the Chairman. At such adjourned meeting, 2 (two) **Loan Note Holders** present in person (or by proxy) and entitled to vote shall constitute a quorum (whatever the nominal amount of the **Loan Notes** held by them). At least 14 (fourteen) days' notice of any adjourned meeting of **Loan Note Holders** shall be given (in the same manner mutatis mutandis as for an original meeting). That notice shall state that 2 (two) **Loan Note Holders** present in person (or by proxy) at the adjourned meeting (whatever the nominal amount of **Loan Notes** held by them) shall form a quorum.

7. A person (who may but need not be a **Loan Note Holder**) nominated by the **Partnership** shall be entitled to take the chair at every such meeting but, if no such person is nominated or if the person nominated is not be present at the meeting within five minutes after the time appointed for holding the meeting, the **Loan Note Holders** present shall choose one of their number to be Chairman. Any Director or officer of, and the Secretary and solicitors of, the **Partnership** and the **General Partner** or any other person authorised in that behalf by the **Partnership** may attend at any such meeting.

8. Each question submitted to a meeting of **Loan Note Holders** shall, unless a poll is demanded, be decided by a show of hands.

9. At any meeting of **Loan Note Holders** unless a poll is demanded by the Chairman or by one or more **Loan Note Holders** present in person or by proxy and holding or representing in the aggregate not less than one-twentieth in nominal amount of the outstanding **Loan Notes** (before or on the declaration of the result of the show of hands), a declaration by the Chairman that a resolution has been carried by the requisite majority, lost or not carried by the requisite majority shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

10. If a poll is duly demanded, it shall be taken in such manner and (subject as set out below) either at once or after an adjournment as the Chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll shall not prevent the meeting from continuing for the transaction of any business other than the question on which the poll has been demanded. The demand for a poll may be withdrawn.

11. If there is an equality of votes, whether on a show of hands or on a poll, the Chairman of the meeting shall be entitled to a casting vote in addition to the vote(s) (if any) to which he may be entitled as a **Loan Note Holder** or as a proxy.

12. The Chairman may, with the consent of (and shall if so directed by) any meeting at which a quorum is present, adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting except business that might lawfully have been transacted at the meeting from which the adjournment took place.

13. Any poll demanded at any meeting on the election of a Chairman, or on any question of adjournment, shall be taken at the meeting without adjournment.

14. On a show of hands, each **Loan Note Holder** who is an individual and is present in person or (being a corporation) is present by its duly authorised representative or by one of its officers as its proxy, shall have one vote. On a poll, each **Loan Note Holder** present in person or by proxy, shall have such number of votes for every, $10,000 nominal value of **Loan Notes** held by him as set out in the currency weighting in clause 5 above, and a person entitled to more than one vote need not (if he votes) use all his votes or cast all the votes that he uses in the same way.

15. In the case of joint registered **Loan Note Holders** any one of them shall be entitled to vote in respect of such **Loan Notes** either in person or by proxy and, in the latter case, as if the joint holder were solely entitled to such **Loan Notes**. If more than one joint holder is present at any meeting either personally or by proxy that one joint holder so present whose name as between himself and the other or others present stands first in the register as one of the joint holders shall alone be entitled to vote in person or by proxy.

16. Each instrument appointing a proxy must be in writing and duly executed by the **Loan Note Holder** or his duly authorised attorney or, in the case of a corporation under its common seal or duly executed by a duly authorised attorney or officer. The Chairman may (but shall not be bound to) require evidence of the authority of any attorney or officer. A proxy need not be a **Loan Note Holder.**

17. An instrument of proxy shall be in the usual or common form or in any other form that the Directors may accept. The proxy shall be deemed to include the right to demand or join in demanding a poll. A proxy shall, unless stated otherwise, be valid as well for any adjournment of the meeting as for the meeting to which it relates and need not be witnessed.

18. The instrument appointing a proxy, and the power of attorney or other authority (if any) under which it is signed or a notary certified copy of such power of attorney or authority, shall be deposited at the place specified in (or in any document accompanying) the notice convening the meeting. If no such place is specified, the proxy shall be deposited at the registered office of the **Partnership** not less than 48 hours before the time appointed for holding the meeting or adjourned meeting or for taking of the poll at which the person named in that instrument proposes to vote. In default, the instrument of proxy shall not be treated as valid. A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the revocation of the proxy or of the authority under which the proxy is given, unless notification in writing of the revocation has been received at the registered office of the **Partnership** or at such other place (if any) specified for the deposit of instruments of proxy in the notice convening the meeting (or any document accompanying it) 48 (forty-eight) hours before the commencement of the meeting or adjourned meeting or the taking of the poll at which the vote is given.

19. Without prejudice to any of the powers conferred on the **Partnership** under any of the provisions of the instrument, a meeting of the **Loan Note Holders** shall, in addition to any other powers, have the following powers exercisable by Extraordinary Resolution:

   (a) power to sanction any abrogation, modification or compromise of, or any arrangement in respect of, the **Loan Note Holders'** rights against **The Partnership**, provided the same has been previously approved in writing by the **Partnership**, whether those rights shall arise under the instrument, the **Loan Note(s)** or otherwise;

   (b) power to assent to any modification of the provisions contained in the instrument and the Conditions. Any such modification shall be proposed by the **Partnership** and to authorise the **Partnership** to execute any supplemental instrument embodying any such modification; and

   (c) power to:
   
       (i) having been previously approved by the **Partnership** modify the date fixed for final redemption of the **Loan Note(s);**
   
       (ii) reduce or cancel the principal amount payable on the **Loan Notes;**
   
       (iii) reduce the amount payable or modify the method of calculating the amount payable on the **Loan Note(s)**; or
   
       (iv) modify the dates for payment in respect of any interest, on the **Loan Notes.**

20. An Extraordinary Resolution passed at a meeting of the **Loan Note Holders** shall be binding on all the **Loan Note Holders** whether or not they are present at the meeting. Each of the **Loan Note Holders** shall be bound to give effect to it accordingly. The passing of any such resolution shall be conclusive evidence that the circumstances justify passing it (so that the meeting may determine without appeal whether or not the circumstances justify passing it).

21. **Extraordinary Resolution**, when used in the Conditions, means a resolution passed at a meeting of the **Loan Note Holders** duly convened and held in accordance with the Conditions.

22. A resolution in writing signed by or on behalf of all the **Loan Note Holders** shall, for all purposes, be as valid and effectual as an Extraordinary Resolution passed at a meeting duly convened and held in accordance with the Conditions. Such resolution in writing may be contained in one document or in several documents in similar form, each signed by one or more **Loan Note Holders.**

23. Minutes of all resolutions and proceedings at every meeting shall be made and duly entered in books to be from time to time provided for that purpose by the **Partnership**. Any minutes, if purporting to be signed by the Chairman of the meeting or by the Chairman of the next succeeding meeting of the **Loan Note Holders**, shall be conclusive evidence of the matters stated in them. Until the contrary is proved, every meeting for which minutes have been made and signed shall be deemed to have been duly held and convened, and all resolutions passed at the meeting to have been duly passed.



## Euro Denominated "Series C" Loan Note Instrument

This Loan Note is only issued to certified High Net Worth persons within the meaning of Article 48 of the Financial Services and Markets Act (Financial Promotions) Order 2005 (FPO) or self certified sophisticated investors within the meaning of Article SOA FPO.

The contents of this Loan Note are exempt from the provisions of S21 of the FMSA 2000 o the grounds that it is only issued to high net worth persons being persons who have complied with the provisions of Part 1 of Schedule 5 of the FPO or self certified sophisticated investors being persons who have complied with Part ii of Schedule 5 of the FPO.

## A Qualifying and Regulated Financial Instrument in terms of section 21 of the UK FMSA, transferable on a retail basis within the MiFID area.

_ . _ %        INTEREST PER ANNUM P A I D _ . _ %      QUARTERLY

**Contents**

*Clause*

| | | |
|---|---|---|
| 1. | Interpretation | 3 |
| 2. | Capital Value | 5 |
| 3. | Ranking | 4 |
| 4. | Use of Proceeds | 4 |
| 5. | Loan Note Certificates | 4 |
| 6. | Conditions of issue | 4 |
| 7. | Loan Notes register | 4 |
| 8. | Loan Notes not quoted | 5 |
| 9. | Enforcement | 5 |
| 10. | Set-off | 5 |
| 11. | Merger / Takeover / Adjustment | 5 |
| 12. | Third party rights | 5 |
| 13. | Governing law and jurisdiction | 5 |
| 14. | Risks & Specific Investment Risks | 5 |

Schedules

| | | |
|---|---|---|
| Schedule 1 | Loan Note Certificate | 6 |
| Schedule 2 | Interest and Redemption | 7 |
| Schedule3 | Transfer provisions and other matters | 8 |
| Schedule4 | Meetings of the Loan Note Holders | 9 |

WWW.PrivilegeWealthLP.com    I    Info@PrivilegeWealthLP.com
The General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GIC0.109665-18
and by the power vested in the Limited Partnership Agreement acting for and on behalf of;
The Limited Partnership: Privilege Wealth One Limited Partnership: Partnership Reg. No: 093.

186 Main Street, Gibraltar
+44 (0) 203 582 3810

1

**THIS DEED** is dated this _____ day of _____ / 2017

**Privilege Wealth One LP** of 186 Main Street, Gibraltar, constituted and registered with The Registrar of Partnerships in Gibraltar with registration number 093 (the "**Partnership**").

The **General Partner**: Privilege Wealth Management Limited of 186 Main Street, Gibraltar, incorporated and registered with the Registrar of Companies in Gibraltar with Company Registration Number 109665 and REID Number GICO.109665-18 (the "**General Partner**").

<span style="font-variant:small-caps">Background</span>

By exercising the powers conferred on it in terms of The Limited Partnership Agreement, ("Stage 2") the **General Partner** of the **Partnership** has, by a resolution passed on Friday 12th September 2017, approved the issue of up to €500,000,000 (Five Hundred Million Euro) in aggregate value of "**Series C**" secured **Loan Notes** denominated in Euro, and have agreed to constitute these **Series C Loan Note(s)** in the following manner.

The **Loan Notes** are issued by the **General Partner** for and on behalf of the **Partnership** in the form and on the terms and conditions set out in this Deed including the Schedules hereto.

<span style="font-variant:small-caps">Agreed terms</span>

1    **Interpretation**

    **The definitions and rules of interpretation in this clause 1 apply in this instrument.**

    "**Business Day**": a day (other than a Saturday, Sunday or public holiday) on which banks in the City of London are open for normal banking business.
    "**Capital Value**": the **Capital Value** of each Series C Loan note of €10,000.00 (ten thousand Euro) representing the value upon which interest is to be paid in terms of this **Series C Loan Note** instrument.
    "**Certificate**": a certificate for **Loan Note(s)** in the form set out in Schedule 1
    "**Conditions**": the conditions attaching to the **Loan Note(s)**, as set out in The Schedules
    "**Date of Issue**": 9.00 am on 11th Day anniversary of the **General Partner** receiving cleared funds into the **Partnership's** bank account; and if such day in not a Business Day, then the next **Business Day.**
    "**Event of Default**": any of the events set out in paragraph 9 of Schedule 2.
    "**General Partner**": The **General Partner** is Privilege Wealth Management Limited, 186 Main Street, Gibraltar and is registered under company number 109665.
    "**Interest Rate**": means the annual percentage interest at which the **Loan Note(s)** attracts quarterly interest payments calculated upon the **Capital Value.**
    "**Loan Note Holder Majority**": the holders of 75% (seventy-five percent) of the value held in nominal amount of the **Loan Notes** outstanding.
    "**KYC & AML Suspension Period**": the 10 (ten) day period allotted to the **General Partner**, to check and authenticate "Source of Funds", and to perform "Know Your Client" and "Anti Money-Laundering" compliance.  No interest accrues during the **KYC & AML Suspension Period,** and **Loan Note** are therefore deemed to have been Issued at 9.00 am on the 11th Day following the date of this deed.
    "**Loan Note Holders**": the persons for the time being entered in the register as holders or joint holders of the **Loan Notes.**
    "**Loan Note(s)**": €10,000 (ten thousand Euro) secured **Series C Loan Notes** constituted by this instrument or as the case may be, the **Capital Value** from time to time issued and paid up and outstanding.
    "**Insurance Policy Document**": the description of the insurance policy entered into by the **General Partner** on behalf of the **Partnership** in order to mitigate risk and protect both the **Limited Partner's** and **Partnership's** funds.
    "**Limited Partnership Agreement**": the Limited Partnership Agreement made and entered into between the **General Partner** and all Limited Partners of the **Partnership** by which the partners shall be bound and that sets out the powers and responsibilities of the **General Partner.**
    "**Quarter Dates**": the Quarterly dates after the **KYC & AML Suspension Period** upon which interest is paid in terms of this **Loan Note(s)**; being, day 91, day 182, day 273, and day 364 after the **Date of Issue**, or the next business day if that day is not a business day.
    "**Limited Partner**": A Limited Partner of the **Partnership**.
    "**Redemption Date**": has the meaning given in paragraph 8 of Schedule 2.
    "**Redemption Notice**": has the meaning as given in paragraph 10 of Schedule 2.

1.1    Any phrase introduced by the terms **including**, **include** or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.
1.2    The schedules to this instrument form part of (and are incorporated into) this instrument.
1.3    A **Person** includes a corporate or unincorporated body.
1.4    Words in the singular include the plural and vice versa.
1.5    A reference to a clause or a schedule is (unless expressly stated otherwise) a reference to a clause of, or schedule to, this instrument.
1.6    Clause and schedule headings do not affect the interpretation of this instrument.
1.7    A reference to one gender includes a reference to the other gender.

**2    Capital Value**

The Capital Value of each Series C **Loan Note** is €10,000 (ten thousand Euro) and the maximum aggregate Capital Value amount of the Series C **Loan Notes** is €500,000,000. (five hundred million Euro)  The minimum subscription will be €100,000 (one hundred thousand Euro).

The maximum aggregate Capital Value amount in total of all **Series A, Series B and Series C Loan Notes** shall not exceed £2,000,000,000.00 (two billion British Pounds) or the Euro or Dollar equivalent.

**3    Ranking**

**Loan Note(s)** are held in the three different trading currencies:

> Series A **Loan Notes** = British Pounds (GBP)
> Series B **Loan Notes** = United States Dollar (USD)
> Series C **Loan Notes** = Euro (EUR)

Each Series **Loan Notes** shall rank pari passu, equally and rateably, with each other and pro rata to Capital Value without discrimination or preference as to other **Loan Note(s)** issued or to be issued by the Partnership.  For purposes of voting at meetings of **Loan Note Holders** and to equalize the voting rights thereof a currency weighting is applied between the different **Series** as further described in Schedule 4 paragraph 5.

**4    Use of Proceeds**

The proceeds of all subscriptions for the **Loan Notes** shall be used to lend funds to corporate entities trading in the Payday loan industry in the United States of America, and to cover the allied administration, management and insurance costs thereof.

**4.1**    The **Capital Value** of each **Series C Loan Note** is: €10,000.00 (ten thousand Euro), and each and every **Loan Note** is risk insured to the full **Capital Value** of €10,000 (ten thousand Euro) with a deductible of 5% (five percent), therefore covering 95% (ninety-five per cent) of all capital advances by the **Limited Partner** to the **Partnership**.

**4.2**    The insurance cover is in the form of Insurance Managers Insurance with Capital Protection providing indemnity against:

Loss incurred by a **Wrongful Act** (namely any misstatement, misleading statement, act, error, omission, neglect, breach of trust, breach of fiduciary duty or breach of regulations committed or attempted or allegedly committed or attempted by any Insured, and/or any other person for whom an Insured Entity or Fund is legally liable, while performing or failing to perform Investment Advisory Services)

Direct financial loss incurred as a result of any **Act of Infidelity** (namely any dishonest, fraudulent or malicious act committed by an Employee alone or in collusion with others with the intent of making improper financial gain for the Employee who committed such act)

Direct financial loss incurred as a result of any **Third Party Crime**

Loss of Business Income directly arising from a **Cyber Event**

Crisis Management Costs and Customer Notification Expenses following a **Security Breach**, Privacy Breach, or breach of Privacy Regulations

**Cyber Extortion** Monies paid following a Cyber Extortion Threat

Any claim from a **Loan Note Holder** arising from any **Event of Default** by the **Partnership** in repaying the full **Capital Value** of the **Loan Note(s)** upon maturity due to default by the US Payday loan companies in repaying its loan obligations to the **Partnership**.

**4.3**    In the **Event of Default** by the **Partnership** in its repayment of the **Capital Value** of the **Loan Note** to the **Loan Note Holder** upon maturity; all proceeds recovered by the **General Partner** from the loans made to corporate entities trading in the Payday loan industry in the United States of America, and all proceeds received from the Insurance Managers Insurance with Capital Shortfall Protection shall be applied solely and exclusively in the reduction of all and any outstanding proportion(s) of the **Capital Value** of the **Loan Note(s)** that were due and payable upon maturity. Such funds shall be paid directly by the **General Partner** to the **Loan Note Holder**.

**4.4**    The **General Partner** and the **Partnership** shall maintain the insurances as provided for by the Insurance Managers Insurance with Capital Protection policy as described above for the full term of the **Loan Note(s)** and for so long as the **Loan Note(s)** remains outstanding and has not been redeemed. It is agreed that this is the sole insurance cover taken out by the **Partnership** (and the **General Partner**) pertaining to this **Loan Note(s)**.  The **Loan Note Holder** may have sight of the insurance policy document upon request to the **General Partner**.

**4.5**    The **Loan Note Holder** specifically accepts that all insurance cover and all and any contractual relationships with insurers and re-insurers arranged by the **Partnership** is conducted in British Pounds (GBP) and as such a positive or negative discrepancy might exist between the **Capital Value** insured and the amount paid out in terms of a Series B or Series C **Loan Note** insurance claim.

**5    Loan Note Certificates**

3

**5.1**  Each **Loan Note Holder,** or the joint holders of **Loan Notes,** shall be entitled to receive as part of the instrument (without charge) a Certificate executed by the **General Partner** for the amount of **Loan Notes** held by him (or them) provided that joint holders of **Loan Notes** will only be entitled to receive one Certificate in respect of their joint holding and delivery of a Certificate to the first-named joint holder set out in the register shall be sufficient delivery to all.

**5.2**  Every Certificate shall have copies of the **Loan Note(s)** endorsed on or attached to it.

**5.3**  \\There a **Loan Note Holder** transfers only part of the **Loan Notes** comprised in a Certificate, the old Certificate shall be cancelled and a new Certificate for the balance of such **Loan Notes** shall be issued without charge.

**6    Conditions o fissue**

The **Loan Notes** shall be issued subject to, and with the benefit of, the Conditions fonning part of and as contained in the **Loan Note Certificate.** The Conditions shall be binding upon the **Partnership,** the **Loan Note Holders** and all persons claiming through or under them.

**7    Loan Notes register**

**7.1**  The **General Partner** shall keep, or cause to be kept, a register of the **Loan Notes** at its registered office showing:

**7.1.1**  the names and addresses of the **Loan Note Holders** for the time being of the **Loan Notes;**

**7.1.2**  the amount of the **Loan Notes** held by every **Loan Note Holder** and the principal monies paid up on them;

**7.1.3**  the date on which the name of that **Loan Note Holder** is entered in respect of the **Loan Notes** standing in his name;

**7.1.4**  the serial number of each **Certificate** issued and the date of its issue; and

**7.1.5**  the date on which a person ceased to hold the **Loan Notes.**

**7.2**  Any change of name or address of any **Note Holder** shall ilmnediately be notified to the **General Partner** and, on receipt, the register shall be altered accordingly. The **Loan Note Holders** (or any of them) and any person authorised i11 writing by any of them may, at all reasonable times during office hours, i11spect the register and to take copies of it or extracts from it. The **General Partner** may however close the register for such periods and at such times as the **General Partner** deems fit, provided that the register is not closed for more than 30 (thil-ty) Busi11ess Days in any one year.

**8    Loan Notes not quoted**

No application has been made to any listi11g authority, stock exchange or other market for the **Loan Notes** to be listed or otherwise traded however, the **General Partner** reserves the right to actively explore the possibility to seek and list the **Loan Notes** on a public market suitable for such listi11g.

**9    Enforcement**

The **Partnership** covenants with each of the **Loan Note Holders** to perform and observe the obligations in this instrument to the i11tent that this instrument shall endure for the benefit of all persons for the time being registered as holders of any **Loan Notes,** each of whom may sue for the performance and observance of the provisions of this i11strument so far as his holdil1g is concen1ed.

**10    Set-off**

Each **Loan Note Holder** shall be recognised by the **Partnership** as entitled to the **Loan Note(s)** registered in his name free from any equity, defence, set-off or cross-claim on the part of the **Partnership** against the original, or any ·intermediate, **Loan Note Holder.**

**11    Merger/ Takeover/ Adjustment**

**11.1**  The **Limited Partnership Agreement** provides that the **General Partner** cannot sell, assign, transfer, exchange, pledge, encumber or otherwise dispose of all or any part of its rights or obligations as a **General Partner** or voluntarily withdraw or resign as the **General Partner** without the sanction of a majority of the **Limited Partners.**

**11.2**  On the basis that the **General Partner** is subject to a winding up order, or an adJninistrator is appoi11ted and another **General Partner** cannot be fow1d, the **Partnership** will cease trading and a professional finn appoi11ted for this purpose will manage the remaining term of the **Loan Note.**

**11.3**  If the **Partnership** is dissolved for any reason an independent firm of auditors will be appointed to contilme the administration of the **Loan Note(s)** until redemption.

**12    Third party rights**

This instrument is enforceable under the Contracts (Rights of Third Parties) Act 1999 by the **Partnership** and any **Loan Note Holder,** but not by any other person.

**13    Governing law and jurisdiction**

**13.1**  This instrument and the **LoanNote(s)** shall be governed by, and construed in accordance with, the laws of England.

**13.2**  The courts of England shall have exclusive jurisdiction to settle any dispute or claim that arises out of, or in connection with, this instrument. Accordingly, any proceeds relating to, or in connection with this instrument or the **Loan Note(s)** may be bought only i11 such courts.

---

**This section draws attention to the risks associated with the Loan Note Investment strategy.**

---

**14. The Risks & Specific Investment Risks**

4

V,Thile recovery of all loans made by the **Partnel'ship** to the Payday loan companies are protected by the Insurance Policy, it is possible that any insurance claim may be partly or fully rejected on the grow1ds that the tenns and conditions of the policy were not fully met.

In the event that **a Loan Note Holdel'** is not repaid the **Capital Value** of the **Loan Note** in full upon maturity, and whicl1 results in the **Partnel'Sbip** claiming under the tenns of the Insurance Policy to repay the **Capital Value** (or part thereof) to the **Loan Note Holdel',** and if in the circumstances the Payday loan company remains unable or wnvilling to repay the **Partnel'ship,** this is likely to have **a** negative impact upon the cash flow and trading activities of the **Genel'al Partuel'.**

Date:          *I*     /2017              Place:

_____

Signed, digitally stamped and executed as a Deed for and on behalf of Privilege Wealth Management Limited by Mr. Mark Mwmelly ACA an authorized Director thereof:

Mr. Mark Munnelly ACA:

Witness Name:                     Witness Signature

Digital Stamp:

5

**Schedule 1 – Form of Loan Note Certificate**

**Schedule 2 - Interest and Redemption**

1. Interest shall accrue on any outstanding **Loan Notes** at the rate of interest as shown in the **Loan Note Certificate** per Schedule 1 (**Interest Rate**) payable quarterly in arrears.
2. Any interest due under clause 1 abovementioned shall be payable upon the respective **Quarter Dates** in each year in which the **Loan Notes** are held. The **General Partner** reserves the right to make the first coupon payment on the second payable **Quarter Date.**
3. Interest, if payable, shall accrue daily at the **Interest Rate** and shall be calculated on the basis of a 365-day year and the actual number of days elapsed from the date of issue of the **Loan Note(s)** to the **Redemption Date** (as defined below).
4. If the **Partnership** fails to pay the **Capital Value** on the **Redemption Date**, interest shall continue to accrue on the unpaid amount at the **Interest Rate.**
5. As and when the **Loan Notes** (or any part of them) are to be redeemed in accordance with paragraph 8 of this Schedule 2, the **Partnership** shall pay the **Loan Note Holders** the **Capital Value** of the **Loan Note(s)**, which are to be redeemed.
6. The **Partnership** shall pay all and any funds due to the **Loan Note Holder**, whether Quarterly interest payments or the refund of the **Capital Value** on the **Redemption Date** to the same bank account as the funds were received from by the **Partnership.**
7. Whenever any payment of Capital Value (or otherwise) becomes due on a day, which is not a Business Day, payment shall be made on the next following Business Day.
8. The **Loan Note(s)** will be redeemed at the **Capital Value** by the **Partnership** on the redemption date (as shown on the Transactional Term Sheet attached to this Loan Note).
9. The date and time of Issue of this **Loan Note** is 9.00 am on the morning of the 11th day after the date that cleared funds are shown as received and cleared by the **Partnership's** bankers;
10. The **Loan Notes** then in issue shall be immediately redeemed at their **Capital Value**, together with interest on the **Loan Note(s)** outstanding at the **Interest Rate**, if an **Event of Default** occurs, namely:
    a) an administration order is made in relation to the **Partnership** or
    b) an order is made, or an effective resolution is passed, for the winding-up, liquidation, administration or dissolution of the **Partnership** (except for the purpose of reorganisation or amalgamation of the **Partnership** or any of its subsidiaries); or
    c) a receiver is appointed in respect of the **Partnership** or in respect of the whole or the major part of the assets or undertaking of the **Partnership** or if distress, execution or other legal process is levied or enforced or sued out on or against the whole or the major part of the assets of the **Partnership** and is not discharged, paid out, withdrawn or removed within 21 (twenty-one) Business Days; (but an Event of Default shall not occur by reason of an encumbrance being placed on the assets of the **Partnership** or a part of the assets of the **Partnership** for purposes of a securitisation transaction for purposes of issuing additional **Loan Notes** for the **Partnership** provided such additional loan notes rank *parri passu* with the **Loan Notes**); or
    d) **The Partnership** stops (or threatens to stop) payment of its debts generally or ceases (or threatens to cease) to carry on its business or a substantial part of its business;
11. The **Partnership** shall give written notice to the **Loan Note Holders** immediately upon the **Partnership** becoming aware of the occurrence of an event specified in paragraph 10 of this Schedule 2, giving reasonable details of that event.
12. If, on redemption of a **Loan Note**, a **Loan Note Holder** fails to deliver the **Certificate** for it, or an indemnity in accordance with these Conditions or to accept payment of moneys due to him, **The Partnership** shall pay the moneys due to him into a bank account which payment shall discharge the **Partnership** from all further obligations in respect of the **Loan Note.**
13. The **Partnership** shall cancel any **Loan Notes** repaid, redeemed or transferred and shall not reissue them.

7

### Schedule 3 - Transfer Provisions and Other Matters

1. The **Partnership** shall recognise the registered holder of any **Loan Note(s)** as the absolute owner of them and shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to take notice or see to the execution of any trust (whether express, implied or constructive) to which any **Loan Note** may be subject. The **Partnership** shall not (except as provided by statute or as ordered by a court of competent jurisdiction) be bound to enter any notice of any trust (whether express, implied or constructive) on the register in respect of any of the **Loan Notes.**

2. The **Loan Notes** are transferable in accordance with this Schedule 3 in integral multiples of €10,000 (ten thousand Euro) by instrument in writing in the usual common form (or in such other form as the **General Partner** may approve) and such instrument need not be under seal.

3. Each instrument of transfer shall be signed by the transferor, and the transferor shall be deemed to remain the owner of the **Loan Notes** to be transferred until the name of the transferee is entered in the register in respect of such **Loan Notes.**

4. Each instrument of transfer shall be sent to, or left for registration at, the registered office of the **Partnership** for the time being, and shall be accompanied by the **Certificate(s)** for the **Loan Note(s)** to be transferred and any other evidence that the **Partnership** may require to prove the title of the transferor or his right to transfer the **Loan Note(s)** (and, if such instrument is executed by some other person on his behalf, the authority of that person to do so). All instruments of transfer that are registered may be retained by the **Partnership.**

5. No transfer of **Loan Notes** shall be registered in respect of which a **Redemption Notice** has been given.

6. Payment of the **Capital Value** and all accrued interest on the **Loan Note(s)** may be made by cheque or electronic fund transfer to the registered holder or, in the case of joint registered holders, to the one who is first-named on the register, or to such person or persons as the registered holder or all the joint registered holders may in writing direct. By default **The Partnership** will pay all payments of Capital and Interest due to a **Loan Note Holder** to the bank account from where the funds were first remitted.

7. If more than one person is entered in the register as joint holders of any **Loan Notes** then, without prejudice to paragraph 5 of this Schedule 3, the receipt of any one of such holders for any moneys payable on or in respect of the **Loan Notes** shall be as effective a discharge to **The Partnership** or other person making the payment as if the person signing such receipt were the sole registered holder of such **Loan Note(s).**

8. If any **Certificate** is worn out or defaced then, on production of it to the **General Partner**, they may cancel it and may issue a fresh **Certificate** in lieu. If any **Certificate** is lost or destroyed it may be replaced on such terms (if any) as to evidence and indemnity as the **General Partner** may reasonably require. An entry recording the issue of the new **Certificate** and indemnity (if any) shall be made in the register. No fee shall be charged for the registration of any transfer or for the registration of any probate, letters of administration, certificate of marriage or death, power of attorney or other documents relating to or effecting title to any **Loan Notes.**

9. Any notice or other document required to be given under this instrument shall be in writing and may be given to or served on any **Loan Note Holder** by sending it by first-class post in a prepaid envelope addressed to such **Loan Note Holder** at his registered address. In the case of joint **Loan Note Holders**, a notice given to, or document served on, the **Loan Note Holder** whose name stands first in the register in respect of such **Loan Note(s)** shall be sufficient notice to, or service on, all the joint **Loan Note Holders**. Any such notice sent or document served by first-class post shall be deemed to have been given or served 48 hours or 96 hours in the case of a notice or document sent to an address for a **Loan Note Holder** not in the United Kingdom after the time when it is posted and in proving such notice or service, it shall be sufficient to prove that the envelope containing the notice or document was properly addressed, stamped and posted.

10. Any notice or other document delivered or sent by post to, or left at, the registered address of any **Loan Note Holder** in pursuance of these provisions shall, notwithstanding that such **Loan Note Holder** is then dead or bankrupt or in liquidation, and whether or not the **Partnership** has notice of his death or bankruptcy or liquidation, be deemed to have been duly served or delivered in respect of any **Loan Note(s)** registered in the name of such **Loan Note Holder** as sole or first-named joint holder unless his name shall at the time of the service of the notice or document have been removed from the register as the holder of the **Loan Notes**, and such service shall for all purposes be deemed sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the **Loan Notes.**

11. A copy of this instrument shall be kept at the **Partnership's** registered office. A **Loan Note Holder** (and any person authorised by a **Loan Note Holder**) may inspect that copy of the instrument at all reasonable times during office hours.

8

**Schedule 4 - Meetings of the Loan Note Holders**

1. For the purposes of Schedule 4 only, the definition of **Loan Note Holders** will constitute the combined nominal holders for all **Loan Notes.**

2. The **General Partner** may at any time convene a meeting of **Loan Note Holders**. In addition, the **General Partner** shall at the written request of the holders of not less than one-tenth in nominal amount of the outstanding **Loan Notes** convene a meeting of the **Loan Note Holders.** Any meeting shall be held at such place as the **General Partner** may designate.

3. At least 14 days' notice (exclusive of the day on which the notice is served or deemed to be served and of the day for which notice is given) of every meeting shall be given to the **Loan Note Holders.** The notice shall specify the place, day and time of the meeting and the general nature of the business to be transacted, but it shall not be necessary (except in the case of an Extraordinary Resolution) to specify in the notice the terms of any resolution to be proposed. The accidental omission to give notice to, or the non-receipt of notice by, any of the **Loan Note Holders** shall not invalidate the proceedings at any meeting. A meeting of the **Loan Note Holders** shall, despite being called at shorter notice than specified above, be deemed to have been duly called if it is agreed in writing by all of the **Loan Note Holders.**

4. At any meeting the quorum shall be 2 (two) **Loan Note Holders** holding, or representing by proxy, at least 25% (twenty-five percent) in nominal amount of the value of the outstanding **Loan Notes.** No business (other than choosing a Chairman) shall be transacted at any meeting unless the requisite quorum is present.

5. Three Series of **Loan Notes** are issued;

    (a) Series A issued in British Pounds

    (b) Series B issued in United States Dollars

    (c) Series C issued in Euro

    A currency weighting bias is utilised in order to establish equitable voting rights between the Series; each Series of **Loan Note** is apportioned a set amount of votes (the Voting Factor) for each **Loan Note** held; and any matter requiring a poll or a majority of votes shall be calculated in terms of the number of votes cast by **Loan Note Holders** in terms of the **Loan Notes** issued within a series multiplied by the Voting Factor.

    (d) Series A voting factor = 1 Vote for each **Loan Note** held

    (e) Series B voting factor = 0.65 of a Vote for each **Loan Note** held

    (f) Series C voting factor = 0.80 of a Vote for each **Loan Note** held

    Thus a vote cast by a **Loan Note Holder** holding a Series A **Loan Note** shall cast 1 (one) vote, whilst a vote cast by a **Loan Note Holder** holding a Series B **Loan Note** shall cast 00.65 (point six-five) of a vote.

6. If a quorum is not present, within half an hour from the time appointed for the meeting, the meeting shall be dissolved if it was convened on the requisition of **Loan Note Holders.** In any other case, it shall stand adjourned to such day and time (at least 14 (fourteen) days later, but not more than 28 (twenty-eight) days later) and to such place as may be appointed by the Chairman. At such adjourned meeting, 2 (two) **Loan Note Holders** present in person (or by proxy) and entitled to vote shall constitute a quorum (whatever the nominal amount of the **Loan Notes** held by them). At least 14 (fourteen) days' notice of any adjourned meeting of **Loan Note Holders** shall be given (in the same manner mutatis mutandis as for an original meeting). That notice shall state that 2 (two) **Loan Note Holders** present in person (or by proxy) at the adjourned meeting (whatever the nominal amount of **Loan Notes** held by them) shall form a quorum.

7. A person (who may but need not be a **Loan Note Holder**) nominated by the **Partnership** shall be entitled to take the chair at every such meeting but, if no such person is nominated or if the person nominated is not be present at the meeting within five minutes after the time appointed for holding the meeting, the **Loan Note Holders** present shall choose one of their number to be Chairman. Any Director or officer of, and the Secretary and solicitors of, the **Partnership** and the **General Partner** or any other person authorised in that behalf by the **Partnership** may attend at any such meeting.

8. Each question submitted to a meeting of **Loan Note Holders** shall, unless a poll is demanded, be decided by a show of hands.

9. At any meeting of **Loan Note Holders** unless a poll is demanded by the Chairman or by one or more **Loan Note Holders** present in person or by proxy and holding or representing in the aggregate not less than one-twentieth in nominal amount of the outstanding **Loan Notes** (before or on the declaration of the result of the show of hands), a declaration by the Chairman that a resolution has been carried by the requisite majority, lost or not carried by the requisite majority shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

10. If a poll is duly demanded, it shall be taken in such manner and (subject as set out below) either at once or after an adjournment as the Chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll shall not prevent the meeting from continuing for the transaction of any business other than the question on which the poll has been demanded. The demand for a poll may be withdrawn.

11. If there is an equality of votes, whether on a show of hands or on a poll, the Chairman of the meeting shall be entitled to a casting vote in addition to the vote(s) (if any) to which he may be entitled as a **Loan Note Holder** or as a proxy.

12. The Chairman may, with the consent of (and shall if so directed by) any meeting at which a quorum is present, adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting except business that might lawfully have been transacted at the meeting from which the adjournment took place.

13. Any poll demanded at any meeting on the election of a Chairman, or on any question of adjournment, shall be taken at the meeting without adjournment.

14. On a show of hands, each **Loan Note Holder** who is an individual and is present in person or (being a corporation) is present by its duly authorised representative or by one of its officers as its proxy, shall have one vote. On a poll, each **Loan Note Holder** present in person or by proxy, shall have such number of votes for every, €10,000 (ten thousand Euro) nominal value of **Loan Notes** held by him as set out in the currency weighting in clause 5 above, and a person entitled to more than one vote need not (if he votes) use all his votes or cast all the votes that he uses in the same way.

9

15. In the case of joint registered **Loan Note Holders** any one of them shall be entitled to vote in respect of such **Loan Notes** either in person or by proxy and, in the latter case, as if the joint holder were solely entitled to such **Loan Notes**. If more than one joint holder is present at any meeting either personally or by proxy that one joint holder so present whose name as between himself and the other or others present stands first in the register as one of the joint holders shall alone be entitled to vote in person or by proxy.

16. Each instrument appointing a proxy must be in writing and duly executed by the **Loan Note Holder** or his duly authorised attorney or, in the case of a corporation under its common seal or duly executed by a duly authorised attorney or officer. The Chairman may (but shall not be bound to) require evidence of the authority of any attorney or officer. A proxy need not be a **Loan Note Holder.**

17. An instrument of proxy shall be in the usual or common form or in any other form that the Directors may accept. The proxy shall be deemed to include the right to demand or join in demanding a poll. A proxy shall, unless stated otherwise, be valid as well for any adjournment of the meeting as for the meeting to which it relates and need not be witnessed.

18. The instrument appointing a proxy, and the power of attorney or other authority (if any) under which it is signed or a notary certified copy of such power of attorney or authority, shall be deposited at the place specified in (or in any document accompanying) the notice convening the meeting. If no such place is specified, the proxy shall be deposited at the registered office of the **Partnership** not less than 48 hours before the time appointed for holding the meeting or adjourned meeting or for taking of the poll at which the person named in that instrument proposes to vote. In default, the instrument of proxy shall not be treated as valid. A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the revocation of the proxy or of the authority under which the proxy is given, unless notification in writing of the revocation has been received at the registered office of the **Partnership** or at such other place (if any) specified for the deposit of instruments of proxy in the notice convening the meeting (or any document accompanying it) 48 (forty-eight) hours before the commencement of the meeting or adjourned meeting or the taking of the poll at which the vote is given.

19. Without prejudice to any of the powers conferred on the **Partnership** under any of the provisions of the instrument, a meeting of the **Loan Note Holders** shall, in addition to any other powers, have the following powers exercisable by Extraordinary Resolution:

    (a) power to sanction any abrogation, modification or compromise of, or any arrangement in respect of, the **Loan Note Holders'** rights against **The Partnership**, provided the same has been previously approved in writing by the **Partnership**, whether those rights shall arise under the instrument, the **Loan Note(s)** or otherwise;

    (b) power to assent to any modification of the provisions contained in the instrument and the Conditions. Any such modification shall be proposed by the **Partnership** and to authorise the **Partnership** to execute any supplemental instrument embodying any such modification; and

    (c) power to:

        (i) having been previously approved by the **Partnership** modify the date fixed for final redemption of the **Loan Note(s);**

        (ii) reduce or cancel the principal amount payable on the **Loan Notes;**

        (iii) reduce the amount payable or modify the method of calculating the amount payable on the **Loan Note(s)**; or

        (iv) modify the dates for payment in respect of any interest, on the **Loan Notes.**

20. An Extraordinary Resolution passed at a meeting of the **Loan Note Holders** shall be binding on all the **Loan Note Holders** whether or not they are present at the meeting. Each of the **Loan Note Holders** shall be bound to give effect to it accordingly. The passing of any such resolution shall be conclusive evidence that the circumstances justify passing it (so that the meeting may determine without appeal whether or not the circumstances justify passing it).

21. **Extraordinary Resolution**, when used in the Conditions, means a resolution passed at a meeting of the **Loan Note Holders** duly convened and held in accordance with the Conditions.

22. A resolution in writing signed by or on behalf of all the **Loan Note Holders** shall, for all purposes, be as valid and effectual as an Extraordinary Resolution passed at a meeting duly convened and held in accordance with the Conditions. Such resolution in writing may be contained in one document or in several documents in similar form, each signed by one or more **Loan Note Holders.**

23. Minutes of all resolutions and proceedings at every meeting shall be made and duly entered in books to be from time to time provided for that purpose by the **Partnership**. Any minutes, if purporting to be signed by the Chairman of the meeting or by the Chairman of the next succeeding meeting of the **Loan Note Holders**, shall be conclusive evidence of the matters stated in them. Until the contrary is proved, every meeting for which minutes have been made and signed shall be deemed to have been duly held and convened, and all resolutions passed at the meeting to have been duly passed.

*EXHIBIT "G"*



## PRIVILEGE WEALTH
### ONE LP

Meeting of Loan Note Holders of Privilege Wealth One LP held on 23 March 2017 at 12.00 PM at the Caleta Hotel, Gibraltar.

Chairman: Jeremy Lowe

Secretary: Azahar Michau

---

Hello Ladies and Gentlemen

Welcome.

My name is Jeremy Lowe and I have been asked to act as Chairman for this meeting.

The Secretary has confirmed that the meeting has been duly convened on 14 days notice.

To form a quorum this meeting requires 2 or more loan note holders holding or representing by proxy 25% of the total nominal value of outstanding loan notes. The Secretary has confirmed that we have a quorum.

I therefore now open the meeting.

The purpose of the meeting today is to consider and vote on a proposed restructuring of the Privilege Wealth One LP MCLN loan note program.

The background and reasons for us to consider the proposed restructuring is set out in the Circular that was circulated to Loan Note holders giving notice of this meeting.

This meeting has been called under the terms and conditions of the MCLNs, and in particular in respect of Schedule 4 of the Loan Note Deed. A copy of which I now table and ask to be added to the minutes of this meeting and which I shall refer to as "the Schedule".

In terms of clause 19 of the Schedule, a meeting of the loan note holders by Extraordinary Resolution has power to amend the terms of the loan notes.

In terms of Clause 20 an Extraordinary Resolution passed at meeting of the Loan Note Holders shall be binding on all loan note holders.

An Extraordinary Resolution is one passed at a meeting of the loan note holders duly convened and held in accordance with the Schedule.

www.PrivilegeWealthLP.com

Info@PrivilegeWealthLP.com | +44 (0) 203 582 3810 | 186 Main Street, Gibraltar
Acting by its General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO.109665-18
Privilege Wealth One Limited Partnership: Partnership Reg. No: 093



**PRIVILEGE WEALTH**
ONE LP

Before voting, I shall read aloud the wording of the proposed resolution to the meeting.

It reads as follows:

At a duly convened meeting of the Loan Note Holders of Privilege Wealth One LP, and in accordance with the Conditions of the Loan Notes, with a Quorum present, the meeting of the Loan Note Holders has by Extraordinary Resolution **RESOLVED** that:

(i)  the following amendments to the terms and conditions of the Loan Notes as set out below are hereby approved as being in the best interests of the Loan Note Holders and the Partnership:

1.  *Use of Proceeds:* The proceeds of all subscriptions for the Loan Notes shall be used to lend funds to corporate entities operating in, and providing loans to, the consumer loan market and to purchase interests in non-performing debtors books for collection and rehabilitation of loans in the United States of America. The proceeds of all subscriptions for the Loan Notes shall also be used to cover the allied administration, management and insurance costs thereof.

2.  *Interest Rate:* The annual percentage interest rate of each of the Loan Notes shall remain unchanged.

3.  *Interest Payments*: The date for payment of Interest Payments shall be adjusted as follows: The Quarter Dates upon which interest is expressed to be due to be paid shall be substituted with an Annual Date whereby all Loan Note holders shall be calculated and paid on 31 March of each year. The first interest date being 31 March 2018 and on 31 March of each subsequent year. The Interest Rate shall be applied on a daily actual basis to calculate the interest payable on each Loan Note at the new interest payment date.

4.  *Redemption Date*: The Redemption Dates of all Loan Notes with Redemption Dates due in 2017 and 2018 shall be extended to a revised Redemption Date being on the same day in the immediately following year. Such that, by way of example a Loan Note due for maturity on 1 August 2017 shall mature of 1

Info@PrivilegeWealthLP.com | +44 (0) 203 582 3810 | 186 Main Street, Gibraltar
Acting by its General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO.109665-18
Privilege Wealth One Limited Partnership: Partnership Reg. No: 093



**PRIVILEGE WEALTH**

ONE LP

August 2018, and a Loan Note with a Redemption Date of 31 March 2018 will be revised to 31 March 2019.

5. *Consideration*. In consideration for the extended Redemption Date, all Loan Note holders who are affected shall receive upon redemption an amount equal to 103% of the Capital Value of the Loan Notes.

6. *Same offer to all Loan Notes holders*: Loan Note holders holding Notes maturing after 2018 shall have the right but not the obligation to extend the Redemption Date of its Loan Notes by 1 year in return for the same Consideration of the amount due on Redemption being increased from 100% of the Capital value of 103% of the Capital Value. If the Loan Note holder wishes to make such extension it shall do so on Notice to the Partnership, which notice must be received at any time prior to 31 March 2018.

7. *Loan Note Register*: The Loan Note register shall be updated to reflect the amendments resolved herein.

8. *New Loan Notes issued*: All Loan Note holders shall be issued a revised Loan Note Certificate, or addendums to current certificates, reflecting the amended terms hereof which will be substitute, and terminate, existing Loan Notes.

9. *Redemption Notice.* This Resolution, and the amendments to the Loan Notes contained herein, shall not constitute an Event of Default and shall cause the Loan Notes to become redeemable under Clause 10 of Schedule 2 of the Conditions.

(ii) The General Partner is hereby authorized, empowered and directed, in the name of and on behalf of the Partnership, to take, or cause to be taken, all such actions, deeds and things necessary or advisable to cause the effect of this Resolution, and the amendment to the terms of the Loan Notes, to be effected including, without limitation, the preparation, execution (whether under hand, by way of deed or otherwise) and filing of documents, forms and agreements and undertakings in support of the subject matter of this Resolution.

www.PrivilegeWealthLP.com

Info@PrivilegeWealthLP.com | +44 (0) 203 582 3810 | 186 Main Street, Gibraltar
Acting by its General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO.109665-18
Privilege Wealth One Limited Partnership: Partnership Reg. No: 093



**PRIVILEGE WEALTH**

ONE LP

(iii)  All actions taken by the Directors, Officers, agents, legal and professional advisers of the General Partner for the Partnership and all documents executed by any Director or Officer of the General Partner prior to the effective date of this Resolution in furtherance of the arrangements, matters and transactions contemplated by these resolutions be and are hereby approved, ratified, confirmed and adopted in all respects as acts and deeds done for and on behalf of the General Partner on behalf of the Partnership.

We shall now take a vote on the proposed resolution.

By a show of hand in the room please raise your hand if you vote in favour of the proposed resolution:

Eight (8)

Please raise your hand if you wish to vote against the proposed resolution:

Zero (0)

And if you are present but wish to abstain from voting:

Zero (0)

**The resolution is therefore passed by a unanimous vote of 100% majority on show of hands.**

We have also received votes by proxy.

The proxies are calculated using the currency conversion rates as prescribed in Clause 5.

I now ask that if there are any noteholders in the room in person who carry a proxy on behalf of any other Noteholder please present a copy to the Secretary now if they have not already done so.

We have have also received a number of proxy vote forms in advance of the meeting.

We shall now confirm the tally of the votes.

The total number of votes available to be cast are: 21,044,509

www.PrivilegeWealthLP.com

Info@PrivilegeWealthLP.com | +44 (0) 203 582 3810 | 186 Main Street, Gibraltar
Acting by its General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO.109665-18
Privilege Wealth One Limited Partnership: Partnership Reg. No: 093



## PRIVILEGE WEALTH
### ONE LP

The total number of votes received is: 12,701,084, which represents 60.4% of the total votes available

The total number of votes cast in favour or the resolution is: 8,412,789 which is 66.23%

The total number of votes cast against the resolution is: 4,288,295 which is 33.77%

Therefore the votes by proxy pass the resolution.

There being no further business for consideration at this meeting, it only remains for me to thank you all again for your attendance and I now call the meeting to a close.

………………………………………………………………………………………………………………………………………………………
…..

Confirmed as a true minute of the meeting: Signed this 23rd Day of March 2017, at The Coleta Hotel, Gibraltar

*Azahar Michau* ............ *Chu* ..............
By: Secretary

www.PrivilegeWealthLP.com

Info@PrivilegeWealthLP.com | +44 (0) 203 582 3810 | 186 Main Street, Gibraltar
Acting by its General Partner: Privilege Wealth Management Limited (Gibraltar): Company Reg. No: 109665/REID No. GICO.109665-18
Privilege Wealth One Limited Partnership: Partnership Reg. No: 093

*EXHIBIT "H"*

## File Copy



# CERTIFICATE OF INCORPORATION
# OF A
# PUBLIC LIMITED COMPANY

## Company Number  **9697314**

The Registrar of Companies for England and Wales, hereby certifies that

PRIVILEGE WEALTH PLC

is this day incorporated under the Companies Act 2006 as a public company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **22nd July 2015**



*N09697314Q*

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006



Companies House



**THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES**

*EXHIBIT "I"*

In accordance with Rule 3.35 of the Insolvency (England & Wales) Rules 2016 & Paragraph 49(4) of Schedule B1 to the Insolvency Act 1986

# AM03
## Notice of administrator's proposals


Companies House



SATURDAY

A24    17/03/2018    #115
*A71WZS0H*
COMPANIES HOUSE

## 1 Company details

| Company number | 0 9 6 9 7 3 1 4 |
|---|---|
| Company name in full | Privilege Wealth Plc |

→ Filling in this form
Please complete in typescript or in bold black capitals.

## 2 Administrator's name

| Full forename(s) | John |
|---|---|
| Surname | Kelmanson |

## 3 Administrator's address

| Building name/number | 4 Stirling Court |
|---|---|
| Street | Stirling Way |
| Post town | Borehamwood |
| County/Region | Hertfordshire |
| Postcode | W D 6  2 B T |
| Country | |

## 4 Administrator's name ❶

| Full forename(s) | Stephen |
|---|---|
| Surname | Katz |

❶ Other administrator
Use this section to tell us about another administrator.

## 5 Administrator's address ❷

| Building name/number | 26-28 Bedford Row |
|---|---|
| Street | |
| Post town | |
| County/Region | London |
| Postcode | W C 1 R  4 H E |
| Country | |

❷ Other administrator
Use this section to tell us about another administrator.

04/17 Version 1.0

# AM03
## Notice of Administrator's Proposals

| **6** | **Statement of proposals** |
|---|---|
| | ☑ I attach a copy of the statement of proposals |

| **7** | **Sign and date** |
|---|---|

| Administrator's Signature | Signature ✕ | ✕ |
|---|---|---|

| Signature date | d 1 | d 5 | m 0 | m 3 | y 2 | y 0 | y 1 | y 8 |
|---|---|---|---|---|---|---|---|---|

## AM03
## Notice of Administrator's Proposals

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

| | |
|---|---|
| Contact name | Jason Callender |
| Company name | Kelmanson Insolvency Solutions |
| Address | 4 Stirling Court |
| | Stirling Way |
| Post town | Borehamwood |
| County/Region | Hertfordshire |
| Postcode | W D 6   2 B T |
| Country | |
| DX | |
| Telephone | 020 8441 2000 |

### ✔️ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
- ☐ The company name and number match the information held on the public Register.
- ☐ You have attached the required documents.
- ☐ You have signed and dated the form.

### ❗ Important information

All information on this form will appear on the public record.

### ✉️ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the address below:

*The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.*
DX 33050 Cardiff.

### ℹ️ Further information

For further information please see the guidance notes on the website at www.gov.uk/companieshouse or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.gov.uk/companieshouse

# In the High Court of Justice

# No CR-2018-000569

# Joint Administrators' Report and Statement of Proposals Pursuant to Paragraph 49 of Schedule B1

**Privilege Wealth Plc - In Administration**

**15 March 2018**

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

**CONTENTS**

| | |
|---|---|
| 1 | Introduction and Background |
| 2 | Administration Strategy and Objective |
| 3 | Joint Administrators Receipts and Payments |
| 4 | Financial Position |
| 5 | Proposals |
| 6 | Exit Routes |
| 7 | Pre-administration Costs |
| 8 | Joint Administrators' Remuneration |
| 9 | Estimated Outcome |
| 10 | Proposals approval and next report |

**APPENDICES**

| | |
|---|---|
| A | Statutory Information |
| B | Receipts and Payments Account for the Period from 23 January 2018 to 15 March 2018 |
| C | Rosebud Agreement Destination of Funds |
| D | Directors' Estimated Statement of Affairs of the Company |
| E | Additional Information in Relation to the Administrators' Fees |

PRIVILEGE WEALTH PLC - ADMINISTRATION

**1        Introduction and Background**

1.1      Privilege Wealth Plc ("PWPLC") was incorporated and operated as a holding company. Its principle purpose was to assist in the raising of finance for its four overseas subsidiaries, as well as the day to day management of the subsidiaries.

1.2      The business model of the group was to make profit from borrowing money and in turn investing these funds in the form of high yielding pay day loans to individuals with low or no credit, primarily located in the United States, or by way of purchasing portfolios of distressed debt. The interest differential less operating costs would represent the profit available for the group whilst the wide spread of risk by way of low exposure to any one defaulting consumer would mitigate the risks for investors

1.3      Due to the nature of the trade the business had no direct PAYE employees and trading premises were not required, with the registered office being used for correspondence purposes only. One director, Martin Sampson, had approximately 4 years previous experience of unsecured lending to US consumers, with the main operations being conducted in Panama where he is based.

1.4      The two principle investors into PWPLC are Privilege Wealth One LLP ("PWOne") and Helix Investment Management SLP ("Helix"), who invested funds secured from their respective loan note holders, bond holders and investors.

1.5      PWOne is a Gibralter limited partnership and Helix is a ring fenced Luxembourg investment fund. Each has its own distinct portfolio of investors.

1.6      The main operations of the group were conducted by Privilege Call Centres Inc, a PWPLC subsidiary located in Panama City, in the Republic of Panama. This subsidiary operated as a call centre, which at its peak in around October 2016, employed in excess of 150 Panamanian nationals. Approximately 25,200 US borrowers were acquired, mostly through purchased leads from a number of US lead provider companies, which would then be contacted from the Panama call centre. If individuals passed a lending criteria screening test (approximately 10-20 minutes) they would be accepted for a loan. Loans typically varied between $200 and $2,000 with the average around $450.

1.7      Privilege Direct Inc ("PDI"), a 76% owned subsidiary of PWPLC also located in Panama, was utilised as a specific vehicle to provide loans, which was facilitated by contracting the services of Rosebud Lending BHL ("Rosebud"), a Sioux Indian sovereign nation lender located in South Dakota. A total of $4.4m was paid to Rosebud, to be advanced directly into the US Consumer Credit market and collected periodically.

1.8      By 1 December 2016 interest of $5.3m had accrued on the $4.4m of capital advanced to Rosebud, with a total of $9.7m repayable to PDI and then onward to PWPLC. Rosebud had insufficient funds to repay the balance due, which affected the cash flow of the group. A Surrender Agreement was later entered into by Rosebud, PWPLC and the two Panamanian subsidiaries, whereby cash in hand of $566,143 USD was to be released to various defined parties simultaneously with the sale of the pay day loan book to a newly formed 100% subsidiary of PWPLC located in Belize.

1.9      Insufficient financial control within the group between 2014 and 2016 would ultimately have a devastating impact on the Company. Richard Colwell, a director of the Company, travelled to Panama approximately 5 times to review and implement some financial control in the main operating subsidiary. Richard Colwell also appointed Knill James Chartered Accountants to get a third party independent qualified opinion on the financial control of the operating subsidiary located in Panama. Upon their findings, Richard Colwell attempted to put approximately 20 base controls in place, however this was reportedly met with resistance by the manager of the call centre located in Panama.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

1.10    As has been widely reported the local manager of the Panama call centre known as Chris Rock, was the victim of a shooting on March 16th 2017 in Panama City. Chris Rock had introduced The Oliphant Group / Oliphant Financial ("Oliphant") located in Sarasota, Florida, United States in or around December 2016 as a trading partner. It is believed that Oliphant may have taken over the collection of the pay day loans and other loan portfolios previously under the control PWPLC but at present the situation is uncertain.

1.11    Furthermore, a group company advanced in excess of $5m directly to Oliphant, for the purchase of a distressed non-performing credit card loan book with a notional value believed to be worth approximately $59m  A return on this investment has not been paid by Oliphant, causing further cash flow problems within the group.

1.12    It was subsequently revealed that Chris Rock was not his true identity and that he was in fact an Interpol wanted person also known as Chris Kamyczek and/or David James. Upon the director's investigations into the financial stability of the subsidiary located in Panama, it became evident that the subsidiaries liabilities were significantly higher than detailed on the accounting records available. Furthermore, upon collection of the "pay day loans" it was established that profits generated were not being paid to the group companies, after settlement of all operating costs, in order to settle all inter-company loans. The Company was therefore using high interest debt, rather than equity, to fund capital expenditure and operational costs

1.13    Both subsidiaries located in Panama have now ceased trading and commenced insolvency proceedings, with significant inter-company balances due to PWPLC.

1.14    During the Autumn of 2016 articles were published on a financial reporting web site, Offshore Alert, suggesting that the whole operation was an investor scam and warning against investment into the business. The directors advise that this compounded the cash flow issues.

1.15    The company took steps to pursue the author of Offshore Alert; David Marchant, for defamation and a judgment was obtained against him in the High Court in London on 9 March 2017 with an award in PWPLC's favour in the sum of £80,000  However, Mr Marchant, who is based in Florida, did not submit to the UK proceedings and no steps have been taken to enforce the judgment.

1 16    The financial irregularities within the group and insolvency of the subsidiaries in Panama would ultimately have a significant impact on PWPLC's ability to trade. In addition, the Company's operational costs were too high, reaching approximately $550,000 per month, consisting mainly of payroll and rental costs.

1.17    As such, the directors approached John Kelmanson of KCBS LLP t/a Kelmanson Insolvency Solutions to provide services to assist with the company's financial position. Based on the information available at that time, it was concluded a Creditors Voluntary Liquidation would be the most appropriate course of action. Notices of a meeting of members and virtual meeting of creditors were issued to members and creditors respectively on 20 December 2017, with the meetings convened to be held on 12 January 2018.

1.18    Helix Investment Management SPA ("Helix"), who are the second largest creditor, requested a physical meeting of creditors on 11 January 2018, which was duly convened to be held on 23 January 2018.

1.19    Mr Kelmanson asked Stephen Katz of David Rubin & Partners LLP, who has significant experience of acting and investigating complex cross border groups of companies to consider a joint appointment and invited Mr Katz to attend a conference call held on 12 January 2018 with Helix and other related parties. Dan Sejas of Sprecher Grier Ltd, an expert insolvency lawyer, was also requested by John Kelmanson to be present on the conference call.

1.20    It was revealed during the conference call for the first time, that Helix were relying on security granted against assets of PWPLC and its US subsidiaries and were acting to secure these potential assets for themselves rather than allowing them to be dealt with for the benefit of all creditors.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

1.21    Shareholder notices were issued for resolutions to be considered and passed on 23 January 2018. As time progressed, it became apparent that the consents to short notice were not going to be provided by two of the company's shareholders, Bowline Private Fund (Cayman) Limited, whom Helix also represent, and Tom Pawelek who is alleged to be working with Oliphant in the US and who is allegedly withholding key electronic data relating to the residual assets.

1 22    There was a real concern by the directors that delaying tactics were being implemented by Helix to allow them to seize control of Company assets. As such, and after consultation with Mr Katz and Mr Kelmanson it was considered that PWPLC should be placed into Administration with immediate effect to avoid further delays and protect the potential assets of PWPLC.

1.23    As a result, John Kelmanson of Kelmmanson Insolvency Solutions and Stephen Katz of David Rubin & Partners Limited were appointed Joint Administrators of the Company by the Directors pursuant to paragraph 22 of Schedule B1 of the Insolvency Act 1986 on 23 January 2018. John Kelmanson is licensed to act in the United Kingdom as an insolvency practitioner by the ACCA. Stephen Katz is licensed to act in the United Kingdom as an insolvency practitioner by the ICAEW.

1.24    John Kelmanson and Stephen Katz act jointly and severally in the Administration.

1.25    The EC Regulation on Insolvency Proceedings 2000 applies to the Administration. The proceedings are main proceedings as defined by Article 3 of the Regulation. The Company is based in the United Kingdom.

1.26    This report incorporates the Joint Administrators' statement of proposals made under paragraph 49 of Schedule B1, which will be treated as delivered to creditors on 19 March 2018.


**2        Administration Strategy and Objective**

2 1       The Administrators must perform their functions with the purpose of achieving one of the following objectives.

a.      *Rescuing the Company as a going concern; or*

b       *Achieving a better result for the Company's creditors as a whole than would be likely if the Company were wound up (without first being in Administration); or*

c.      *Realising property in order to make a distribution to one or more secured or preferential creditors.*

2.2     The prospects of a Creditors Voluntary Arrangement would be largely dependent on the approval of the two largest creditors of PWPLC, who represent in excess of 85% of creditors, as per the Directors' Estimated Statement of Affairs. It was clear from the outset however, that purpose (a) would not be achievable as PWPLC was insolvent and had ceased to trade. The two subsidiaries located in Panama, representing the largest debtors of PWPLC, had also ceased to trade and proceeded to enter into Liquidation.

2.3     It was apparent that the resolutions to wind the company up were not going to be passed by shareholders at the short meetings convened and as such, a further substantial passage of time would have elapsed and thus put the Company's assets in jeopardy, given the actions of Helix. Placing PWPLC into Administration will therefore undoubtedly achieve a better result of the Company's creditors and satisfy the requirements of purpose (b).

2.4     There is no qualifying floating charge holder or preferential creditor and therefore objective (c) cannot be met.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

### Progress Since Appointment:

### Administration (including statutory compliance and reporting)

2.5     Following the Joint Administrators appointment, the strategy for the Administration was carefully assessed to ensure that a coherent planned process for the case could be achieved. This work has included liaison with solicitors to deal with the legal considerations surrounding the Company's insolvency (such as assessing the validity of any 3rd party security in relation to the assets) and liaising with all relevant parties about the most appropriate means of realising maximum value in PWPLC's business and assets.

2.6     The realisation of PWPLC's assets is unusual in its nature and complex due to the jurisdictions involved, parties claiming interest and the tracing of assets required. Further information in this regard is provided below from 2.12.

2.7     The interest in the Administration and queries received by the Joint Administrators has proved to be substantial, due to the interest and concern being shown by a large number of individual investors. The quantum of creditor liability is significant and the nature of this liability complex. Further details in this regard are provided below from 2.40.

2.8     The Joint Administrators have also dealt with a number of statutory formalities which are required under related legislation   Typically, this includes issuing and filing all appointment notices with creditors and the Registrar of Companies and also advertising their appointment in the London Gazette.

2.9     The Joint Administrators have also prepared and issued these proposals to creditors outlining how the purpose of the Administration may be achieved

2.10    Other statutory duties performed are outlined in further detail in the fees estimate/fees information which can be found at **Appendix E**. Please note that much of this work will have been performed to comply with statutory requirements and as such may not necessary add any value to the insolvent estate.

### Trading

2.11    The company ceased to trade prior to the date of Administration and as such there has been no requirement for the Administrators to trade the business post appointment.

### Realisation of assets

2.12    The most significant assets within PWPLC are detailed below:

### *Rosebud Lending*

2.13    As detailed above at 1.8, a Surrender and Sale Agreement was entered into by Rosebud in full and final settlement of the outstanding balance totalling $9 7m USD. The agreement included the assignment of the pay day loan book, in addition to release of part of the cash in hand held by Rosebud, totalling $566,143 USD. Further details regarding these assets of the Company are provided below:

Cash in Hand

2.14    The Joint Administrators have undertaken a detailed exercise of tracing the destination of all funds received within the agreement, which has involved meetings and regular communication with the directors of PWPLC, correspondence with the lawyer engaged by Privilege Direct Inc, review of the electronic financial records and contacting all parties who are believed to be in receipt of funds. A summary of the Administrators findings are detailed below and in the schedule attached at **Appendix C**

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

2 15    *PWPLC Escrow Account* – The sum of $150,000 was to be held on escrow for the benefit of the Privilege group, to be released in four tranches. The sum of $50,000 is due as at today's date, which has not yet been received. The final balance of $100,000 is payable in three further tranches, with the final payment falling due in September 2018. The Joint Administrators have been in correspondence with Rosebud and held conference calls, to establish the best mechanism for the release of funds. Correspondence remains ongoing in this regard

2.16    *PWPLC Payment – Carmel Collections.* As at the date of the agreement, Carmel Collections were holding a balance of $45,105 in relation to the pay day loan book. This balance was payable immediately upon execution of the agreement and remains outstanding. The Joint Administrators have endeavoured to establish the contact details of Carmel Collections and requested payment. Contact has been made with the lawyer representing Carmel Collections and dialog remains ongoing in this regard, with a proposed Settlement Agreement to be agreed and executed shortly in order to facilitate the release of funds.

2 17    *PWPLC Payment – FSE Law.* FSE Law were instructed by Privilege Direct Inc to act on their behalf in collecting the sums payable to the Privilege group, in accordance with the Surrender Agreement. FSE collected the sums due, after settlement of Rosebud legal costs relating to the pay day loan portfolio. These funds have been utilised, in accordance with the director's instructions, to pay seven different parties. Further details of these payments are provided at 2 18 – 2.20 below.

2.18    Included within the detailed payments is payment of $25,000 USD to Berger Singerman, a law firm based in Florida, US. The Joint Administrators have established the instruction to the lawyer was to conduct a pre-suit investigation with a view to issuing a claim against Oliphant for an account and if necessary monetary damages  The Joint Administrators have considered in detail the best strategy to progress this potential asset realisation and have held a conference call with the lawyer, in addition to correspondence, in order to progress matters. Ultimately the sums held by the lawyer were deemed to be insufficient to allow for them to fully engage in the case and they were unwilling to work on a contingency fee basis. Therefore the return of the balance held after deduction of their fees has now been received, totalling £11,562.

2 19    We are advised that a sum of $10,000 has been retained in order to facilitate payment to a private investigator and lawyer/collection agency to locate and issue legal proceedings against Tom Pawelek, a shareholder and former director of PWPLC. It is understood that Mr Pawelek holds or is able to access all of the electronic data relating to the 25,200 US customer details included within the pay day loan book. The Joint Administrators have been advised by the law firm based in Tampa, Florida, that the funds have never been received by them and the directors are seeking to establish where the funds are and to assist with their repatriation to the company.

2.20    Other payments made include settlement of FSE's costs and payments to the Liquidator of the two Panama subsidiaries. Where appropriate we have contacted the parties to account for the sums paid and to provide information and documentation relating to any services carried out We are still in the process of obtaining and reviewing this.

2.21    *Pomo One* – We are advised by the directors that this payment represents a payment for data leads. However, at present we are unaware of why it was necessary to make this payment from the funds released and this remains under review.

2.22    *£14,857 payment* – the payment out of these sums remains under review.

2.23    Rosebud Escrow Account – The sum of $25,000 is payable to Rosebud under the same stipulations to that of the PWPLC Escrow Account  This is not a realisable asset of the Company.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

Sale of Pay Day Loan Portfolio

2.24    As mentioned above the sale of the Rosebud pay day loan portfolio to a newly formed 100% owned subsidiary of PWPLC was concluded alongside the Surrender Agreement with the consideration being the $9.7 USD owed to Privilege Direct Inc (Panama) by Rosebud The Joint Administrators have considered in detail the best strategy to maximise value in the loan book and are taking steps to deal with this asset

2.25    The Joint Administrators have contacted the Liquidator of both Privilege Direct Inc (Panama) and Privilege Call Centres Inc (Panama) and obtained confirmation that the Liquidator holds no claim or interest in the Rosebud pay day loan book.

2.26    A similar confirmation has also been obtained from Martin Sampson in Panama who remains interested by way of a minority shareholding in Panama

2.27    The Joint Administrators are aware that Helix are seeking to rely on security granted in the US over the subsidiaries of PWPLC., Pursuant to this Helix and Concord (both represented by Peter Stokes) have already issued legal proceedings in both State and Federal Courts in Florida, USA against Privilege Direct Inc, Oliphant Financial and Oliphant Group in respect of this security and are seeking an account which is believed to include amounts perceived as due from the Rosebud pay day loan book, amongst others. The Joint Administrators are reviewing these claims and have engaged with Mr Stokes on these issues in order to seek to avoid very costly disputed legal proceedings in the US Courts. In particular Rosebud were always the legal owner of the pay day loan book and therefore our view is any security created in the US could not have legally attached to it. In light of this it is our current view that the legal and beneficial ownership of the Rosebud pay day loan book currently vests in the Belize subsidiary of PWPLC and is not subject to the Helix security.

2 28    As noted above we have maintained a dialogue with Helix and have held conference calls with all relevant parties, with a view to establishing the most cost effective resolution in relation to the pay day loan book and related matters. Recent developments have resulted in all parties reaching an agreement in principle, subject to execution of a proposed Settlement Agreement. In order not to prejudice any ongoing settlement negotiations further details are not being disclosed at this time.

2 29    Attempts have been made by the Joint Administrators to contact Oliphant, who it is understood may be continuing to collect sums due from the Rosebud loan book, to obtain an account of all funds received and now due to PWPLC or its subsidiary. The lawyer representing Oliphant has made contact and been unhelpful in responding to the queries and information requested.

2.30    In order to progress matters the Administrators are arranging for legal representation in order that PWPLC join the proceedings issued by Helix and Concord in Florida as a plaintiff and support their claims.

2 31    As noted above Concord Equity Group Plc, of which Peter Stokes is a director, have also issued legal proceedings in Florida, US against Oliphant. The Joint Administrators consider that joining these proceedings will also be of use to PWPLC. Concord Equity Group Plc are not a creditor of PWPLC.

2.32    It is considered beneficial to all parties involved that they co-operate with each other, to achieve realisations.

2.33    As mentioned at 2.19, PWPLC had previously employed a private investigator and lawyer collection agency to locate and issue legal proceedings against Tom Pawelek, the former director. We are also in the process of instructing lawyers in the US with a view to progressing matters. The electronic data is essential in order to pursue the amounts due from the pay day loans and other assets.

PRIVILEGE WEALTH PLC - ADMINISTRATION

### *Oliphant – Credit Card Loan Book*

2 34    As detailed at 1.11 above, Privilege Wealth Management Limited has paid funds on behalf of PWPLC totalling approximately $3.7m under promissory notes directly to Oliphant for investment into a distressed credit card loan book. The Joint Administrators have also been advised that an individual has invested $1.3m into PWPLC, which was paid to Oliphant for investment into the credit card loan book  The Joint Administrators have been in correspondence with the individual, who believes that this amount is currently held by Oliphant *and ring fenced from any third party security.*

2.35    No funds have been received from Oliphant in respect of the capital invested and the Joint Administrators are considering the most cost effective strategy to realise any sums which may be properly due to PWPLC.

2 36    Helix have also advanced capital directly to Oliphant, and via Privilege Direct Corp, for which the above mentioned secured promissory notes have been issued to Helix. These funds were issued for investment into the credit card loan book and Helix maintain they hold security over the credit card loan book

2.37    The work undertaken by the Joint Administrators and their staff to date in investigating and realising the Company's assets has been necessary in order to maximise the likelihood of a return to creditors being made.  Assets that remain to be realised, will be dealt with as the Administration progresses and further updates will be provided to creditors in ongoing progress reports as appropriate

### Creditors

2.38    The Joint Administrators have received extensive calls and emails from the individual investors of the largest creditor, PWOne. Whilst the individual investors of PWOne are not directly creditors of the company and the Joint Administrators recognise that until recently investors had not received clear financial information from the management of PWOne. However, we are aware that this has now been rectified and that investors are engaged with the managing partners and therefore we do not intend to continue to enter into prolonged correspondence with each investor  At present much time has been expended attending to such matters. The time incurred / to be incurred in this respect will not necessarily bring any financial benefit to creditors of PWPLC.

2 39    Dialogue has been maintained with the second largest creditor, Helix Investment Management LLP, regarding their creditor status and any security which they may hold over company assets in overseas jurisdictions

2.40    Due to the value and nature of the claims held by the two largest creditors, which consist of many promissory loan notes, it is anticipated that significant time will be expended in due course agreeing these claims.

2.41    *Included within the company's creditors are three "legacy creditors" whose debts predate the* incorporation of PWPLC and relate to investment into a pay day loan program with a group company. Due to the age and nature of these creditor claims, it is anticipated that adjudication of these claims may also require considerable resource and therefore time.

### Investigations

2.42    The Joint Administrators are required, within 3 months of their appointment, to submit a return on the conduct of all persons who have been appointed as a director of the Company, or have appeared to be a shadow director of the Company during the period of 3 years ending on the date of the Joint Administrators' appointment. To facilitate the preparation of this return and the Joint Administrators enquires into the Company's affairs, the Joint Administrators have already invited creditors to provide them with information on any matters of concern to the creditors.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

2.43    There are a total of seven directors subject to investigation, of which five are understood to be located overseas. Communication with some of the Company's directors has therefore proved to be a difficulty.

2 44    The Joint Administrators have sought to secure the records of the Company, both physical and electronic, for examination. Whilst there is concern regarding the location, availability and supply of physical records, the Joint Administrators have been provided with electronic financial records, which continue to be examined to identify all potential realisations and areas of misconduct.

2.45    In the event that questionable transactions are identified it may be necessary to conduct further investigations and instruct solicitors to assist in pursuing a recovery. If the Joint Administrators encounter resistance in making a recovery, formal legal action may be required.

2.46    The Joint Administrators findings at this early stage would lead them to believe that the Privilege group was possibly operated as a Ponzi scheme, with only an estimated $9m invested into actual assets out of a total $40m of capital raised from investors  Investigations continue in this regard.

2.47    Information of the Joint Administrators detailed investigations into assets of PWPLC have been provided under the 'Realisation of Assets' section of the report.

2.48    Due to the nature of the group of companies, quantum of funds involved and interest in the company's affairs, it is anticipated that significant time will be expended conducting all appropriate investigations.

**3    Joint Administrators' Receipts and Payments**

3.1    A summary of receipts and payments for the Administration period from the date of my appointment to 15 March 2018 is attached at **Appendix B**  I would comment on the account as follows:

**Receipts**

VAT Refund

3.2    A VAT refund has been received from HM Revenue & Customs relating to a period prior to the date of Administration.

Rosebud Lending Settlement – Cash

3.3    The sum of £5,373.60 has been received from Cubed Consultancy. This represents the balance available from the settlement funds paid by Rosebud Lending, after deduction of legal costs and expenses from various parties, in accordance with the signed Surrender Agreement.

Cash Held at Lawyers

3.4    The sum of £11,562.76 has been returned by a Berger Singerman, a firm of lawyers located in Florida, US who were previously instructed by the directors of PWPLC as detailed at 2.19 above.

**Payments**

Statutory Advertising

3.5    The sum of £79 plus VAT has been paid in respect of the London Gazette advertisement of the Appointment of Joint Administrators

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

Insurance Bordereau

3.6     The Joint Administrators are required to obtain a statutory bond to cover asset realisations in the Administration. The sum of £780 has been paid to date in this regard

**4       Financial Position**

4 1     Attached at **Appendix D** is a copy of the Director's Estimated Statement of Affairs of the Company as at the date of the appointment of the Joint Administrators, which has been submitted by each director of the Company and is stated before the costs of the Administration procedure are considered.

4.2     I have the following observations to make in relation to the Directors' Estimated Statement of Affairs:

Directors' Loan Account

4.3     The directors' loan account relates to balances due from three former directors of the Company as detailed below:

- Mr A Sweeny - $101,512 01

- Mr P Stokes - $164,289.92

- Mr T Pawelek - $1,953.12

4 4     It is the Joint Administrators current understanding that all three former directors reside abroad, which will likely complicate realisations.

Book Debts

4.5     The Company's book debts consist of balances due from the four subsidiary companies, two of which are located in the US and the remaining two in Panama City. As previously reported the two subsidiaries in Panama City are in Liquidation and it is the Joint Administrators understanding that the two subsidiaries located in the US have minimal/no assets. A realisation is therefore considered unlikely.

Shares & Investments

4.6     This represents the investment at cost in the subsidiaries Privilege Call Centres and Privilege Direct Corporation (US). As detailed above, a realisation from PWPLC's subsidiaries in Liquidation is considered unlikely.

Other Receivables

4.7     Included within other receivables is a provision set aside for an insurance claim commenced by the Company in respect of the above mentioned libel action against Mr Marchant  The Joint Administrators are exploring this potential claim, however at this time a realisation is not anticipated.

4.8     It has been established that the balance remaining relates to a provision in the draft accounts for sums considered due from seven Companies. The Joint Administrators are currently reviewing the financial records of the Company and are in dialogue with the directors to establish whether a realisation can be made in this regard.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

<u>Notes Receivable</u>

4.9    Notes receivable represents the promissory notes issued to PWPLC by Privilege Direct and Privilege Call Centres Panama. This is in relation to the investment made into the Rosebud Lending Pay Day Portfolio  These notes are now no longer realisable as any value which was in them now vests in the sums due to PWPLC from the Belize subsidiary. Also included are sums advanced to Oliphant which are the subject of the actions noted above.

<u>Accrued Income</u>

4.10    This represents the promissory notes accrued interest due in respect of the notes receivable

<u>Unpaid Calls</u>

4.11    Sums due from the shareholders in respect of unpaid share capital, as detailed below:

- Bowline Private Fund (Cayman) - £7,500
- Mr M Munnelly - £15,000
- Mr M Sampson - £11,250
- Mr T Pawelek

<u>Creditors - Directors</u>

4.12    The balance due to directors represents the amount outstanding to an ex director of the Company and the two current directors of the Company.

<u>Creditors – Promissory Notes</u>

4.13    This represents the promissory notes and accrued interest due to Helix, PW One LLP and the three legacy creditors, in relation to the funds invested.

**5    Proposals**

5.1    It is proposed that the Joint Administrators will continue to manage the affairs of the Company in order to achieve the objective of the Administration. In the circumstances it is proposed that

5.2    If, having realised the assets of the Company the Administrators think that a distribution will be made to the unsecured creditors other than by virtue of section 176A(2)(a), they propose filing a notice with the Registrar of Companies which will have the effect of bringing the appointment of the Administrators to an end and will move the Company automatically into Creditors' Voluntary Liquidation (**CVL**) in order that the distribution can be made. In these circumstances, it is proposed that the Joint Administrators in office at the date of conversion to CVL will become the Joint Liquidators in the CVL. The acts of the Joint Liquidators may be undertaken by either or both of them.

5 3    If the Joint Administrators think that the Company has no property which might permit a distribution to its creditors, they will file a notice with the Court and the Registrar of Companies for the dissolution of the Company

5.4    See Section 6 below on **Exit Routes** for further information on the exit routes available from Administration.

5.5    The Joint Administrators shall do all such other things and generally exercise all of their powers as contained in Schedule 1 of the Insolvency Act 1986, as he considers desirable or expedient to achieve the statutory purpose of the Administration

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

5.6     If the Joint Administrators consider it necessary to extend the period of the Administration, they will seek the consent of creditors or the approval of the Court to the extension. Creditors may consent to an extension for a period of up to one year and the Court can order that the Joint Administrators term of office be extended for a specified period determined by it.

5.7     The creditors consider establishing a Creditors' Committee and that if any such Committee is formed they be authorised to sanction the basis of the Administrators' remuneration and disbursements and any proposed act on the part of the Administrators without the need to report back to creditors generally, to include any decision regarding the most appropriate exit route from the Administration.

5.8     The basis of the Joint Administrators' remuneration may be fixed as one or more of the following bases and different bases may be fixed in respect of different things done by them.

    ■     As a percentage of the value of the assets they have to deal with, or

    ■     By reference to time properly spent by the Administrators and their staff managing the Administration, or

    ■     As a set amount

5.9     In accordance with Statement of Insolvency Practice 9, issued by the Association of Business Recovery Professionals, the Joint Administrators be authorised to draw Category 2 disbursements as and when funds are available, in accordance with their firm's published tariff Details of Category 2 disbursements charged by the firms can be found at **Appendix E**.

5.10    Where no Creditors' Committee is appointed the remuneration and disbursements of the Administrators shall be fixed by a decision of creditors or where the Joint Administrators think that the Company has insufficient property to enable a distribution to be made to the unsecured creditors (other than via the Prescribed Part), approval will be sought from the secured and (if necessary) the preferential creditors in accordance with insolvency legislation. The Joint Administrators will also seek approval for any unpaid pre-administration costs detailed in this report and their discharge from liability in the same manner.

5.11    In this case, the Joint Administrators are seeking to approve the basis of their remuneration as follows:

    ■     Due to the highly speculative nature of this case with assets being located in several jurisdictions and being subject to several competing legal claims the Joint Administrators are proposing that their remuneration be based on percentage of the property with which they are dealing and be fixed at 30% of the gross value of all property realised.

    Further details about the proposed fee basis can be found in Section 8 below and **Appendix E**.

5.12    The Joint Administrators will be discharged from liability under Paragraph 98 of Schedule B1 to the Insolvency Act 1986 immediately upon their appointment as Administrators ceasing to have effect.


**6       Exit Routes**

6.1     The options available to the Joint Administrators for the exit from Administration include Compulsory Winding Up, Creditors Voluntary Liquidation, Company Voluntary Arrangement, dissolution of the Company

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

### Creditors Voluntary Liquidation

6.2    Based on present information, the Administrators think a dividend will be paid to the unsecured creditors other than by virtue of the Prescribed Part. As a result, the Administrators will either make an application to Court to enable them to make a distribution to unsecured creditors in the Administration or they will file a notice with the Registrar of Companies in order that the Administration will cease and the Company will move automatically into Creditors' Voluntary Liquidation (**CVL**) to facilitate this distribution. It is proposed that the Administrators in office at the date of conversion to CVL will become the Joint Liquidators of the CVL.

6.3    It is proposed that the Joint Liquidators will be authorised to act jointly and severally in the subsequent liquidation.

6.4    Under the provisions of the Insolvency Act 1986, there is no requirement for an additional meeting of members and creditors to be convened to place the Company into CVL or to appoint a Liquidator. This is because the creditors can agree to the process and to the nominated Liquidator at decision process to be held on 2 April 2018. As a result, the move from Administration to CVL is a simple procedure.

6.5    Creditors should note that in accordance with paragraph 83(7) of Schedule B1 to the Insolvency Act 1986 and Rule 3.60(6) of the Insolvency Rules 2016 they have the right to nominate an alternative liquidator of their choice. To do this, creditors must make their nomination in writing to the Administrators prior to these proposals being approved. Where this occurs, the Administrators will advise creditors and provide the opportunity to vote. In the absence of a nomination, the Administrators will automatically become the Joint Liquidators of the subsequent CVL.

## 7    Pre-administration Costs

7.1    Pre-administration costs are defined as:

    (i)    Fees charged, and

    (ii)    Expenses incurred

by the Joint Administrators, or another person qualified to act as an insolvency practitioner before the company entered Administration (but with a view to its doing so), and "unpaid pre-administration costs" are pre-administration costs which had not been paid when the company entered Administration.

7.2    A letter of engagement between Kelmanson Insolvency Solutions and PWPLC dated 23 January 2018 agreed to pay for our time costs associated with assessing the proposed Administration and seeking the appointment of Joint Administrators.

7.3    Mr Katz and his team were first consulted on 12 January 2018 in connection with the proposed liquidation and acted in an advisory capacity from this date and throughout the period until the date of appointment. However, due to the short time period immediately prior to the appointment taking place and the fact that Mr Katz was working at Mr Kelmanson's office on 23 January no letter of engagement was issued but the time incurred by Mr Katz and his team on that date specifically relating to the obtaining of the administration Order is £1,585 plus the Court fee on application for the Order of £50.

7.4    Below is information on the pre-administration costs incurred in this case, together with details of any amounts which remain unpaid, where applicable.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

7.5     Pre-appointment fees charged and expenses incurred by the Administrators are as follows:

| Charged by | Brief description of services provided | Total amount charged £ | Amount paid £ | Who payments made by | Amount unpaid £ |
|---|---|---|---|---|---|
| KCBS LLP | Strategy & Planning of Administration / preparation of Administration documents | 2,125 | Nil | N/A | 2,125 |
| David Rubin & Partners Limited | Strategy & Planning of Administration / preparation of Administration documents | 1,585 | Nil | N/A | 1,585 + Court fee £50 |

7.6     As referred to above it became apparent on 22 January 2018 that the notices issued to shareholders for the winding up resolutions to be considered and passed on 23 January 2018 were not going to be passed, and that delay tactics were possibly being implemented by Helix to allow them to seize control of Company assets

7.7     It was at this point in time that it was considered the company should be placed into Administration with immediate effect to avoid further delays and protect the potential assets of the company.

7.8     The time costs incurred by KCBS LLP between first considering the Administration to the date of the Joint Administrators appointment total £2,125 representing 8 hours and 30 minutes. This equates to an average hourly charge of £250.00 per hour.

7.9     The time costs incurred by David Rubin & Partners Limited between first considering the Administration to the date of the Joint Administrators appointment total £1,585 representing 4 hours 36 minutes. This equates to an average hourly charge of £344.57 per hour.

7.10    This work has included the following:

- Meetings with the Company's directors and associated discussions

- Full review of the Company's financial position and consideration of appropriate insolvency procedure in order to maximise assets for creditors

- Liaising with Stephen Katz regarding the proposed appointment as Joint Administrator

- Liaising regarding the safeguarding of assets in other jurisdictions

- Liaising with key stakeholders prior to the administration appointment, including the largest creditor of the Company.

- Preparation of all appropriate documentation to secure the appointment as Joint Administrators

7.11    The payment of the unpaid pre-administration costs set out above as an expense of the Administration is subject to the approval of creditors, separately to the approval of the Joint Administrators' proposals. This approval will be the responsibility of the Creditors' Committee if one is appointed or alternatively by a decision of the creditors where there is no Committee.

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

**8      Joint Administrators' Remuneration**

8.1     As Joint Administrators, we are required to provide creditors with details of the work we propose to undertake in the Administration and the expenses we consider will be, or is likely to be, incurred in dealing with the Company's affairs, prior to determining the basis upon which my remuneration will be fixed.

8.2     In addition to this, where the Joint Administrators seek agreement to the basis of their remuneration by reference to time properly spent by them and their staff in attending to matters arising in the Administration, a fees estimate outlining the time and estimated cost of the work to be done must also be provided.

8 3     In this case, we are not seeking to determine the basis of our remuneration as time properly spent by us and our staff in dealing with the affairs of the Company and we are therefore not, required to provide a fees estimate to creditors. Details of the basis  we are proposing, together with information about the work we consider will be necessary in this case and the expenses we consider will, or are likely to be, incurred on this case can be found at **Appendix E**  Further information on the work done since our appointment to the date of this report, can be found in section 2.  Appropriate approval to the basis of our remuneration will be sought as outlined in section 5 of this report.

8.4     Please note however, that in circumstances where my initial investigations reveal matters for further detailed investigation or previously unknown assets to be realised, we reserve the right to refer back to creditors to establish how we are to be remunerated for such additional work, which may be proposed on a time cost basis.  If such work proves necessary, we will revert to creditors with our fees estimate for approval.

8.5     We will provide updates on the expenses we consider will be, or are likely to be, incurred during this case with our progress reports in due course

8.6     Administrators may include details of the remuneration they anticipate will be charged and the expenses they anticipate will be incurred if they become the Joint Liquidators in the subsequent CVL.  This can be done when seeking approval to the basis of their remuneration as Administrators, or alternatively their fees estimate for the CVL can be provided once the Company has moved into CVL. Please refer to **Appendix E** to this report for further information.

8.7     A copy of "A Creditors' Guide to Administrators' Fees" is available on request or can be downloaded from http://www icaew com/en/technical/insolvency/creditors-guides  If you would prefer this to be sent to you in hard copy please contact Jason Callender of this office on 020 8441 2000.

**9      Estimated Outcome**

9 1     Due to the highly speculative nature of this case at this early stage, with assets being located in several jurisdictions and being subject to several competing legal claims, the Joint Administrators are not currently in a position to provide an estimated outcome statement. Creditors will be updated in this regard in the next report.

**10     Proposals approval and next report**

10.1    *I am seeking a decision of creditors on the approval of my proposals by correspondence. The letter issued to creditors with this report (or the link to this report) contains further information about this decision process.*

10.2    The Administrators are required to provide a progress report within one month of the end of the first six months of the Administration and we will report to you again at this time

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

For and on behalf of
Privilege Wealth Plc

**John Kelmanson**
Joint Administrator

Enc

PRIVILEGE WEALTH PLC - ADMINISTRATION

**Appendix A**

**Statutory Information**

### Company information

| | |
|---|---|
| Company name | Privilege Wealth Plc |
| Trading name(s) | None |
| Registered number | 09697314 |
| Registered office address | 4 Stirling Court<br>Stirling Way<br>Borehamwood<br>Hertfordshire<br>WD6 2BT |
| Former registered office address | Rivers Lodge<br>West Common<br>Harpenden<br>Hertfordshire<br>AL5 2JD |
| Trading address(s) | Rivers Lodge<br>West Common<br>Harpenden<br>Hertfordshire<br>AL5 2JD |
| Court details | High Court of Justice |
| Court reference number | 000569 of 2018 |

### Details of the Company's Directors, Shareholders and Secretary

| | Date appointed | Date resigned | Shares held |
|---|---|---|---|
| **Director(s)** | | | |
| Richard Colwell | 20 September 2016 | - | - |
| Mark Munnelly | 22 July 2015 | - | 40% |
| Martin Sampson | 22 July 2015 | - | - |
| Christian Boerner | 28 July 2015 | 10 May 2017 | - |
| Tomasz Pawelek | 1 September 2015 | 29 September 2016 | 10% |
| Peter Stokes | 28 September 2015 | 5 May 2017 | - |
| Andrew Sweeney | 22 July 2015 | 26 September 2016 | - |
| | | | |
| **Other Shareholders** | | | |
| | | | |
| Bowline Private Fund (Cayman) | | | 20% |
| Martin Sampson | | | 30% |
| | | | |
| **Secretary** | | | |
| UKPLC Client Secretary Ltd | 22 July 2015 | 27 August 2016 | - |

**PRIVILEGE WEALTH PLC - ADMINISTRATION**

### Joint Administrators' Details

| | | |
|---|---|---|
| Name of Administrators | John Kelmanson | Stephen Katz |
| Address | KCBS LLP t/a Kelmanson Insolvency Solutions 4 Stirling Court Sirling Way Borehamwood Hertfordshire WD6 2BT | David Rubin & Partners 26-28 Bedford Row London WC1R 4HE |
| Telephone Number | 020 8441 2000 | 0207 400 7900 |
| Fax Number | 020 8441 3000 | 0207 430 2346 |
| Administrator's IP Number | 004866 | 008681 |
| Authorising Body | ACCA | ICAEW |
| Date of Appointment | 23 January 2018 | 23 January 2018 |

Appendix B

# Privilege Wealth Plc
## (In Administration)
## Joint Administrators' Summary of Receipts & Payments
## To 15/03/2018

| S of A £ | | £ | £ |
|---|---|---|---|
| | **ASSET REALISATIONS** | | |
| Uncertain | Directors' Loan Account | NIL | |
| Uncertain | Book Debts | NIL | |
| Uncertain | Shares & Investments | NIL | |
| | Cash held at Lawyers | 11,562 76 | |
| | Rosebud Lending Settlement - Cash | 5,373 60 | |
| 2,353.00 | VAT Refund | 2,352.60 | |
| 2,205 00 | Cash at Bank | NIL | |
| Uncertain | Other Receivables | NIL | |
| Uncertain | Promissory Notes Receivable | NIL | |
| NIL | Promissory Notes Interest Payable | NIL | |
| | Bank Interest Gross | 0.01 | |
| Uncertain | Unpaid Calls | NIL | |
| | | | 19,289.17 |
| | **COST OF REALISATIONS** | | |
| | Insurance Bordereau | 780 00 | |
| | Statutory Advertising | 79.00 | |
| | | | (859.00) |
| | **UNSECURED CREDITORS** | | |
| (124,038.00) | Trade & Expense Creditors | NIL | |
| (2,488,167.00) | Directors | NIL | |
| (39,552,906.00) | Promissory Notes | NIL | |
| | | | NIL |
| | **DISTRIBUTIONS** | | |
| (12,500.00) | Ordinary Shareholders | NIL | |
| | | | NIL |
| **(42,173,053.00)** | | | **18,430.17** |
| | **REPRESENTED BY** | | |
| | VAT Receivable | | 15.80 |
| | Bank 1 - Current | | 18,414.37 |
| | | | **18,430.17** |

John Kelmanson
Joint Administrator

Privilege Wealth plc

Rosebud Funds remaining on administration

| | Rosebud | PW plc Escrow | PW plc Payment | Promo One | Rosebud Escrow | Carmel Collections | FSE | FSE | Berger Singerman | Richard Colwell | Mark Munnelly | Funds re Cantrell LLC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | EUR | $ | $ | $ | $ |
| As per agreement | 175,000 00 | 150,000 00 | 176,143 42 | 40,000 00 | 25,000 00 | - | - | - | - | - | - | - |
| Paid out | (86,556.96) | - | - | - | - | - | - | - | - | - | - | - |
| Funds at Carmel | - | - | (45,104 91) | - | - | 45,104 91 | - | - | - | - | - | - |
| Paid out | - | - | (14,856.85) | - | - | - | - | - | - | - | - | - |
| Promo One | - | - | (430 00) | 430 00 | - | - | - | - | - | - | - | - |
| Sent to FSE | - | - | (115,751 24) | - | - | - | 115,751 24 | - | - | - | - | - |
| Rosebud monies | (88,443 04) | - | - | - | - | - | - | - | - | - | - | - |
| Promo One monies | - | - | - | (40,430 00) | - | - | - | - | - | - | - | - |
| | | | | | | | (115,751 24) | 97,605.79 | - | - | - | - |
| FSE fees | - | - | - | - | - | - | - | (22,800 00) | - | - | - | - |
| Berger Singerman | - | - | - | - | - | - | - | (10,654 61) | 12,500 00 | - | - | - |
| Manuel Sanchez | - | - | - | - | - | - | - | (5,176.90) | - | - | - | - |
| Banking fee | - | - | - | - | - | - | - | (51 18) | - | - | - | - |
| Collection Solutions inc ($7,500) | - | - | - | - | - | - | - | (6,388.97) | - | - | - | - |
| Mark Steel ($2,000) | - | - | - | - | - | - | - | (1,728.28) | - | - | - | - |
| Collection Solutions inc ($8,000) | - | - | - | - | - | - | - | (6,815.61) | - | - | - | - |
| Richard Colwell ($20,000) | - | - | - | - | - | - | - | (16,994.74) | - | 20,000 00 | - | - |
| Cubed Consultancy (M Munelly) | - | - | - | - | - | - | - | (26,455 69) | - | - | 30,910 87 | - |
| FSE fees | - | - | - | - | - | - | - | (539.81) | - | - | - | - |
| Transfer from GCS | - | - | - | - | - | - | - | 12,465 00 | (12,500 00) | - | - | - |
| Berger Singerman fees | - | - | - | - | - | - | - | - | (8,394.85) | - | - | - |
| Mark Steel investigator | - | - | - | - | - | - | - | - | - | (655 00) | - | - |
| Cantrell LLC retainer | - | - | - | - | - | - | - | - | - | - | (10,000 00) | 10,000.00 |
| Panama Liquidator | - | - | - | - | - | - | - | - | - | - | (15,800.00) | - |
| Martin Sampson | - | - | - | - | - | - | - | - | - | (4,500.00) | - | - |
| Remitted to liquidation | - | - | - | - | - | - | - | - | (16,570 15) | (2,345 00) | (5,110.87) | - |
| | - | 150,000 00 | 0 42 | - | 25,000 00 | 45,104 91 | - | - | - | - | - | 10,000 00 |

Reconciliation

| | $ |
|---|---|
| Funds at Carmel | 45,628.91 |
| Funds at Rosebud BHL | 520,514 51 |
| | 566,143 42 |
| Rosebud BHL | 175,000.00 |
| PW Escrow funds | 150,000.00 |
| PW payment | 176,143 42 |
| Promo One payment | 40,000.00 |
| Rosebud escrow | 25,000 00 |
| | 566,143 42 |

Appendix C

Insolvency Act 1986

Privilege Wealth Plc
Estimated Statement Of Affairs as at 23 January 2018

| | Book Value £ | Estimated to Realise £ | £ |
|---|---|---|---|
| ASSETS | | | |
| Directors' Loan Account | 197,877.00 | | Uncertain |
| Book Debts | 2,396,149.00 | | Uncertain |
| Shares & Investments | 9,525,994.00 | | Uncertain |
| VAT Refund | 2,353.00 | | 2,353.00 |
| Cash at Bank | 2,205 00 | | 2,205.00 |
| Other Receivables | 321,192.00 | | Uncertain |
| Promissory Notes Receivable | 16,390,163.00 | | Uncertain |
| Promissory Notes Interest Payable | 17,360,828.00 | | NIL |
| Unpaid Calls | 37,500.00 | | Uncertain |
| | | | 4,558.00 |
| | | | |
| LIABILITIES | | | |
| PREFERENTIAL CREDITORS:- | | | |
| | | | NIL |
| | | | 4,558.00 |
| | | | |
| DEBTS SECURED BY FLOATING CHARGES PRE 15 SEPTEMBER 2003 | | | |
| OTHER PRE 15 SEPTEMBER 2003 FLOATING CHARGE CREDITORS | | | |
| | | | NIL |
| | | | 4,558.00 |
| | | | |
| Estimated prescribed part of net property where applicable (to carry forward) | | | NIL |
| | | | 4,558.00 |
| DEBTS SECURED BY FLOATING CHARGES POST 14 SEPTEMBER 2003 | | | |
| | | | NIL |
| | | | 4,558 00 |
| | | | |
| Estimated prescribed part of net property where applicable (brought down) | | | NIL |
| | | | 4,558.00 |
| | | | |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | | | |
| Trade & Expense Creditors | 124,038.00 | | |
| Directors | 2,488,167.00 | | |
| Promissory Notes | 39,552,906.00 | | |
| | | | 42,165,111 00 |
| Estimated deficiency/surplus as regards non-preferential creditors | | | |
| (excluding any shortfall in respect of F.C's post 14 September 2003) | | | (42,160,553.00) |
| | | | (42,160,553.00) |
| | | | |
| Issued and called up capital | | | |
| Ordinary Shareholders | 12,500.00 | | |
| | | | 12,500.00 |
| **TOTAL SURPLUS/(DEFICIENCY)** | | | (42,173,053 00) |

**Kelmanson Insolvency Solutions**
**Privilege Wealth Plc**
**B - Company Creditors**

| Key | Name | Address | £ |
|-----|------|---------|---|
| CC01 | Richard Colwell | 47 Mardley Hill, Welwyn, AL6 0TT | 47,400.99 |
| CC02 | Caledonia Investments SL | Apdo de Correos 706, La Cala de Mijas, 29649 Mijas Costa, Malaga, Spain | 406,025.79 |
| CG00 | Gibson Talent | 1 Walford Road, North Holmwood, Dorking, Surrey, RH5 4JA | 2,976.61 |
| CH00 | Helix Investment Management SLP | 89e Park d'activites, L8308 CAPELLEN, Grand-Duchy of Luxembourg | 8,383,001.98 |
| CH01 | Horizon Projects SL | c/o 41 Copperfields, High Wycombe, Bucks, HP124AN | 887,582.16 |
| CK00 | Knill James Chartered Accountants | 1 Bell Lane, Lewes, East Sussex, BN7 1JU | 75,953 89 |
| CL00 | Lewis Silkin LLP | 5 Chancery Lane, Clifford's Inn, London, EC4A 1BL | 45,107 54 |
| CM00 | Martin Sampson | 11 Pheasant Walk, High Legh, Knutsford, WA16 6LU | 2,411,409 87 |
| CM01 | Mark Munnelly | 127 Beverley Road, Ruislip, HA4 9AP | 29,356 45 |
| CP00 | Privilege Wealth One LLP | 186 Main Street, Gibraltar, GX11 1AA | 28,440,125 36 |
| CP01 | Privilege Direct sa (Panama) | Torre 3000, Planta Baja y Mezzanine, Blvd. Pacifica, Punta Pacifica, Panama City, Panama | 943,059.88 |
| CS00 | Mr & Mrs Saint | 47 Empire Walk, Greenhitrhe, Kent, DA9 9FU | 493,110.62 |

| **12 Entries Totalling** | | | **42,165,111.14** |
|---|---|---|---|

Signature

IPS SQL Ver  2015.09

**Kelmanson Insolvency Solutions**
**Privilege Wealth Plc**
**C - Shareholders**

| Key | Name | Address | Type | Nominal Value | No. Of Shares | Called Up | Paid Up |
|-----|------|---------|------|---------------|---------------|-----------|---------|
| HB00 | Bowline Privte Fund (Cayman) L | DMS Corporate Services, DMS House 2nd Floor, 20 Genesis C | Ordinary | 10,000.00 | 10,000 | 0.00 | 2,500.00 |
| HM00 | Mr Mark Munnelly | 127 Beverley Road, Ruislip, HA4 9AP | Ordinary | 20,000.00 | 20,000 | 0.00 | 5,000 00 |
| HM01 | Mr Martin Sampson | 11 Pheasant Walk, High Legh, Knutsford, WA16 6LU | Ordinary | 15,000.00 | 15,000 | 0.00 | 3,750.00 |
| HT00 | Mr Tom Pawelek | | Ordinary | 5,000.00 | 5,000 | 0.00 | 1,250.00 |
| **4 Ordinary Entries Totalling** | | | | **12,500.00** | **50,000** | **0.00** | **12,500.00** |

Signature

Page 1 of 1                    IPS SQL Ver  2010                    01 February 2018 12 34

.    .

**Fees Information in accordance with The Insolvency (England and Wales) Rules 2016 and Statement of Insolvency Practice 9**

**Fees Overview**

Prior to an insolvency practitioner agreeing the basis of their remuneration as an Administrator, details of the work proposed to be done and the expenses it is considered will be, or are likely to be, incurred in dealing with a company's affairs must be provided to creditors.

In addition, where the Administrator proposes to take all or any part of this remuneration based on the time they and their staff will spend dealing with the affairs of the insolvent company, a **fees estimate** must also be provided. This will outline the anticipated cost of that work, how long it is anticipated the work will take and whether any further approvals may be needed from creditors in due course.

In this case, we are not proposing to agree the basis of our remuneration as Joint Administrators based on time spent dealing with the Company's affairs, therefore we are not required to provide creditors with a **fees estimate**. We are required to confirm the basis or bases we are seeking in the alternative, and details of the work proposed to be done in this case can be found below.

**Work anticipated and the likely return to creditors**

Some of the work undertaken by an insolvency practitioner is required by statute and may not necessarily provide a financial benefit to creditors. Examples of this work include investigations required by Statement of Insolvency Practice 2 and the Company Directors Disqualification Act 1986 or dealing with the claims of former employees via the National Insurance Fund.

Where the work to be done is anticipated to produce a financial benefit to creditors, this will be stated and it may be necessary for the Administrator to instruct third parties to assist in this process because of a particular expertise that the third party may bring such as valuation, tax or legal advice.

Where it is practical to do so, an Administrator will provide an indication of the likely return to creditors when seeking approval for the basis of his remuneration. Again due to the complex nature of the work undertaken by insolvency practitioners and the uncertainties that may exist in relation to the realisation of a company's assets at the outset of a case, this may not be possible. An Administrator is however, required by statute to provide periodic reports to creditors on the progress of a case which will include an update as to the likely return creditors may expect.

**Proposed Fee Basis/Bases**

In this case, due to the highly speculative nature of the appointment we are proposing the following bases for our remuneration as Joint Administrator:

1. That the Joint Administrators be authorised to draw 30% of total realisations, at the Joint Administrators discretion, as and when funds are available. This includes any assets which are not disclosed on the ESOA.

**Administration (including statutory compliance & reporting)**

Insolvency Practitioners are required to carry out certain tasks in nearly every insolvency assignment, namely administrative duties and dealing with the Company's creditors. Whilst these tasks are required by statute or regulatory guidance, or are necessary for the orderly conduct of the proceedings, they do not necessarily produce any direct financial benefit for creditors, but nonetheless still have to be carried out. This work may include:

- Notifying creditors of the Joint Administrators' appointment and other associated formalities including statutory advertising and filing relevant statutory notices at Companies House
- Preparing and issuing annual and final progress reports to members and creditors
- Lodging periodic returns with the Registrar of Companies for the administration
- Complying with statutory duties in respect of the Administrator's specific penalty bond
- Creation and update of case files on the firm's insolvency software
- Redirection of the Company's mail to one of the Joint Administrators office
- Establishing and holding periodic meetings of the committee and associated filing formalities (if a committee is appointed)
- Securing the Company's books and records
- Pension regulatory reporting and auto-enrolment cancellation
- Completion and filing of the notice of the Company's insolvency to HMRC
- Initial assessment required by Statement of Insolvency Practice 2 and the Company Directors Disqualification Act 1986 (CDDA) including the review of the Company's books and records and the identification of potential further asset realisations which may be pursued in the administration
- Initial investigations as required by the Company Directors Disqualification Act 1986 and Statement of Insolvency Practice 2
- Filing a statutory report to the Insolvency Service under the CDDA
- Periodic case progression reviews (typically at the end of Month 1 and every 6 months thereafter)
- Opening, maintaining and managing the administration estate cashbook and bank account(s)
- Dealing with all post-appointment VAT and corporation tax compliance
- Liaison with secured creditors, if any, obtaining charge documents and validating the security
- Dealing with employees, if any, to provide support and assistance in lodging any claims they may be entitled to make for unpaid wages, holiday pay and other statutory entitlements from the National Insurance Fund and the Company.  Liaising with (or appointing) union representatives and payroll providers and reviewing employment contracts as necessary
- Attending to correspondence and telephone calls with directors and shareholders
- Attending to correspondence and telephone calls with other interested parties including HM Revenue & Customs
- Closing the Administration and preparing and issuing the Administrators' final account to prescribed parties
- Attending to correspondence and telephone calls with creditors
- Recording and acknowledging creditors' claims

The Joint Administrators reserve the right to seek a further set amount in the event of a distribution to creditors to reflect the work carried out in relation to reviewing and adjudicating upon creditors' claims, issuing Notice(s) of Intended Dividend and declaring/issuing the dividend itself. Where applicable, a further fee resolution may be sought from creditors.

Based on the Director's Estimated Statement of Affairs values, this is currently estimated as uncertain due to the matters detailed below and in our report and will be subject to change dependent upon actual recoveries.

**Realisation of assets**

The Joint Administrators will seek to realise all of the Company's assets as outlined in the director(s) statement of affairs. Work done by the administrator, their staff and any third parties engaged to assist the administrators in realising the Company's assets will, if sufficient, provide a financial benefit to creditors. This may involve realising assets to facilitate a distribution to secured creditors of the Company only (from which a Prescribed Part fund may be derived for the benefit of unsecured creditors) or may, depending on realisations and the extent of any 3rd party security, result in a distribution to the preferential and/or unsecured creditors of the Company.  Further information on the likely outcome of the administration process will be provided in the administrator's subsequent progress reports.

In accordance with the assets listed in the Director's Estimated Statement of Affairs (or updated estimation of the Administrator), the anticipated percentage fees will be as follows;

| Asset | Likely Work Involved | Estimated to Realise (£) | Estimated % Fee (£) |
|---|---|---|---|
| Rosebud Lending – Collection of Loan Book | Correspondence with Tom Pawelek and his legal representatives to obtain loan book data and electronic information.<br><br>Work relating to joining of existing proceedings with Helix and Concord to obtain an account with a view to undertaking a full reconciliation. Correspondence with all parties subject to legal proceedings.<br><br>All matters relating to Helix and the security upon which they rely over this asset, including potential execution of a Settlement Agreement. UK Solicitor instruction.<br><br>Potential instruction of specialist in the United States to collect sums outstanding from loan book and all related matters.<br><br>Correspondence with Oliphant and related parties regarding any amounts collected to date.<br><br>All other work required to realise loan book, full details of which are not yet known to the Joint Administrators, due to the nature of the asset.<br><br>United States lawyer and UK Solicitor instruction likely. | Uncertain | 30% - uncertain |
| Rosebud Lending – Escrow Account | All work required pursuing Rosebud Lending and related parties for funds held in escrow, due to PWPLC / subsidiaries. Possible instruction of United States lawyer. | Uncertain | 30% - uncertain |
| Rosebud Lending – Carmel Solutions | Ongoing correspondence with Carmel Solutions and their lawyer regarding release of funds. All matters relating to Settlement Agreement. Potential instruction of solicitor. | Uncertain | 30% - uncertain |

| | | | |
|---|---|---|---|
| Rosebud Lending – Cash | Review and reconciliation of account of all funds paid and received. Communication with all relevant parties to obtain balance payable. | £5,373.60 | 30% - £1,612.08 |
| Cash held at lawyers | Correspondence with Berger Singerman in the United States | £11,562.76 | 30% - £3,468.83 |
| Oliphant | Work relating to joining of existing proceedings with Helix and Concord to obtain an account with a view to undertaking a full reconciliation. Correspondence with all parties subject to legal proceedings.<br><br>All matters relating to Helix and the security upon which they rely over this asset, including potential execution of a Settlement Agreement.<br><br>Liaison with Oliphant and related parties regarding any amounts collected to date.<br><br>All other work required to realise sums properly due to PWPLC, full details of which are not yet known to the Joint Administrators, due to the nature of the asset.<br><br>United States lawyer and UK Solicitor instruction likely. | Uncertain | 30% - uncertain |
| Director Loan Accounts | All work required perusing all three directors located abroad for sums perceived as due. Possible instruction of solicitor. | Uncertain | 30% - uncertain |
| Book Debts | Contact with all subsidiaries and liquidator where appropriate for sums due. Review of financial position of all subsidiaries and all related work required. Potential instruction of solicitor. | Uncertain | 30% - uncertain |
| Shares & Investments | As above, contact with relevant subsidiaries and liquidator where appropriate for sums due. Review of financial position of all subsidiaries and all related work required. Potential instruction of solicitor. | Uncertain | 30% - uncertain |
| Other Receivables | Review and reconciliation of all amounts perceived as due. Contact with appropriate parties. Potential instruction of solicitor. | Uncertain | 30% - uncertain |

| Unpaid Calls | Contact four relevant parties for sums due. Potential instruction of solicitor | Uncertain | 30% - uncertain |
|---|---|---|---|
| VAT Refund | Correspondence with HMRC | £2,352.80 | 30% - £705.84 |

The percentage is a reflection of the work required, the nature of the assets involved and the associated risks to realise the assets and provides a direct financial benefit to the administration estate. The percentage is an appropriate, reasonable and commensurate reflection on the work that the administrators anticipate will be necessarily and properly undertaken to realise such assets.

We have considered the costs of similar past assignments done by both firms and the proposed fee bases are in line with the time costs incurred on such cases in the past. It is therefore an appropriate, reasonable and commensurate reflection on the work that the Joint Administrators anticipate will be necessarily and properly undertaken. Creditors should also note and consider the comparison to the fee structure of The Insolvency Service as from 21 July 2016 in compulsory liquidations, where the Official Receiver's General Fee is £6,000, plus the company winding up administration fee of £5,000, plus a 15% charge for all assets realised by the Official Receiver acting as liquidator.

Creditors should be aware that in this particular case, the estimated realisations are largely unknown and are potentially spread across a number of jurisdictions with disputed beneficial ownership and therefore the Joint Administrators are assuming a high level of risk in terms of their proposed fee structure. It is due to this that the Joint Administrators consider this proposal to be fair for the Company's creditors and it is value for money for creditors.

Please note however, that in circumstances where my initial investigations reveal matters for further detailed investigation or previously unknown substantial assets to be realised, we reserve the right to refer back to creditors to establish how we are to be remunerated for such additional work, which may be proposed on a time cost basis. If such work proves necessary, we will revert to creditors with our fees estimate for approval.

**Creditors (claims and distributions)**

As Joint Administrators, we will deal with all secured, preferential and unsecured creditor correspondence and claims as received, including any claims of creditors under retention of title. An indication of the dividend prospects in this particular administration were included in the Directors' Statement of Affairs, which was provided at the meeting of creditors and made available to all known creditors shortly thereafter. This takes into consideration the costs of realising the assets and dealing with the statutory formalities of the administration process and the related costs and expenses. I will deal with the review and adjudication of creditors' claims as appropriate, if and when it is determined that a dividend is to be declared to that class of creditor. I will undertake appropriate investigations into and obtain valuations of, the Company's assets and will confirm the likely return to creditors in my first progress report.

**Investigations**

As Joint Administrators, I am required to conduct investigations into the conduct of the director(s) of the Company and transactions entered into prior to the Company's insolvency, as required by the Company Directors Disqualification Act 1986 and Statement of Insolvency Practice 2 (Investigations by Office Holders in Administrations and Insolvent Administrations). This work may not necessarily lead to any financial benefit to creditors yet is work I am required to undertake by statute. My initial investigations may reveal that further recoveries could be available for the insolvent estate and if this proves to be the case and I consider that further work will be required to pursue these assets, I will refer back to creditors about the likely costs involved in pursuing such recoveries.

**Anticipated Expenses**

As also noted, we are now required to provide creditors with details of the expenses we consider will be, or are likely to be, incurred in the Administration. These may include expenses such as agent's costs for assisting in the disposal and realisation of the company's physical assets or other routine expenses associated with an insolvency case such as statutory advertising costs or the office holder's specific penalty bond.

Below is a summary of the expenses we consider will be, or are likely to be, incurred in this case. We will provide a further update in my first progress report to creditors at the first Administration progress report which is due to be sent within one month of the first six months, if the case is concluded beforehand. In this case, it is anticipated that the following expenses will be incurred;

| Expense Type | Reason for Expense | Anticipated Cost (£) | Expected Basis of Expense |
|---|---|---|---|
| Statutory Advertising | Statutory requirement | | Set fee for all adverts |
| Statutory Bonding | Statutory requirement | | Scale rate dependant on asset levels |
| Agent's Fees | Valuation, negotiations and sale of assets | Uncertain | |
| | | | |
| Carriage & Archiving | Collect records, store records | £300 | Estimate only |
| Legal Fees | | Uncertain | |
| Court Fee | Filing of the documents | £50 | Set fee |
| Travel Costs | Travel to Meetings | £50 | Current best estimate |

All amounts are plus VAT where applicable.

It has not been possible to provide an estimate of the potential quantum of legal fees due to the highly speculative nature of this case at this early stage, with assets located in several jurisdictions and being subject to competing legal claims. Creditors will be update in this regard in the next report.

**Category 2 disbursements policy**

Category 2 disbursements require approval from creditors. These are costs which are directly referable to the appointment in question but are not payments which are made to an independent third party and may include shared or allocated costs that can be allocated to the appointment on a proper and reasonable basis such as internal room hire, document storage or business mileage. Any Category 2 disbursements which this firm proposes to charge in this case are reflected in the table of expenses above. Approval to charge these will be sought from creditors when the basis of our remuneration as Joint Administrators is fixed.

Details of Kelmanson Insolvency Solutions Category 2 disbursements recovered as follows:

| Expense | Recharge £ |
|---|---|
| Meeting room hire – per meeting | 125 00 |
| Storage – per box – per month (minimum 2 years) | 3 00 |
| Destruction of Books and Records – per box | 3 00 |
| Mileage at HMRC approved rate – per mile | 0 45 |
| Headed Paper (per sheet) | 0.25 |
| Photocopying (per sheet) | 0 06 |
| Envelopes (each) | 0 25 |

Details of David Rubin & Partners Limited Category 2 disbursements recovered are as follows:

| | |
|---|---|
| Headed paper | 25p per sheet |
| Photocopying | 6p per sheet |
| Envelopes | 25p each |
| Postage | Actual cost |
| Meeting room facility | £150 |

**Storage and Archiving Charges**

David Rubin & Partners Limited use a commercial archiving company for storage facilities for companies' records and papers. This is recharged to the estate at the rate of £10 per box per quarter, and includes a small charge to cover the administration costs of maintaining the archiving database and retrieval of documents. We also use our own personnel and vehicle for collection of books and records for which we charge £60 per hour.

**Travel**

Mileage incurred as a result of any necessary travelling is charged to the estate at HM Revenue & Customs approved rate, currently 45p per mile.

*EXHIBIT "2"*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

PRIVILEGE WEALTH ONE LIMITED                    Chapter 15
PARTNERSHIP

      Debtor in a Foreign Proceeding.                    Case No.:
_____/

**ORDER GRANTING RECOGNITION OF FOREIGN**
**MAIN PROCEEDING PURSUANT TO §§ 1515 AND 1517 OF**
**THE BANKRUPTCY CODE AND GRANTING RELATED RELIEF**

      This matter came on for hearing on _____, 2018 at _____ a.m./p.m.

("Hearing"), upon the Verified Motion for Order of Recognition of Foreign Main Proceeding

Pursuant to §§1515 and 1517 and Request for Hearing ("Verified Motion") [ECF No. 2] of Mr.

David Ingram (the "Joint Liquidator" or "Foreign Representative") of Privilege Wealth One Limited Partnership ("Gibraltar Proceeding" and "Debtor"), seeking recognition and related relief pursuant to Chapter 15 of the Bankruptcy Code, of the foreign bankruptcy proceeding of Debtor (the "Foreign Proceeding") pending before the Supreme Court of Gibraltar ("Gibraltar Court") in 32-36, Town Range, Gibraltar.  The Court, having considered the Verified Motion, its attachments, the Petition ("Petition") [ECF No. 1] the argument of counsel at the Hearing, and being otherwise duly informed, makes the following order.

The Court finds:

A.      Due and timely notice of the filing of the Chapter 15 Petition, Verified Motion and the Hearing was given by the Foreign Representative as directed by this Court.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

C.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410.

D.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

E.      David Ingram and Frederick David John White qualify as "foreign representatives" as defined in 11 U.S.C. §101(24).

F.      This Chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1515, 1517.

G.      Foreign Representative has met the requirements of 11 U.S.C. §§ 1515(b), 1515(c), 1515(d), and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

H.      The Gibraltar Proceeding is a foreign proceeding under 11 U.S.C. §§ 101(23) and 1502(4).

2

I.      The Foreign Proceeding is entitled to recognition by this Court under 11 U.S.C. § 1517.

J.      The Foreign Proceeding is pending in Gibraltar.  Debtor has its center of main interests in Gibraltar, and, accordingly, the Foreign Proceeding is a foreign main proceeding, under 11 U.S.C. § 1502(4), entitled to recognition as a foreign main proceeding under 11 U.S.C. § 1517(b)(1).

K.      Foreign Representative is entitled to all relief provided under 11 U.S.C. § 1520, without limitation.

L.      Foreign Representative is further entitled to the relief expressly set forth in 11 U.S.C. § 1521.

M.      The relief granted by this Order is necessary and appropriate, in the interests of public and international comity, consistent with the public policy of the United States, warranted pursuant to 11 U.S.C. § 1521 and will not cause any hardship to the creditors of Privilege Wealth One Limited Partnership, or other parties that is not outweighed by the benefits of the relief being granted.

Accordingly, it is ORDERED AND ADJUDGED that:

1.      The Gibraltar Proceeding is granted recognition as a "foreign main proceeding" under 11 U.S.C. § 1517.

2.      The Gibraltar Proceeding, including the orders of the Gibraltar Court commencing the Foreign Proceeding and appointing Mr. David Ingram and Mr. Frederick David John White as Joint Liquidators attached to the Chapter 15 Petition, shall be given full force and effect and be binding on and enforceable in the United States against all persons and entities.

3.      Foreign Representative is entrusted with the full administration and realization of all or a part of the Debtor's bankruptcy estate and assets within the territorial jurisdiction of the United States.

4.      Foreign Representative shall have the authority to act independently to carry out any of the duties and powers granted by this Order.

5.      The provisions of 11 U.S.C. § 1520 apply, without limitation, to this proceeding.

6.      All persons and entities are stayed from commencing or continuing any action or proceeding concerning the assets, rights, obligations or liabilities, of the Debtor or the Debtor's bankruptcy estate, located in the United States.

7.      All persons and entities are stayed from executing against the assets, of the Debtor or the Debtor's bankruptcy estate, located in the United States.

8.      All persons and entities are prohibited from transferring, encumbering or otherwise disposing of any assets, of the Debtor or the Debtor's bankruptcy estate, located in the United States.

9.      All persons and entities provided notice of the Chapter 15 Petition, Verified Motion and the Hearing thereon who are in possession, custody or control of property, or the proceeds thereof, of the Debtor or the Debtor's bankruptcy estate, located within the territorial jurisdiction of the United States, shall immediately advise Foreign Representative by written notice sent to the following addresses:

Attn: David Ingram
Frederick David John White
Grant Thornton UK LLP
30 Finsbury Square
London, EC2P 2YU

With a copy to:

>Attn: Edward H. Davis
>Leyza F. Blanco
>Sequor Law, P.A.
>1001 Brickell Bay Drive, 9th Floor
>Miami, Florida 33131

which written notice shall set forth: (i) the nature of such property or proceeds; (ii) when and how such property or proceeds came into the custody, possession or control of such person or entity; and (iii) the full identity and contact information for such person or entity.

10.     Foreign Representative is authorized to examine witnesses, take evidence or seek the delivery of information concerning the assets, affairs, rights, obligations or liabilities of the Debtor or the Debtor's bankruptcy estate pursuant to §1521(a)(4), the Federal Rules of Bankruptcy Procedure, including without limitation the procedure of Fed. R. Bankr. P. 2004 and Local Rule 2004-1, without further order of this Court.

11.     Foreign Representative is further authorized to operate and may exercise the powers of a trustee under, and to the extent provided by 11 U.S.C. §§ 363 and 552.

12.     This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this Chapter 15 case, and any request by any person or entity for relief from the provisions of this Order.

13.     This Court shall retain jurisdiction with respect to the administration, realization, and distribution of the assets of the Debtor within the territorial jurisdiction of the United States.

14.     Foreign Representative is directed to serve a true and correct copy of this Order in accordance with Rule 2002(q) of the Federal Rules of Bankruptcy Procedure.

15.    A motion to vacate or to dismiss this Order or otherwise object to recognition may be filed no later than the 60th day after the first date that any person or entity receives notice of this Order.

# # #

Submitted by:

Leyza F. Blanco, Esq.
SEQUOR LAW, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
edavis@sequorlaw.com
lblanco@sequorlaw.com
Telephone:    (305) 372-8282
Facsimile:    (305) 372-8202

Copies furnished to:
Leyza F. Blanco, Esq.

*(Attorney Blanco shall serve a conformed copy of the foregoing order upon all interested parties and file a Certificate of Service with this Court)*

6